IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JIANGSU JIASHENG PHOTOVOLTAIC TECHNOLOGY CO., LTD.,** *et al.,*<br>                    **Plaintiffs,**<br><br>                    v.<br>**UNITED STATES,**<br>                    **Defendant,**<br>                    **and**<br>**HANWHA SOLARONE (QUIDONG) CO., LTD.,** *et al.,*<br>                    **Defendant-Intervenors.** | Consol. Court No. 13-00012<br><br>Before: Hon. Donald C. Pogue, Chief Judge |

<u>ORDER</u>

Upon consideration of the motion of Petitioner-Plaintiff SolarWorld Industries America, Inc. ("SolarWorld") for judgment on the agency record, and all other papers and proceedings herein, it is hereby

**ORDERED** that SolarWorld's motion for judgment on the agency record is granted; and it is further

**ORDERED** that the Department of Commerce's determinations to: (1) value Changzhou Trina Solar Energy Co., Ltd.'s and Wuxi Suntech Power Co., Ltd.'s aluminum frames using a Thai Harmonized Tariff Schedule heading covering alloyed aluminum profiles; and (2) grant separate rates to a number of separate rate applicants, are unsupported by substantial record evidence and otherwise contrary to law; and it is further

Consol. Court No. 13-00012
Page 2

      **ORDERED** that this action is remanded to the Department of Commerce for proceedings consistent with this Court's opinion.

      **SO ORDERED.**

 

                                        _____

                                        Hon. Donald C. Pogue, Chief Judge

Dated:_____, 2013
        New York, New York

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JIANGSU JIASHENG PHOTOVOLTAIC TECHNOLOGY CO., LTD.,** *et al.,*<br><br>                                 **Plaintiffs,**<br><br>                        **v.**<br><br>**UNITED STATES,**<br><br>                                 **Defendant,**<br><br>                        **and**<br><br>**HANWHA SOLARONE (QUIDONG) CO., LTD.,** *et al.,*<br><br>                                 **Defendant-Intervenors.** | Consol. Court No. 13-00012<br><br>Before: Hon. Donald C. Pogue, Chief Judge |

### PETITIONER-PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to U.S. Court of International Trade Rule 56.2, Petitioner-Plaintiff SolarWorld Industries America, Inc. ("SolarWorld") hereby moves for judgment upon the agency record with respect to the final determination of the U.S. Department of Commerce ("the Department") in the investigation of *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China.* The Department's final determination was published in the *Federal Register* on October 17, 2012. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China,* 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) (final deter. of sales at less than fair value; affirm. final deter. of critical circumstances, in part); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China,* 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final deter. of sales at less than fair value; antidumping duty order).

Consol. Court No. 13-00012
Page 2

   SolarWorld respectfully moves, for the reasons explained in the accompanying brief, that this Court find that the Determent's determinations to: (1) value Changzhou Trina Solar Energy Co., Ltd.'s and Wuxi Suntech Power Co., Ltd.'s aluminum frames using a Thai Harmonized Tariff Schedule heading covering alloyed aluminum profiles; and (2) grant separate rates to a number of separate rate applicants, are unsupported by substantial record evidence and otherwise contrary to law. SolarWorld further moves that the Court remand these determinations to the Department for disposition consistent with the Court's final opinion.

Respectfully submitted,

Timothy C. Brightbill
Tessa V. Capeloto
Laura El-Sabaawi

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to SolarWorld Industries America, Inc.*

August 29, 2013

13636325.1

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JIANGSU JIASHENG PHOTOVOLTAIC TECHNOLOGY CO., LTD.,** *et al.,*<br><br>               **Plaintiffs,**<br><br>    v.<br><br>**UNITED STATES,**<br><br>            **Defendant,**<br><br>        and<br><br>**HANWHA SOLARONE (QUIDONG) CO., LTD.,** *et al.,*<br><br>          **Defendant-Intervenors.** | Consol. Court No. 13-00012<br><br>Before: Hon. Donald C. Pogue, Chief Judge<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Business Proprietary Information Has Been Removed from pages 2-3, 17, 34-35 and 38. |

## PETITIONER-PLAINTIFF'S BRIEF IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Timothy C. Brightbill, Esq.
Tessa V. Capeloto, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000

*Counsel to SolarWorld Industries America, Inc.*

August 30, 2013

**Table of Contents**

I.    INTRODUCTION ..................................................................................................... 1

II.   RULE 56.2 STATEMENT ......................................................................................... 1

      A.   Administrative Decision Under Review .................................................... 1

      B.   Issues of Law Presented ........................................................................... 1

III.  BACKGROUND ...................................................................................................... 2

      A.   Facts Relevant to Surrogate Value for Aluminum Frames .......................... 2

      B.   Facts Relevant to Separate Rates Determinations ..................................... 7

IV.   STANDARD OF REVIEW ......................................................................................... 8

V.    SUMMARY OF ARGUMENT ..................................................................................... 8

VI.   ARGUMENT ......................................................................................................... 9

      A.   The DOC's Decision to Value Trina's and Suntech's Aluminum Frames Using HTS
           7604 Is Not Supported By Substantial Evidence and Is Otherwise Contrary to Law ... 9

           1.   The DOC Improperly Failed to Rely on a Uniquely Dispositive CBP Ruling to
                Value Aluminum Frames .......................................................................... 10

           2.   The DOC Failed to Address Evidence Detracting from Its Conclusions .......... 15

           3.   The DOC Inappropriately Misconstrued HTS Subheading 7616.99 as Not
                Including Aluminum Alloy Products ......................................................... 21

      B.   The DOC's Determination to Grant Separate Rates to Certain Respondents Was Not
           Supported by Substantial Evidence and Was Otherwise Not in Accordance with Law 21

           1.   Legal Framework .................................................................................... 22

           2.   The DOC Improperly Granted Separate Rates to Applicants that Are SASAC-
                Owned and that Withheld Ownership Information ...................................... 23

           3.   The DOC Improperly Found an Absence of *De Facto* Government Control with
                Regard to Separate Rate Applicants Controlled by Members of the CPC, NPC,
                and/or the CPPCC .................................................................................. 36

           4.   Conclusion ............................................................................................ 40

VII.  CONCLUSION ..................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Advanced Technology & Materials Co., Ltd. v. United States,*
    885 F. Supp. 2d 1343 (CIT 2012) ..................................................................*passim*

*Altx, Inc. v. United States,*
    370 F.3d 1108 (Fed. Cir. 2004) ...............................................................................31

*Anshan Iron & Steel Co. v. United States,*
    27 C.I.T. 1234 (2003) ..............................................................................................10

*Atar, S.r.L. v. United States,*
    33 Int'l Trade Rep. (BNA) 1689 (Ct. Int'l Trade 2011) ..........................................13

*Atlantic Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ...............................................................................39

*Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States,*
    880 F. Supp. 2d 1348 (Ct Int'l Trade 2012) ......................................................12, 20

*Citrosuco Paulista, S.A. v. United States,*
    12 C.I.T. 1196 (1988) ..............................................................................................26

*Diversified Products Corp. v. United States,*
    6 C.I.T. 155 (1983) ..................................................................................................20

*Hynix Semiconductor Inc. v. United States,*
    29 C.I.T. 995, 391 F.Supp. 2d 1337 (2005) .............................................................20

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................................10, 13, 39

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ...............................................................................10

*Shanghai Foreign Trade Enters. Co. v. United States,*
    28 C.I.T. 480 (2004) ................................................................................................26

*Sigma Corp. v. United States,*
    117 F.3d 1401 (Fed. Cir. 1997) ..........................................................................22, 25

*SKF U.S.A. Inc. v. United States,*
    630 F.3d 1365 (Fed. Cir. 2011) ...............................................................................13

*Tianjin Mach. Import & Export Corp. United States,*
    16 C.I.T. 931 (1992) ................................................................................................25

*Zenith Electronics Corp. v. United States,*
   988 F.2d 1573 (Fed. Cir. 1993) ................................................................23

**FEDERAL STATUTES**

19 U.S.C. § 1516a(b)(1) ...........................................................................8

19 U.S.C. § 1677b(c)(1) ...................................................................9, 11, 12

**REGULATIONS**

19 C.F.R. §§ 177.8, 177.9.........................................................................10

**ADMINISTRATIVE MATERIALS**

*Bicycles from the People's Republic of China,* 61 Fed. Reg. 19,026 (Dep't Commerce
   Apr. 30, 1996)......................................................................................22

CBP Ruling HQ 085421 (Sept. 21, 1989) ...................................................21

CBP Ruling NY 19 B86759 (July 10, 1997) ................................................21

CBP Ruling NY 890892 (Oct. 12, 1993).....................................................14

CBP Ruling NY A85502 (Nov. 25, 1996).....................................................14

CBP Ruling NY B84848 (Aug. 1, 1997).......................................................14

CBP Ruling NY G82995 (Oct. 12, 2000).....................................................21

CBP Ruling NY K84014 (Mar. 25, 2004).....................................................14

*Certain Cut-to-Length Carbon Steel Plate from Ukraine,* 62 Fed. Reg. 61,754, 61,579
   (Dep't Commerce Nov. 19, 1997)..............................................................23

*Certain Frozen Warmwater Shrimp from the People's Republic of China,* 72 Fed. Reg.
   72,668 (Dep't Commerce Dec. 21, 2007) ...................................................26

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the
   People's Republic of China,* 77 Fed. Reg. 31,309 (Dep't Commerce May 25, 2012).....*passim*

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the
   People's Republic of China,* 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012)......*passim*

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the
   People's Republic of China,* 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012)................1

*Freshwater Crawfish Tail Meat from the People's Republic of China,* 76 Fed. Reg.
   62,349 (Dep't Commerce Oct. 7, 2011) .......................................................12

*Magnesium Metal From the People's Republic of China*, 75 Fed. Reg. 65,450 (Dep't Commerce Oct. 25, 2010) .................................................................................... 12

*Porcelain-on-Steel Cooking Ware from the People's Republic of China,* 71 Fed. Reg. 24,641 (Dep't Commerce Apr. 26, 2006) ........................................................... 26

*Silicon Carbide From the People's Republic of China,* 59 Fed. Reg. 22,585 (Dep't Commerce May 2, 1994) ......................................................................................... 22

*Sodium Hexametaphosphate From the People's Republic of China*, 75 Fed. Reg. 64,695 (Dep't Commerce Oct. 20, 2010) ........................................................................... 12

*Wooden Bedroom Furniture from the People's Republic of China*, 75 Fed. Reg. 50,992 (Dep't Commerce Aug. 18, 2010) .......................................................................... 12

**NON-CONFIDENTIAL VERSION**
                                           *Business Proprietary Information Has Been Deleted*

## I.   INTRODUCTION

On behalf of SolarWorld Industries America, Inc. ("SolarWorld"), we submit the

following brief in support of SolarWorld's Rule 56.2 motion for judgment on the agency record.

## II.   RULE 56.2 STATEMENT

### A.   Administrative Decision Under Review

The administrative determination challenged in this case is the final determination of the

U.S. Department of Commerce ("the DOC") in *Crystalline Silicon Photovoltaic Cells, Whether*

*or Not Assembled into Modules, from the People's Republic of China* ("*CSPV from China*"), 77

Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) (final deter. of sales at less than fair value,

and affirm. final deter. of critical circum., in part), PR 1432 ("Final Determination").[1]   An

amended final determination and antidumping duty order were published on December 7, 2012.

*CSPV from China*, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final deter. of

sales at less than fair value, and antidumping duty order), PR 1417.

### B.   Issues of Law Presented

1. Whether the DOC's decision to value Changzhou Trina Solar Energy Co., Ltd.'s ("Trina") and Wuxi Suntech Power Co., Ltd.'s ("Suntech") aluminum frames using a Thai Harmonized Tariff Schedule ("HTS") heading covering alloyed aluminum profiles, HTS 7604, is not supported by substantial evidence on the record and is otherwise not in accordance with law, given that substantial evidence indicates that solar module aluminum frames are classified under a different HTS heading, HTS 7616, including a U.S. Customs Border Protection ("CBP") Ruling requested by Suntech only three months prior to the start of the period of investigation ("POI") for the precise input in question.

2. Whether the DOC's decision to grant separate rates to a number of separate rate applicants is not supported by substantial evidence on the record and is otherwise not in accordance with law, given the significant record evidence of *de jure* and *de facto* government control over the companies.

---

[1]      In this brief, documents contained in the public administrative record are identified by name and date, followed by "PR," followed by the corresponding administrative record number. Documents contained in the confidential administrative record are identified by name and date, followed by "CR," followed by the corresponding administrative record number.

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

## III.   BACKGROUND

### A.   Facts Relevant to Surrogate Value for Aluminum Frames

Prior to the DOC's investigation of *CSPV from China*, Suntech requested that CBP issue a HTS classification ruling on "extruded aluminum frames for solar panels." Letter from Wiley Rein LLP to Sec'y Commerce, re: *CSPV from China: Comments on Trina's Second Supplemental Surrogate Questionnaire Response* (Apr. 20, 2012), PR 1036, at Ex. 1 (Customs Ruling N139353, Jan. 13, 2011) ("Comments on Trina's QR"). On January 13, 2011, *i.e.*, only three months prior to the POI, CBP issued its ruling. Based on the aluminum frame description provided by Suntech, CBP ruled that "{t}he applicable subheading for the aluminum frames for solar panels will be *7616.99.5090*, {HTS}, which provides for other articles of aluminum, other...other. The rate of duty will be 2.5 percent ad valorem." *Id.*

On December 9, 2011, the DOC issued a questionnaire to Trina and Suntech, including a section on surrogate values requiring each respondent to "identify the U.S. HTS sub-heading number under which the input would be classified." *See, e.g.,* Letter from Dep't Commerce to Mayer Brown LLP, re: *CSPV from China* (Dec. 9, 2011), PR 247, at Appendix XI. In their January 2012 responses, both Suntech and Trina reported a U.S. HTS classification for aluminum frames used in their solar module production. Consistent with the CBP ruling, Suntech classified its aluminum frames under HTS 7616.99, a subheading pertaining to "Other articles of aluminum: Other." Letter from Mayer Brown LLP to Sec'y Commerce, re: *CSPV from China: Questions 1 & 3 of the Surrogate Value Additional Questions in the Section A Questionnaire – Response of Wuxi Suntech Power Co., Ltd.* (Jan. 18, 2012), PR 537, CR 574, at Ex. 1 ("Suntech QR"). Trina classified its [

], Letter from Arent Fox LLP to Sec'y Commerce, re: *CSPV from*

**NON-CONFIDENTIAL VERSION**
                                  *Business Proprietary Information Has Been Deleted*

*China: Section A Questionnaire Response – Surrogate Questions* (Jan. 17, 2012), PR 478, CR

442, at Ex. 1.

Shortly thereafter, in February 2012, the parties to the proceeding submitted proposed

surrogate values for the DOC's non-market economy ("NME") factors of production analysis.

SolarWorld recommended that the DOC value [


]. Letter from Wiley Rein LLP to Sec'y Commerce, re: *CSPV from China: Comments*

*on Surrogate Country and Initial Proposed Surrogate Values for the Preliminary Determination*

(Feb. 21, 2012), PR 732, CR 772, at Ex. 4.    Suntech continued to advocate for HTS number

7616.99.  Letter from Mayer Brown LLP to Sec'y Commerce, re: *CSPV from China: Comments*

*of Wuxi Suntech Power Co., Ltd. – Surrogate Country and Surrogate Value Selection* (Feb. 21,

2012), PR 722, at Ex. 1 ("Suntech Surrogate Country and SV Selection").    Trina, however,

changed its position and instead proposed HTS number 7610.9090, which pertains to items such

as bridge sections, roofs, pillars, columns and balustrades.  Letter from Arent Fox LLP to Sec'y

Commerce, re: *CSPV from China: Comments on Surrogate Values* (Feb. 21, 2012) at Ex. 2, PR

694.

On April 5, 2012, the DOC issued a supplemental surrogate questionnaire to Trina,

seeking further surrogate value information.  In many questions, the DOC provided examples of

CBP rulings that provided guidance on the relevant material input's valuation.  Letter from the

DOC to Arent Fox LLP, re: *CSPV from China: Second Surrogate Value Supplemental*

*Questionnaire* (April 5, 2012), PR 935, at 1 ("Second SV Supplemental Questionnaire").  For

example, the DOC cited CBP Ruling A87702 with regard to whether silicon dioxide is properly

classified under HTS number 2811.21.1000. *Id.* at 4.

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

With respect to aluminum frames, the DOC inquired as to whether HTS heading 7604 was the correct heading for Trina's aluminum frames if they were hollow profiles and, if not, whether HTS subheading 7610.90 was appropriate. *Id.* at 3. Trina responded that the company "and the DOC are in agreement that aluminum frames should be classified under HTS 7610.90." *See* Letter from Arent Fox LLP to Sec'y Commerce, re: *CSPV from China: Second Supplemental Surrogate Questionnaire Response of Changzhou Trina Solar Energy Co., Ltd.* (Apr. 18, 2012), PR 1015, CR 1065, at 1 ("Trina 2d Surrogate QR"). Trina itself reaffirmed this point twice, in two separate submissions. *See* Letter from Arent Fox LLP to Sec'y Commerce, re: *CSPV from China: Comments regarding the use of India or Thailand as Potential Surrogate Countries* at 12 (Apr. 19, 2012), PR 1021, CR 1096; Letter from Arent Fox LLP to Sec'y Commerce, re: *CSPV from China: Response to Petitioner's Letter of April 20, 2012* (Apr. 26, 2013) at 3, PR 1090.

In its April 2012 surrogate value submissions, SolarWorld argued that the classification of aluminum frames under HTS heading 7610 was improper. *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *CSPV from China: Comments on Surrogate Country and Initial Proposed Surrogate Values for the Preliminary Determination* (Apr. 12, 2012) at 18-20, Ex. 14, PR 1038, 1040, CR 985, 987; Comments on Trina's QR at 2-5. SolarWorld explained that "CBP has already addressed the issue of frames for solar modules and has found them to be properly classifiable under HTS heading 7616." *See* Comments on Trina's QR at 2-5.

Despite the definitive CBP ruling and its earlier submissions claiming that its aluminum frames are classified under HTS number 7616.99, Suntech in its April 25, 2012 surrogate value submission, criticized the use of this Thai HTS number, claiming that the average unit value for this input was "aberrationally high." *See* Letter from Mayer Brown LLP to Sec'y Commerce, re: *CSPV from China: Comments of Wuxi Suntech Power CO., Ltd. – Surrogate Country and*

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

*Surrogate Value Selection for Aluminum Frames* (Apr. 25, 2012), PR 1083, CR 1156, at 1-4

("Suntech April 25 Letter").  However, Suntech did not address the merits of Thai HTS number

7616.99, nor did it acknowledge the existence of its CBP ruling request.

In its Preliminary Determination, the DOC declined to use Thai HTS number

7616.99.90090, reasoning that it is not bound by U.S. customs rulings for U.S. imports and that

7616.99 is an "other" heading that could reflect imports of a number of products.  Memorandum

from Jeff Pedersen, International Trade Compliance Analyst, AD/CVD Operations, Office 4, to

The File, re: *CSPV from China: Factor Valuation Memorandum* (May 16, 2012), PR 1194, at 3

("Prelim. SV Memo").   Instead, the DOC selected Thai HTS 7610.10, explaining that this

subheading includes "aluminum window frames," which are "structurally similar to the frames

used in modules."  *Id.*

On July 9, 2012, *i.e.*, more than nine months after initiation and mere months before the

DOC's Final Determination, both Suntech and Trina placed on the record for the first time

import data for Thai HTS 7604.29.90001.  *See* Letter from Arent Fox LLP to Sec'y Commerce,

re: *CSPV from China: Additional Surrogate Information* (July 9, 2012), PR 1267, at Ex. 1

("Trina Additional SV Information"); Letter from Mayer Brown LLP to Sec'y Commerce, re:

*CSPV from China: Additional SV Information* (July 9, 2012), PR 1281, at Ex. 2.

In its July 30, 2012 case brief, SolarWorld put forth extensive evidence indicating that

Thai HTS 7616.99.90090 is the appropriate HTS for valuing aluminum frames.  *See* Letter from

Wiley Rein LLP to Sec'y Commerce, re: *CSPV from China: Case Brief on General Issues* (July

30, 2012), PR 1351-52, CR 1562-64, at 35-54 ("Case Br."). SolarWorld argued that it was

unreasonable for the DOC not to rely on CBP's ruling valuing Suntech's aluminum frames under

HTS 7616.99, given that that the ruling was requested by a mandatory respondent, for the precise

**NON-CONFIDENTIAL VERSION**
                                                    *Business Proprietary Information Has Been Deleted*

input in question, only three months prior to the start of the POI. Further, the agency relied on

CBP rulings to value several other inputs at issue in the investigation. *Id.* at 44-48. SolarWorld

also asserted that, consistent with the DOC's precedent, Thai HTS 7616.99 is not aberrational.

*Id.* at 48-53.

In its rebuttal brief, SolarWorld argued that the mandatory respondents' most recently

proffered HTS heading, HTS 7604, was entirely inappropriate. *See* Letter from Wiley Rein LLP

to Sec'y Commerce, re: *CSPV from China: Rebuttal Brief on General Issues* (Aug. 6, 2012), PR

1367, CR 1571, at 48-58 ("Rebuttal Br."). As SolarWorld noted, while HTS 7604 consists of

"base level aluminum inputs that require further processing or manufacturing before they are

ready for final use" and encompasses products that have "uniform shape and cross section along

the whole length of the profile," aluminum frames for solar modules are "fabricated frames of

non-uniform cross section and contain examples of mitering, working, processing, grooving, and

other processing." *Id.* at 57.

On October 17, 2012, the DOC issued its Final Determination, abandoning its

Preliminary Determination and deciding to use Thai HTS 7604.29.9001, "aluminum alloy

profiles, other than hollow profiles...other profiles" to value Trina's aluminum frames and Thai

HTS 7604.21, "aluminum alloy hollow profiles," to value Suntech's aluminum frames.

Memorandum from Christian Marsh, Deputy Assistant Sec'y, to Paul Piquado, Assistant Sec'y,

re: *I&D Memo for the Final Deter. in the Antidumping Duty Invest. of CSPV from China* (Oct. 9,

2012), PR 1397, at cmt. 16 ("I&D Memo"). While recognizing that these HTS categories are

"basket categories," the DOC reasoned that they are consistent with the respondents'

descriptions of their aluminum frames. *Id.* Moreover, the DOC stated that it was not bound by

**NON-CONFIDENTIAL VERSION**
                                                    *Business Proprietary Information Has Been Deleted*

CBP rulings, and whether or not the respondents' aluminum frames were finished articles was

not relevant to its decision. *Id.*

### B.  Facts Relevant to Separate Rates Determinations

The DOC considers China to be a NME. *See CSPV from China*, 77 Fed. Reg. 31,309,

31,313 (Dep't Commerce May 25, 2012), PR 1431 ("Prelim."). Consequently, all companies

within China are presumed to be controlled by the government. *Id.* at 31,315. Companies that

wish to be considered separately from the PRC-wide entity must provide information to

demonstrate that they are free of both *de jure* and *de facto* governmental control. *See, e.g., id.*

During the investigation, 68 Chinese companies applied for a separate rate. Final

Determination, 77 Fed. Reg. at 63,794. Throughout the investigation, SolarWorld provided

significant evidence and argument to the DOC, demonstrating that many of the separate rate

applicants had failed to rebut the presumption of *de jure* and/or *de facto* government control.

*See, e.g.*, Letter from Wiley Rein LLP to Sec'y Commerce, re: *CSPV from China: Comments on*

*Separate Rate Application Responses* (Mar. 29, 2012), PR 911-14, CR 973-80 ("*SolarWorld's*

*March 2012 Separate Rates Comments*"). However, in the Preliminary Determination, the DOC

granted a separate rate to all but three of the companies that submitted a separate rate application

and shipped subject merchandise to the United States.[2] Prelim., 77 Fed. Reg. at 31,316-17. In its

case brief to the agency, SolarWorld again advanced significant evidence and argument to show

that a number of the companies to whom the DOC had preliminarily granted a separate rate had

---

[2]       The DOC properly denied a separate rate to Jiangsu Jiasheng Photovoltaic Technology
Co., Ltd. because it failed to submit a timely response to the quantity and value questionnaire.
The DOC also denied the separate rate applications of Jiangyin Hareon and Wuxi Taichen
Machinery & Equipment Co., Ltd. because they failed to submit timely responses to the
supplemental separate rate questionnaire. Six other companies were denied a separate rate
because they did not sell subject product during the POI.

in fact not rebutted the presumption of *de jure* and/or *de facto* government control. *See* Case Br., PR 1351, CR 1562.

Despite this evidence, in its Final Determination, the DOC continued to find that the Separate Rate Applicants that were granted separate rate status in the Preliminary Determination demonstrate{d} both *de jure* and *de facto* absence of government control.[3] Final Determination, 77 Fed. Reg. at 63,794.

## IV.   STANDARD OF REVIEW

The Court reviews the DOC's determination in an antidumping duty investigation to determine whether it is supported by substantial evidence on the record and is otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1).

## V.   SUMMARY OF ARGUMENT

The DOC's determination to value Trina's and Suntech's aluminum frames using Thai HTS 7604 is not supported by substantial evidence and is contrary to law. In rendering this determination, the DOC ignored a uniquely dispositive CBP ruling classifying Suntech's aluminum frames under HTS number 7616.99. In addition, the agency failed to address

---

[3]    The companies to which the DOC improperly granted a separate rate are: Trina; Chint Solar (Zhejiang) Co., Ltd. ("Chint Solar"); Shanghai BYD Company Limited ("Shanghai BYD"); Hanwha Solarone (Qidong) Co., Ltd. ("Solarone Qidong"); Hanwha Solarone Hong Kong Limited ("Solarone Hong Kong"); Motech (Suzhou) Renewable Energy Co., Ltd. ("Motech"); tenKsolar (Shanghai) Co., Ltd. ("tenKsolar"); Zhejiang Jiutai New Energy Co., Ltd. ("Zhejiang Jiutai"); CEEG (Shanghai) Solar Science Technology Co., Ltd. ("CEEG Shanghai"); Jetison Solar (China) Co., Ltd. ("Jetison Solar"); CSG PV Tech Co., Ltd. ("CSG PV"); CEEG Nanjing Renewable Energy Co., Ltd. ("CEEG Nanjing"); Ningbo Komaes Solar Technology Co., Ltd. ("Ningbo Komaes"); China Sunergy (Nanjing) Co., Ltd. ("China Sunenergy"); Sumec Hardware & Tools Co., Ltd. ("Sumec Hardware"); Tianwei New Energy (Chengdu) PV Module Co., Ltd. ("Tianwei New Energy"); Ningbo ETDZ Holdings Ltd. ("Ningbo ETDZ"); Dongfang Electric (Yixing) MAGI Solar Power Technology ("Dongfang Electric"); JA Solar Technology Yangzhou Co., Ltd. ("JA Solar"); Shanghai JA Solar Technology Co., Ltd. ("Shanghai JA Solar"); JingAo Solar Co., Ltd. ("JingAo"); Ningbo Qixin Solar Electrical Appliance Co., Ltd. ("Ningbo Qixin"); Jiawei Solarchina (Wuhan) Co., Ltd. ("Jiawei Solarchina"); Jiangyin Hareon Power Co., Ltd. ("Jiangyin Hareon"); ET Solar Industry Limited ("ET Solar"); Yingli Energy (China) Company Limited ("Yingli"); Baoding Tianwei Yingli New Energy Resources Co., Ltd. ("Baoding Tianwei"); Green Energy Holding Company Limited ("Green Energy"); Eopolly New Energy Technology Co., Ltd. ("Eopolly"); Konca Solar Cell Co., Ltd. ("Konca"); and LDK Solar Co., Ltd. ("LDK").

significant record evidence placed on the record by SolarWorld indicating that HTS 7404 did not cover the aluminum frames used by Trina and Suntech in their production of solar modules, and that HTS 7616 was the most appropriate HTS number to value these frames. Finally, the DOC inappropriately misconstrued HTS subheading 7616.99 as not including aluminum alloy products. As a result, the DOC's valuation of aluminum frames for solar modules should be remanded to the agency.

The DOC's determination to grant separate rates to a number of separate rate applicants, including those owned by SASAC, those which did not provide their ownership information, and those which are controlled by members of the NPC, CPC and/or CPPCC, is also unsupported by substantial evidence and otherwise contrary to law. These separate rate applicants failed to rebut the presumption of *de jure* and *de facto* government control. In addition, the DOC failed to address arguments and evidence presented by SolarWorld on the propriety of granting separate rates to certain companies, and failed to adequately explain its determination to grant nearly every applicant a separate rate.

## VI.   ARGUMENT

### A.   The DOC's Decision to Value Trina's and Suntech's Aluminum Frames Using HTS 7604 Is Not Supported By Substantial Evidence and Is Otherwise Contrary to Law

Pursuant to 19 U.S.C. § 1677b(c)(1), in valuing factors of production, the DOC must use the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate." The DOC's practice when selecting surrogate values is "to select, to the extent practicable, {surrogate values} which are publicly available, *product-specific*, representative of a broad market average, tax-exclusive, and contemporaneous with the POI." Memorandum to the File from Jeff Pedersen, re: *CSPV from China: Factor Valuation Memorandum* (Oct. 9, 2012), PR 1404, at 2 ("Factor Valuation Memo") (emphasis added).

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

While the agency enjoys broad discretion in selecting surrogate values, *Anshan Iron & Steel Co.*

*v. United States*, 27 C.I.T. 1234, 1246 (2003), its decision must be reasonable given the record as

a whole and it must articulate a satisfactory explanation for its action, including a "rational

connection between the facts found and the choices made." *See Nippon Steel Corp. v. United*

*States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  As detailed below, the DOC's decision to

value Trina's and Suntech's aluminum frames for solar modules using HTS 7604 is unreasonable

and contrary to law.

> **1.      The DOC Improperly Failed to Rely on a Uniquely Dispositive CBP**
> **Ruling to Value Aluminum Frames**

CBP is considered the authoritative source when questions arise regarding classification

of goods.  Requests for classification rulings result in binding letter rulings, which require an

importer to import the same good utilizing the tariff heading that CBP determines to be correct.

*See* 19 C.F.R. §§ 177.8, 177.9.  In this case, CBP found, based on evidence provided by Suntech,

and requested only three months prior to the start of the POI, that HTS 7616.99.5090 is the

correct heading for aluminum frames used in the production of solar modules.  The DOC's

failure to rely on this ruling in valuing the mandatory respondents' aluminum frames renders the

agency's decision unsupported by substantial evidence and contrary to law.

Specifically, on December 20, 2010, Suntech requested that CBP issue an HTS

classification ruling on "extruded aluminum frames for solar panels" from China. *Comments on*

*Trina's QR* at Ex. 1.  In its January 13, 2011, ruling, CBP summarized Suntech's request as

follows:

> The merchandise is described in your letter as extruded frames for solar panels.
> You indicated that the frames are cut to lengths of 992 mm and 1965 mm. You
> stated that the frames under consideration are "punched and notched with the ends
> of the extrusion being mitered. Corner keys are inserted in the small frame

NON-CONFIDENTIAL VERSION
*Business Proprietary Information Has Been Deleted*

extrusion and the ends of the large frames are opened to receive the corners keys. There is no further processing to the aluminum frames. They are just snapped together."

*Id.* Based on Suntech's aluminum frames description, CBP ruled that "{t}he applicable subheading for the aluminum frames for solar panels will be *7616.99.5090*, {HTS} of the United States ("HTSUS"), which provides for other articles of aluminum, other...other." *Id.* Notably, HTS 7616.99 is the same HTS heading that Suntech itself initially proposed to value its aluminum frames. Suntech QR at Ex. 1; Suntech Surrogate Country and SV Selection at Ex. 1.

Despite this evidence, the DOC ignored CBP's definitive ruling for purposes of valuing the aluminum frames. The DOC said that the agency "is not bound by rulings for U.S. imports when selecting import values from surrogate countries, but instead must select a value using the best available information." I&D Memo at cmt. 16; *see also* 19 U.S.C. § 1677b(c)(1). The DOC further maintained that "there was no explanation in the CBP ruling obtained by Wuxi Suntech as to why the frames should be classified under HTS heading 7616.99" and that the agency was therefore unable "to weigh the ruling against record evidence supporting the use of a HTS heading different from the one identified in the ruling." *Id.* Instead of valuing Trina's and Suntech's aluminum frames using HTS 7616.99 – the heading initially proposed by Suntech and confirmed by CBP to be the most appropriate – the DOC selected HTS 7604, covering alloyed aluminum profiles.

The DOC's decision not to rely on the CBP ruling requested by Suntech is flawed for several reasons. As an initial matter, the CBP ruling should have been dispositive for determining the proper classification. The ruling covered aluminum frames used in solar module production – *i.e.,* the *exact product* used in the production of subject merchandise. Moreover, the ruling was requested by Suntech, a mandatory respondent in the investigation, which requested the ruling merely three months prior to the POI. As a ruling requested by a respondent

**NON-CONFIDENTIAL VERSION**
                                                       *Business Proprietary Information Has Been Deleted*

for the precise product at issue, CBP's ruling was unquestionably the "best information available" on the record for valuing aluminum frames.  19 U.S.C. § 1677b(c)(1).  By rejecting it, therefore, the DOC ignored the statutory requirement that it rely on the "best information available" to value factors of production.  *Id.*  In fact, SolarWorld is not aware of *any other case* where, as here, the agency rejected a CBP ruling for a tariff classification that was requested by a mandatory respondent for the exact input in question.  Accordingly, although the DOC may not have been bound by CBP's aluminum frames ruling, as the agency itself acknowledges, it must "select a value using the best available information."  *Id.*  Given the uniquely dispositive nature of this ruling, the DOC erred in not relying on the ruling as the "best available information" that Trina's and Suntech's aluminum frames are properly classified under HTS 7616.99.  *See id.*  As this Court has found, the DOC "must make data choices that a reasonable mind could find to be the best available on the record."  *See Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States,* 880 F. Supp. 2d 1348, 1361 (Ct Int'l Trade 2012).

In addition, the DOC failed to adequately explain its deviation from its practice of relying on CBP rulings in this case.[4]  The DOC continually relied on CBP rulings in selecting other import values during the investigation.  For example, in its March 16, 2012 questionnaire to Trina, the DOC repeatedly cited to several CBP tariff classification rulings in connection with its

---

[4]      Notably, the DOC regularly relies on CBP rulings, and has done so in other cases where the facts were less compelling than in the instant case (*i.e.*, in cases where the CBP rulings were not requested by a mandatory respondent for the precise input in question).  *See, e.g.*, Issues and Decision Memorandum accompanying *Magnesium Metal From the People's Republic of China,* 75 Fed. Reg. 65,450 (Dep't Commerce Oct. 25, 2010) (final) at cmt. 10 (citing Customs Ruling HQ 961439); Issues and Decision Memorandum accompanying *Sodium Hexametaphosphate From the People's Republic of China,* 75 Fed. Reg. 64,695 (Dep't Commerce Oct. 20, 2010) (final) at cmt. 3 (relying on a Customs Ruling for HTS 2835.39.00); Issues and Decision Memorandum accompanying *Wooden Bedroom Furniture from the People's Republic of China,* 75 Fed. Reg. 50,992 (Dep't Commerce Aug. 18, 2010) (final) at cmt. 7 (citing Customs Ruling HQ 965594).

assessment of surrogate values. Letter from Dep't Commerce to Arent Fox LLP, re: *Surrogate Value Supplemental Questionnaire in CSPV from China* (Mar. 16, 2012), PR 874, at 1-3 ("DOC Supp. Surrogate Questionnaire"); *see also* Trina 2d Surrogate QR at 3-6, 11. Specifically, the DOC sought clarification regarding solar junction boxes (CBP ruling NY N047162); silane (CBP ruling NY B84848); phosphorus oxychloride (CBP ruling NY 890892); silicon dioxide (CBP ruling A87702); steel buckles (CBP ruling NY E87517); polyvinyl chloride boxes (CBP ruling NY K84014); labels (CBP ruling NY K88961); and sand (CBP rulings NY A84999 and NY N021132). *See id.* In its Final Determination, the agency used the HTS subheading enumerated in the CBP ruling for each of these inputs. *Compare* Prelim. SV Memo at Attachment XIV *with* Factor Valuation Memo at 3. The DOC also relied on a CBP ruling to value suspension (CBP ruling N169383). *See* I&D Memo at cmt. 25; *see also* Trina Additional SV Information at Ex. 9; Letter from Mayer Brown LLP to Sec'y Commerce, re: *CSPV from China: Additional SV Information* (July 9, 2012), PR 1281, at Ex. 2. Nonetheless, the DOC declined to rely on the CBP ruling for aluminum frames, which was requested by a mandatory respondent for the precise input in question.

Although the DOC is permitted to deviate from its practice, it is "well-established" that it must provide a reasoned explanation for doing so. *Atar, S.r.L. v. United States*, 33 Int'l Trade Rep. (BNA) 1689 (Ct. Int'l Trade 2011) (*discussing SKF U.S.A. Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011)); *see also Motor Vehicle Mfrs. Ass'n of the United States, Inc.*, 463 U.S. 29. Here, the DOC failed entirely to explain, or even acknowledge, its contradictory treatment of CBP rulings in this case. Instead, the DOC merely asserted that it is not bound by CBP rulings. I&D Memo at cmt. 16.

**NON-CONFIDENTIAL VERSION**
                                                *Business Proprietary Information Has Been Deleted*

The DOC claimed that the CBP ruling for Suntech's aluminum frames failed to provide an adequate explanation for why the frames should be classified under HTS 7616.99. However, this claim fails to support the agency's change in practice. In fact, the CBP ruling requested by Suntech explained that, based on the company's description of its aluminum frames as extruded frames for solar panels, cut to lengths of 992 mm and 1965 mm, "punched and notched with the ends of the extrusion being mitered," and not further processed, the appropriate HTS for these products was HTS 7616.99. *Comments on Trina's Supplemental Surrogate QR* at Ex. 1. The amount of detail included in this ruling was comparable to that provided in other CBP rulings relied upon by the DOC in this investigation, including the CBP rulings used to value suspension, labels, silicon dioxide, steel buckles, polyvinyl chloride boxes, and simple silica. *See* I&D Memo at cmt. 25; Trina 2d Surrogate QR at 4-5; CBP Ruling NY A85502 (Nov. 25, 1996); CBP Ruling E87517 (Sept. 9, 1999); and CBP Ruling NY K84014 (Mar. 25, 2004). In fact, the level of explanation provided in the aluminum frames ruling was even greater than in several other rulings relied upon by the DOC in the same investigation, including the CBP rulings used to value silane and phosphorous oxychloride. *See* CBP Ruling NY B84848 (Aug. 1, 1997); CBP Ruling NY 890892 (Oct. 12, 1993). In contrast to the aluminum frames ruling, neither of these CBP rulings included a thorough description of the product. *See id.*

In sum, the DOC inappropriately rejected a CBP ruling that was uniquely dispositive on the issue of valuing aluminum frames and was the best information available. The DOC also failed to provide an adequate explanation for its departure from its practice of relying on CBP rulings to value surrogate inputs in this investigation. For these reasons, the DOC's determination to rely on HTS 7604 to value aluminum frames is not supported by substantial evidence and must be remanded for reconsideration.

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

### 2.    The DOC Failed to Address Evidence Detracting from Its Conclusions

In addition to improperly rejecting the CBP ruling for aluminum frames, the DOC failed

to address evidence detracting from its selection of HTS 7604 to value Trina's and Suntech's

aluminum frames.   In both its case and rebuttal briefs, SolarWorld provided extensive evidence

that HTS 7604 was inaccurate for valuing Trina's and Suntech's aluminum frames.   For example,

Trina itself effectively rejected the use of HTS 7604 and the classification of its aluminum

frames as hollow profiles early in the investigation.    In a supplemental surrogate value

questionnaire to Trina, the DOC asked the company as follows:

> If your aluminum frames consist of hollow profiles, it appears that your
> 'aluminum profile made frames' may be classified under HTS 7604.21.
> Otherwise, the DOC agrees that your aluminum frames should be classified under
> HTS 7610.90.   Please confirm under which heading 'aluminum profile made
> frame' should be classified, and provide an explanation why this input should be
> classified under this particular heading.

Second SV Supplemental Questionnaire at 2.   In response, Trina stated that the company "and

the DOC are in agreement that aluminum frames should be classified under HTS 7610.90." *See*

Trina 2d Surrogate QR at 1.   Trina and its counsel certified this response as accurate.

Additionally, both SolarWorld and Trina placed on the record CBP rulings demonstrating

that HTS 7604, covering alloyed aluminum profiles, is inapplicable because it covers base level

products of uniform shape that require further working and processing before assembly into

finished goods.   Rebuttal Br. at 53-58.   For example, in ruling N162619, CBP ruled on hollow

aluminum extrusions that would later be manufactured into windows, railings, and patio

enclosures. *Id.* at 54.   In N169345, the agency ruled on hollow and open construction extrusion

to be cut to length at the time of installation and, in N126062, the agency also classified

"{s}imple aluminum tracks that have not been processed further than cut to length and drilled"

and "aluminum extrusions that are to be further processed into 'push panels'" under HTS 7604.

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

*Id.* at 55.  Even Trina's own evidence – Ruling H88504 – involved a base level product to be "further fabricated and processed into final form *after* importation."  *Id.*

SolarWorld explained that while HTS 7604 covers base-level extrusions that are uniform in shape along their whole length, and require further working before they are ready to be put into final form and assembly into a finished good, aluminum frames used in solar modules are <u>not</u> uniform in shape along their whole length, and are already a fully finished end product.  *Id.* In fact, "CBP in its Suntech classification ruling, specifically noted that solar frames are much different – they are already 'punched and notched with the ends of the extrusion being mitered.'" *Id.* (*citing* CBP Ruling N13953 (Jan. 13, 2011)).  Aluminum frames also require "{c}orner keys {to be} inserted in the small frame extrusion and the ends of the large frames are opened to receive the corner keys."  *Id.*  Customs specifically found that these frames are fully completed products when imported: "{t}here is no further processing to the aluminum frames.  They are just snapped together."  *Id.* at 56.

SolarWorld also placed on the record WCO Explanatory notes and photographs of aluminum frames for solar modules, which confirm that these products are fully manufactured frames that require no further processing and are in a finished form for final assembly.  *Id.* at 56, 58.  According to Note 1(b) to Chapter 76, aluminum "profiles" (*i.e.*, classified under Thai HTS 7604.29.90001) have a "uniform cross-section along their whole length."  *Id* at 55.  By contrast, Suntech's solar aluminum frames have been notched and have their ends mitered, and are modified such that they are fully processed, ready to mate, and to lock in place with a "corner key."  *Id* at 56.  Further, photographs of aluminum frames for solar modules demonstrate that these frames are not profiles because they not of "uniform cross-section."  *Id.*  Instead, they are fully processed units, ready for simple and final assembly.  *Id.*  Solar frames are often painted,

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

include key ports for corner keys, are stamped or etched with a company logo, and are clearly

processed into a finished good – ready for assembly. Suntech April 25 Letter at Ex. 1. Indeed, a

review of Trina's bill of materials for its subject merchandise indicates that Trina utilizes [

]. Letter from

Arent Fox LLP to Sec'y Commerce, re: *CSPV from China: Supplemental Section D*

*Questionnaire Response* (Mar. 9, 2012), PR 850, CR 874, at Ex. SD-20.

    The fact that aluminum frames are a finished good and not a simple extrusion classifiable

under HTS 7604 was confirmed by Trina at verification. Rebuttal Br. at 57. Specifically, DOC

officials asked Trina company officials about the "structure of, and the primary inputs used to

produce, aluminum frames" and asked them to provide "the BOM(s) for aluminum frames, plus

any other documentation." *Id.* at 57-58 (*discussing* Memorandum from Edward Yang, Senior

Enforcement Coordinator, to The File, re: *Verification of the Sales and Factors of Production*

*Information Submitted by Changzhou Trina Solar Energy Co. Ltd. in CSPV from China* (July 19,

2012), PR 1299, CR 1537, at 69 ("Verification Report")). Trina officials responded that they do

*nothing* to the aluminum frames when they are received. *Id.* As the DOC's verification report

for Trina clearly states, "Trina Solar does not make any changes to the aluminum frames after it

purchases them; it just assembles them." *Id.* This "statement matches precisely the way that

Suntech described its frames to CBP (which led CBP to classify their frames under HTS heading

7616)." *Id.*

    Aluminum profiles are articles of a "uniform cross section" and goods that have not

assumed the "character of articles or products of other headings." Rebuttal Br. at 56; *see also*

Notes to Chapter 76 of the HTSUS (2013) ("Chapter Notes"). Solar module frames are <u>not</u> of

uniform cross section. Further, given that these products require no further processing and are in

a finished form for final assembly, they are goods that have "assumed the character of articles or products of other headings" – *i.e.*, HTS 7616. *Id.* This evidence further establishes that the mandatory respondents' aluminum frames are not profiles classifiable under HTS 7604.

In its briefs, SolarWorld also provided substantial and definitive evidence that Suntech's aluminum frames are classified under HTS 7616.99. In its ruling for aluminum frames, "the CBP found, based on evidence provided by Suntech, and dated January 13, 2011, that HTSUS number 7616.99.5090 is the correct heading for aluminum frames used in the production of solar modules." Case Br. at 44-54, PR 1352, CR 1563. Thus, to the extent Suntech imported these products during the POI, it was required by law to use this Customs ruling classification. Nonetheless, the DOC declined to apply the Customs ruling to Suntech. As SolarWorld explained, "the DOC's decision to ignore a binding classification ruling requested by a mandatory respondent in this investigation is especially suspect given the DOC's repeated reliance on CBP classification rulings to determine the propriety of various other surrogate values in this investigation." *Id.* at 45. Indeed, the DOC relied on seven different rulings for products used in the production of solar cells and modules. *Id.* at 46.

CBP's binding tariff classification ruling regarding Suntech's aluminum frames "is precisely the reason why Suntech initially proposed that the DOC classify its aluminum frames under HTS heading 7616.99." Rebuttal Br. at 48. In addition, SolarWorld noted that despite its awareness of the ruling, "Suntech has *never* even acknowledged the ruling's existence," and the failure of Suntech's counsel to acknowledge this Customs ruling is a material omission that contradicts its company and counsel certifications that its submissions are complete and accurate." *Id.* at 48-49.

In its Final Determination, the DOC failed to sufficiently address and/or even acknowledge these arguments. For example, the DOC barely addressed the extensive evidence indicating that aluminum frames for solar modules are a finished good and not a simple extrusion classifiable under HTS heading 7604.[5] The DOC simply stated that SolarWorld's assertion that respondents' aluminum frames are finished articles "is not relevant to our decision," as "HTS heading 7604 does not specify whether is contains finished or unfinished aluminum profiles." I&D Memo at cmt. 16. This explanation is wholly inadequate.

SolarWorld provided several CBP rulings for aluminum profiles categorized under HTS 7604, demonstrating that they are base level, intermediate products of uniform shape that require further processing before they can be assembled into finished goods. Even Trina's proffered CBP ruling for HTS 7604 involved a base level product to be further fabricated and processed into final form after importation. Moreover, according to Note 1(b) to Chapter 76, aluminum "profiles" (*i.e.*, classified under Thai HTS 7604.29.90001) have a "uniform cross-section along their whole length." Respondents' frames do not meet this definition. Indeed, SolarWorld placed on the record photographs of aluminum frames for solar modules demonstrating that they are not of "uniform cross-section," and are fully finished articles, ready for final assembly. *Id.* Trina also confirmed at verification that its aluminum frames do not undergo further processing, Verification Report at 69, and disavowed HTS 7604 as an appropriate HTS number to value its frames. *See* Trina 2d Surrogate QR at 1. This evidence directly contradicts the DOC's

---

[5]     The DOC acknowledged, however, that HTS 7604 is a "basket category." I&D Memo at cmt. 16. Indeed, the DOC seemed initially troubled with the broadness of this category as early as April 21012 when it noted in a questionnaire to Suntech that "HTS category 7604 contains aluminum bars, rods, and profiles" and asked Suntech to "state whether this broad HTS category is more specific to the aluminum frame input used by Wuxi Suntech." Suntech April 25 Letter at 12.

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

conclusion that the question of whether aluminum frames are finished articles is "not relevant" to their valuation; yet, none of this evidence was addressed by the agency.

Moreover, in rejecting the CBP ruling requested by Suntech, the DOC simply reasoned that the ruling is not binding, and provided no explanation as to why Suntech's frames should be classified under HTS 7616.99.  I&D Memo at cmt. 16.  However, the DOC failed to address SolarWorld's argument that the DOC relied on many other CBP rulings to value inputs in the same investigation.  Nor did the agency's determination address the fact that many of the CBP rulings relied upon by the agency provided a comparable level of explanatory detail, if not less detail, than in the aluminum frames ruling.  The agency also failed to address the unique circumstances surrounding the Customs Ruling for aluminum frames: that it was for aluminum frames used in solar module production, was requested by Suntech, and was sought merely three months prior to the start of the POI.  Given the uniquely dispositive nature of this evidence, the DOC failed to sufficiently explain how the CBP ruling does not constitute the best available information on the record for valuing Trina's and Suntech's aluminum frames.

As the courts have made clear, "substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  *Hynix Semiconductor Inc. v. United States*, 29 CIT 995, 999, 391 F.Supp. 2d 1337, 1342 (2005) (internal quotation omitted).  Where the agency's conclusions are not reasonable in light of the record evidence, they cannot stand, *see Diversified Products Corp. v. United States*, 6 CIT 155, 161 (1983)*; see also Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States,* 880 F. Supp. 2d 1348 (CIT 2012).  Here, the DOC failed entirely to address record evidence detracting from its conclusions.  As a result, substantial evidence does not support the DOC's determination and the Court should remand this issue to the DOC for reconsideration consistent with the comments provided herein.

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

### 3. The DOC Inappropriately Misconstrued HTS Subheading 7616.99 as Not Including Aluminum Alloy Products

In its Final Determination, the DOC valued Trina's and Suntech's aluminum frames using Thai HTS categories covering alloyed aluminum profiles (HTS 7604.29 and 7604.21, respectively), relying heavily on the fact that these categories cover aluminum alloy products. I&D Memo at cmt. 16. The DOC's determination suggests that HTS subheading 7616.99 does not cover aluminum alloy products. *See id.* However, this distinction is meaningless, as HTS 7616.99 also covers aluminum products that are alloyed by their very nature.[6]

While the article description for HTS 7616.99 does not specify whether it covers alloyed aluminum frames, a review of the HTSUS indicates that only parts of Chapter 76, specifically the earlier headings that cover less sophisticated aluminum products, contain subheadings for alloyed or non-alloyed aluminum products. For example, although the Notes to Chapter 76 make clear that "aluminum can stock," classified under HTS 7607.11.90, is an alloyed aluminum product, the description for this subheading does not specify that this product is an alloy. *See* Chapter Notes. The aluminum products in the latter half of Chapter 76 are sophisticated aluminum products that, by their very nature, contain alloying elements. *See, e.g.,* CBP Ruling NY 19 B86759 (July 10, 1997); CBP Ruling NY G82995 (Oct. 12, 2000); and CBP Ruling HQ 085421 (Sept. 21, 1989). Given that the DOC inappropriately misconstrued HTS 7616.99 as not including aluminum alloy, its selection of HTS 7604.29 and 7604.21 to value aluminum frames for solar modules because they cover aluminum alloy products is unreasonable.

### B. The DOC's Determination to Grant Separate Rates to Certain Respondents Was Not Supported by Substantial Evidence and Was Otherwise Not in Accordance with Law

---

[6]     In the Preliminary Determination, the DOC placed no weight on the alloy issue.

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

### 1.    Legal Framework

In NME investigations, the DOC employs a presumption that all enterprises within the NME's territory are controlled by the government. *See e.g., Bicycles from the People's Republic of China,* 61 Fed. Reg. 19,026, 19,026-28 (Dep't Commerce Apr. 30, 1996) (final).   This presumption has been upheld by the Court of Appeals for the Federal Circuit. *See Sigma Corp. v. United States,* 117 F.3d 1401, 1405 (Fed. Cir. 1997).

The presumption is rebuttable.  However, to rebut the presumption, an NME company must show that it is free from *de jure* government control.  *See* Import Administration Policy Bulletin 5.1 (Apr. 5, 2005) at 2 ("Policy Bulletin 5.1").  In analyzing *de jure* control, the DOC considers: 1) an absence of restrictive stipulations associated with the company's business and export licenses; 2) any legislative enactments decentralizing control of companies; and 3) any other formal measures by the government decentralizing control of companies. *Id.*

Given that NME governments may enact laws nominally permitting private enterprise, but nonetheless exercise a significant degree of control over such enterprises, a separate rate applicant must also show that it is free from *de facto* governmental control to rebut the presumption.  *See, e.g., Silicon Carbide From the People's Republic of China,* 59 Fed. Reg. 22,585, 22,586 (Dep't Commerce May 2, 1994) (final).  In this analysis, the DOC considers: 1) whether export prices are set by, or subject to the approval of, a governmental authority; 2) whether the respondent has authority to negotiate and sign contracts and other agreements; 3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and 4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses. *See, e.g.,* Policy Bulletin 5.1 at 2.

Importantly, the burden of rebutting the presumption of government control is on the separate rate applicant, as the applicant is the "party in possession of the necessary information." *Zenith Electronics Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the necessary information.").

**2.    The DOC Improperly Granted Separate Rates to Applicants that Are SASAC-Owned and that Withheld Ownership Information**

The DOC improperly granted separate rates to a number of companies that failed to identify their actual owners, as well as companies that are owned by the Chinese government.

a.    Importance of Ownership Information to the DOC's Separate Rates Analysis

As an initial matter, SolarWorld notes that the DOC unreasonably failed to recognize the relevance and importance of ownership in its separate rate analysis, particularly its analysis of *de jure* government control.  While government ownership may not be dispositive of government control over a company, *see* I&D Memo at 26, an entity's ownership is such an important factor in determining control of the entity, that it is difficult to imagine an adequate investigation into control of an entity without thorough consideration of its ownership.  Indeed, as the Court has noted, "owners, of course, may be 'companies' – with obvious interests in the 'decision-making process' to which their investments are being put." *Advanced Technology & Materials Co., Ltd. v. United States*, 885 F. Supp. 2d 1343, 1350 (CIT 2012) ("*Advanced Tech*").

As the DOC itself explained, "{t}he purpose of applying one countrywide rate in an NME context is to prevent an NME government from later circumventing an antidumping order by controlling the flow of subject merchandise through exporters which have the lowest margin." *Certain Cut-to-Length Carbon Steel Plate from Ukraine*, 62 Fed. Reg. 61,754, 61,579 (Dep't Commerce Nov. 19, 1997) (final).  To the extent that separate rate applicants are ultimately owned by a state-run enterprise, the potential for such re-routing of trade is clear.

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

In prior cases, the DOC has recognized the relevance of ownership to its separate rates analysis. For example, in an administrative review of the order on *Certain Frozen Warmwater Shrimp from the People's Republic of China*, the DOC found that misrepresentations by a respondent "call{ed} into question {the respondent's} ownership structure as reported in {the review}, and, <u>consequently</u>, its eligibility for a separate rate." *Ad Hoc Shrimp Trade Action Committee v. United States*, CIT Ct. No. 11-335, Slip Op. 2013-93 (July 23, 2013) at 3 (internal citations omitted) (emphasis added). DOC thus acknowledged that a respondent's ownership structure may be a determinative – or, at least, relevant – factor in determining its eligibility for a separate rate. It is unreasonable for the DOC to fail to recognize the same fact here.

> b.   <u>The DOC Improperly Granted Separate Rates to Companies that Failed to Provide Ownership Information</u>

Given the importance of ownership to the DOC's analysis of government control, the DOC acted unreasonably in granting separate rates to companies that failed to divulge their ultimate owners to the agency. In the underlying investigation, a number of respondents revealed that they were ultimately held by a legal entity, such as a holding company or limited partnership. However, some of these companies failed to disclose the controlling shareholders of such entities. For the majority of the relevant companies, the undisclosed ultimate shareholders represent more than 51 percent of the equity interest in the company.

The companies that failed to provide sufficient evidence to rebut the presumption of government control by not providing ownership information are Trina; Chint Solar; Shanghai BYD; Solarone Qidong; Solarone Hong Kong; Motech; tenKsolar; Zhejiang Jiutai; CEEG Shanghai; Jetison Solar; CSG PV; CEEG Nanjing; Ningbo Komaes; and China Sunergy.

> (1)   Separate Rate Applicants that Did Not Provide Ownership Information Failed to Rebut the Presumption of Government Control

24

As noted above, as a matter of law, the DOC presumes that a company located in an NME is controlled by its government. *See Sigma Corp.,* 117 F.3d at 1405. The applicant must "affirmatively demonstrate" that it is entitled to a separate rate by showing "an absence of central government control, both in law and fact, with respect to exports." *Tianjin Mach. Import & Export Corp. United States,* 16 CIT 931, 935 (1992).

There can be no more clear failure to rebut the presumption of government control than the failure to identify a company's ultimate shareholders. Given the importance of a company's ownership to the analysis of who ultimately controls the company, as discussed above, it is simply unreasonable to find that a company has provided sufficient information to <u>rebut a presumption</u> of government control, while at the same time it has withheld its ownership information from the agency. But that is what the DOC found in this investigation. The DOC supported its determination by stating that, "even if one of the respondents in question had identified the government among one of its ultimate owners, government ownership <u>alone</u> would not have warranted denying the company separate rate status." I&D Memo at 32 (emphasis added). The DOC seems not to contemplate the very real possibility that government ownership, in conjunction with other facts (such as, *e.g.*, information regarding the control a company's owners have over its export activities) could very well have warranted denying a company a separate rate. But it is impossible to fully explore the issue of control unless all of a company's government ownership is revealed. Thus, the DOC's determination that these separate rate applicants succeeded in rebutting the presumption of government control is unreasonable and unsupported by substantial evidence.

(2)    The DOC Unreasonably Departed from Past Precedent in Granting a Separate Rate to Companies Who Failed to Provide Ownership Information

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

Recognizing their absolute failure to rebut the presumption of government control, the DOC in previous cases has refused to grant respondents a separate rate when they have failed to provide necessary information on their ownership structures. For example, in *Certain Frozen Warmwater Shrimp from China*, the DOC denied the respondent a separate rate due to an inability to determine its actual owners. Issues and Decision Memorandum accompanying *Certain Frozen Warmwater Shrimp from the People's Republic of China*, 72 Fed. Reg. 72,668 (Dep't Commerce Dec. 21, 2007) (final) at cmt. 1. In a later review of the same antidumping duty order, the DOC again determined not to grant a separate rate to a respondent, in part because information on the its ownership structure had been "call{ed} into question" and, accordingly, "the record contained no reliable evidence to rebut the presumption of government control." *Ad Hoc Shrimp Trade Action Committee* at 3.

Similarly, in *Porcelain-on-Steel Cooking Ware from China*, the DOC denied a respondent a separate rate, reasoning, in part, that it could not verify the information submitted by the respondent regarding its corporate ownership. Issues and Decision Memorandum accompanying *Porcelain-on-Steel Cooking Ware from the People's Republic of China,* 71 Fed. Reg. 24,641 (Dep't Commerce Apr. 26, 2006) (final) at cmt. 1.

However, in this case, the DOC granted separate rates to a number of companies, despite their failure to identify ultimate owners. It is "a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure." *Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196, 1209 (1988) (internal citations omitted). This rule is designed to "insure consistency in an agency's administration of a statute." *Id. See also Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 488 (2004) ("Commerce . . . has an additional duty 'to explain its departure from prior norms'") (internal citations omitted).

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

Here, in response to SolarWorld's argument about the agency's precedent, the DOC simply stated that "the reason for not granting separate rate status {in the prior cases} was not a failure by respondents to identify their ultimate owners, but rather was based on the fact that respondents' statements…concerning ownership could not be verified." I&D Memo at 32.  This is not a reasonable explanation.  Indeed, the DOC appears to suggest that it is <u>impermissible</u> for a respondent to provide ownership information that cannot be verified (as in its prior cases), yet it is <u>permissible</u> for a respondent to provide no ownership information at all (as in this case).  Such a position is nonsensical, and would incentivize respondents to withhold information from the agency completely, rather than provide some information that could turn out to be unverifiable.  Therefore, the DOC's departure from its past practice was unexplained and impermissible.

      c.    <u>The DOC Improperly Found an Absence of Government Control over Applicants Ultimately Owned by SASAC</u>

The DOC improperly granted separate rates to Sumec Hardware, Tianwei New Energy, Ningbo ETDZ and Dongfang Electric, each of which is ultimately owned by China's State-Owned Assets Supervision and Administration Commission ("SASAC")[7] and which failed to demonstrate an absence of *de jure* and *de facto* government control.

      (1)    SASAC: Background

SASAC is a central governmental body in China that oversees state assets.  The Chinese government founded SASAC in 2003, and it was "specifically created to represent the state's shareholder interests in state-owned enterprises" ("SOEs").  *See SolarWorld's March 2012 Separate Rates Comments* at Ex. 1, PR 912, CR 978.  Its foundation heralded a return and retrenchment of significant state intervention in the "commercial decisions of state-owned enterprises, including decisions relating to their strategies, management and investments." *Id.*

---

[7]    *See* Case Br. at 86-100, PR 1352, CR 1564, for an explanation of SASAC's ownership interests in each of these companies.

**NON-CONFIDENTIAL VERSION**
                    *Business Proprietary Information Has Been Deleted*

Upon SASAC's founding, many of China's largest SOEs were put directly under SASAC's control, including those that have ownership in the separate rate applicants identified above. *See id.* at Ex. 2.

SASAC's control over the companies it owns is currently governed by the Company Law of the PRC ("Company Law") and China's Interim Regulations on the supervision and management of SOEs ("Interim Regulations"). *See id.* at Exs. 3 and 4. Pursuant to these laws, SOEs are controlled by the Chinese government, which has all the rights that any sole investor would have in a company, including the rights to hire and fire, receive and dispose of profits, and direct and approve investment, mergers and spin-offs.

State Council Decree 378 promulgated China's Interim Regulations, which declare that SOE assets are owned by the state (rather than by the enterprises themselves), thus ensuring that there is no clear distinction between SOEs and the government itself. *Id.* at Ex. 3. The Interim Regulations further state that SASAC performs "the responsibilities of investor" with regard to SOEs. *Id.* Thus, the State Council, through the actions of SASAC, wields all the rights and powers of an investor over SOEs, including "enjoying owner's equity" and "administering assets, personnel and other affairs." *Id.*

To define these responsibilities, rights and powers, the Interim Regulations reference the Company Law, which governs business forms in China and identifies the rights of investors. Under the law, investors, including the government, have the power to: 1) decide on a company's business policy and investment plans; 2) elect and recall directors and supervisors; 3) examine and approve directors' reports, budgets, financial plans and distributions; 4) adopt resolutions regarding a company's registered capital, the issuance of bonds, the assignment of capital

contributions, and/or mergers, liquidations and acquisitions; and 5) amend the articles of association of the company. *See id.* at Ex. 4.

Furthermore, the Interim Regulations specifically charge SASAC with 1) appointing and removing the directors and managers of SOEs; 2) "improv{ing} the controlling power… of the State" over state-owned assets; and 3) approving and directing SOEs' articles of association, as well as their mergers, stock offers and asset sales. *Id.* at Ex. 3. As the DOC itself noted in its Preliminary Determination, under the Interim Regulations, "SASAC plays a role in approving the development of certain investment and business plans to ensure that these plans are in line with the PRC's industrial policy objectives as well as in the appointment of the board and certain key senior management positions." Prelim., 77 Fed. Reg. at 31,316.

> (2) The DOC Improperly Found that SASAC-Owned Separate Rate Applicants Rebutted the Presumption of *De Jure* Government Control

Despite the significant retrenchment of government control over SOEs evinced by the Company Law and Interim Regulations, the DOC found, unreasonably and without substantial evidence to support its conclusion, that "the laws placed on the record of this investigation establish the absence of *de jure* control of respondents whose shareholders include SOEs." Prelim., 77 Fed. Reg. at 31,316; I&D Memo at cmt. 6.

First, in an attempt to support its finding, the DOC selectively cited several provisions of the Interim Regulations and the Company Law, while ignoring other, contradictory provisions of the laws. With regard to the Interim Regulations, the DOC noted:

> Article 7 of China's Interim Regulations provides for the "separation of government functions from enterprise management and separation of ownership from management." Further, Article 10 of those regulations states that those companies operating under SASAC "enjoy autonomy in their operation" and that SASAC "shall support the independent operation of enterprises according to law, and shall not interfere in their production and operation activities."

I&D Memo at cmt. 6.  However, as this Court has previously found, "various provisions among the Interim Regulations directly conflict with these observations." *Advanced Tech.*, 885 F. Supp. 2d at 1351.  The DOC failed to adequately address these conflicting provisions, which demonstrate the SASAC-owned separate rate applicants' lack of *de jure* independence from government control.

In *Advanced Tech.*, the Court pointed out that "{t}he Interim Regulations provide that SASAC's 'invested enterprises shall accept the supervision and administration... authority according to law{.}  This seems an obvious declaration of *re*-centralized *de jure* control, of 'invested enterprises' including those that are wholly state-owned... and those in which the state has an investment." *Id.* at 1351 (internal citations omitted) (emphasis in original).  In that case, the Court also noted Art. 20 of the regulations, which states that SASAC "is responsible for *directing* State-owned enterprises." *Id.* (internal citations omitted) (emphasis in original).

Moreover, "the Interim Regulations confer upon SASAC the authority to appoint or remove... 'the responsible persons of its invested enterprises.'" *Id.*  "Further, 'in accordance with the Company Law{,}' SASAC has the authority to nominate candidates 'for the director of the board or supervisor to be dispatched' to a company with state-owned equity... and instruct those directors/representatives to exercise voting rights in accordance with SASAC's instructions." *Id.* at 1351-1352.  Thus, the Interim Regulations make clear that there is a "*de jure* possibility of a general manager appointed by a board under SASAC's effective control." *Id.*

Similarly, in this case, the DOC's "interpretation of the Interim Regulations... prevented it from acknowledging a *de jure* prospect of 'government control'" of the respondents ultimately owned by SASAC. *See id.* at 1352.  The DOC cannot simply quote selectively from the regulations to support its *de jure* independence determination, while ignoring provisions that

**NON-CONFIDENTIAL VERSION**
                                    *Business Proprietary Information Has Been Deleted*

directly contradict that determination, especially given the <u>presumption</u> of control in NME cases.

*See Altx, Inc. v. United States*, 370 F.3d 1108, 1113 (Fed. Cir. 2004) ("While {an agency} need

not address every argument and piece of evidence, it <u>must address significant arguments and</u>

<u>evidence which seriously undermines its reasoning and conclusion</u>.") (emphasis added, internal

citation omitted)).

　　In addition, without citing any specific provisions, the DOC relied on the Company Law

as evidence that, in China, "a company is an enterprise legal person, that shareholders shall

assume liability towards the company to the extent of their shareholdings, and that the company

shall be liable for its debts to the extent of all its assets." I&D Memo at 28, PR 1397. The

significance of this as to the independence of SASAC-owned companies is unclear. The single

prior case cited by the DOC regarding this provision of the Company Law, *Freshwater Crawfish*

*Tail Meat from the People's Republic of China*, similarly fails to explain how the Company

Law's establishment of a company as "an enterprise legal person" somehow evinces the

company's independence from the government, even when government-owned. 76 Fed. Reg.

62,349, 62,352 (Dep't Commerce Oct. 7, 2011) (prelim.).

　　Moreover, the DOC failed to cite – or address SolarWorld's arguments regarding –

several provisions of the Company Law that strongly suggest a <u>lack</u> of *de jure* independence,

rather than the opposite. *See Altx, Inc.*, 370 F.3d at 1108. Namely, under the Company Law,

investors, including the government, have the power to: 1) decide on a company's business

policy and investment plans; 2) elect and recall directors and supervisors; 3) examine and

approve directors' reports, budgets, financial plans and distributions; 4) adopt resolutions

regarding a company's registered capital, the issuance of bonds, the assignment of capital

contributions, and/or mergers, liquidations and acquisitions; and 5) amend the articles of

association of the company. *See SolarWorld's March 2012 Separate Rates Comments* at Ex. 4,

PR 912, CR 978. As the Court has previously explained, "{r}epetition, to the point of mantra,

that the Company Law 'establishes an absence of *de jure* control'… does not transform

incomplete analysis or *ipse dixit* conclusion." *Advanced Tech.*, 885 F. Supp. 2d at 1355-56.

Second, the DOC's determination conflated the *de jure* and *de facto* government control

analyses. For example, in its purported explanation of a finding of *de jure* independence, the

DOC discussed the composition of the Boards of Directors of various respondents, in an

apparent attempt to demonstrate that "there {was} no evidence that, even where there is indirect

government ownership of one of the respondents at issue, the PRC government was involved in

decisions of the board of directors of the company related to export activities." *See* I&D Memo

at cmt. 6. The DOC thereby failed to give any import to SASAC's <u>power</u>, bestowed by the

Company Law and the Interim Regulations, to control decisions of the company related to export

activities, stating only the lack of evidence that SASAC had <u>exercised</u> such power. However,

such a focus on the exercise of power impermissibly transforms the *de jure* analysis into a *de

facto* analysis, ignoring the essential fact that the laws of China explicitly give the government

control over enterprises in which it has ownership interests.

The DOC committed a similar fundamental error in its final determination in the

antidumping duty investigation of *Diamond Sawblades and Parts Thereof from the People's

Republic of China* ("*Diamond Sawblades*"). In reviewing that decision, this Court explained:

"Curiously, {the DOC} acknowledges as part of its *de jure* analysis that 'the Interim Regulations

provide that SASAC may intervene in certain business operations' but then it 'notes that there is

no record evidence that SASAC acted upon this power and intervened in the selection of

**NON-CONFIDENTIAL VERSION**
                                         *Business Proprietary Information Has Been Deleted*

management and board members.'" *Advanced Tech.*, 885 F. Supp. 2d at 1358.   The Court

identified this as a "conflation of *de facto* and *de jure* analysis." *Id.*  DOC similarly erred here.

Third, in making its determination, the DOC "eviscerat{ed} the presumption of state

control," and improperly shifted the burden of proof to SolarWorld.  *Advanced Tech* at 1358.

The DOC supported its determination of *de jure* independence by claiming a lack of requisite

evidence on the record, *see* I&D Memo at cmt. 6, PR 1397, failing to recognize that the burden is

on the <u>respondent</u> to produce evidence demonstrating the absence of control.  With such a burden,

it is improper for the DOC to rely on a <u>lack</u> of information on the record as support for its finding

that respondents have successfully rebutted the presumption.

On this point too, the DOC made a similar error in *Diamond Sawblades*, noting a lack of

record evidence that SASAC intervened to select management and board members as support for

its finding of an absence of control.  As the Court stated in its review of the determination, "the

administrative proceeding does not appear to have advanced to such a state that the onus had

shifted to the {petitioner} on that burden." *Advanced Tech.*, 885 F. Supp. 2d at 1358.

Therefore, the DOC's finding that the separate rate applicants ultimately owned by

SASAC rebutted the presumption of *de jure* government control was not supported by

substantial evidence and was otherwise not in accordance with law.

> (3)   The DOC Improperly Found that the SASAC-Owned
>        Separate Rate Applicants Rebutted the Presumption of *De
>        Facto* Government Control

The DOC also found that a number of separate rate applicants ultimately owned by

SASAC succeeded in rebutting the presumption of *de facto* government control.  In so finding,

the DOC failed to address many of SolarWorld's arguments.  For those that it did address, its

determinations were unreasonable and not supported by substantial evidence.

The DOC's determination was not in accordance with law because it failed to adequately address significant evidence and argument put onto the record by SolarWorld with regard to the *de facto* government control over a number of SASAC-owned companies. *See* Case Br. at 88-100, PR 1352, CR 1564. It is well established that a remand is appropriate where, as here, an agency failed to address material arguments raised by a party below. *See, e.g., Union Steel Mfg. Co. v. United States*, 837 F. Supp. 2d 1307, 1311 (CIT 2012) (citation omitted). For example, the DOC failed to address the argument and evidence submitted by SolarWorld with regard to the Chinese government's *de facto* control over Jiawei Solarchina – specifically, regarding the control over the company's operations, including its finances, by [

]. *See* Case Br. at 97-98, PR 1352, CR 1564.

Moreover, several of the DOC's findings of *de facto* independence were not supported by substantial evidence. For example, the DOC found that Ningbo ETDZ demonstrated an absence of *de facto* government control and granted it a separate rate, somehow reaching this conclusion while acknowledging that Ningbo ETDZ's [


]. *See* Memorandum from Jeff Pedersen to The File, re: *Issues and Decision Memorandum for the Final Determination in CSPV from China: Proprietary Information Relating to Issues Involving Changzhou Trina Solar Energy Co., Ltd. in the October 9, 2012 Issues and Decision Memorandum* (Oct. 9, 2012), PR 1403, CR 1613, at 1. The DOC accepted [


]." *Id.* at 1-2. [

]. Case Br. at 100, PR 1352, CR 1564.

34

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

[                    ] also nominated Ningbo ETDZ's Chief Financial Officer.  I&D Memo at 33.
It is unclear how the DOC could have reasonably determined that Ningbo ETDZ "has autonomy
from the government in making decisions regarding the selection of management" and "makes
independent decisions regarding the disposition of profits or financing of losses," factors
considered in its *de facto* control analysis, while also stating that the Board chairman and Chief
Financial Officer are selected by a [        ] state-owned entity. *See* I&D Memo at 31.

Similarly, the DOC's determination regarding Dongfang Electric was not supported by
substantial evidence.  SolarWorld presented evidence that Dongfang Electric's [

].  Case Br. at 95-96, CR 1352, PR 1564.  In addition, Dongfang Electric's

[

].  *See id.* at 96.  Moreover, Dongfang Electric's [

].  *See id.*

Despite the significant evidence of *de facto* control, the DOC found an absence of such
control, justifying its decision based on 1) Dongfang Electric's statement that its Board carries
out its roles considering the interests of Dongfang Electric; and 2) the DOC's belief that the fact
that Dongfang Electric's [                                        ] is
not evidence of government control of the company's profits.  I&D Memo at 33.  Especially in
light of the significant evidence of *de facto* government control, these statements cannot
reasonably be said to constitute substantial evidence supporting the DOC's finding.

**NON-CONFIDENTIAL VERSION**
                    *Business Proprietary Information Has Been Deleted*

3.      **The DOC Improperly Found an Absence of** *De Facto* **Government Control with Regard to Separate Rate Applicants Controlled by Members of the CPC, NPC and/or the CPPCC**

The DOC also erred in finding that separate rate applicants controlled by members of the Communist Party of China ("CPC"), the National People's Congress ("NPC") and/or the Chinese People's Political Consultative Conference ("CPPCC") rebutted the presumption of *de facto* government control.

a.      The National People's Congress: Background

The NPC is China's unicameral legislative body. *See SolarWorld's March 2012 Separate Rates Comments* at Ex. 25, PR 913, CR 979-980. The Chinese Constitution states that the NPC is "the highest organ of state power." *Id.* NPC members vote for the president, propose and vote on laws and even vote on the industrial plan for China's planned economy. *See id.* As such, NPC members are government officials and are a key part of China's government.

A number of applicants to whom the DOC granted a separate rate have Board members and/or senior managers who are members of the NPC, including Chint Solar, JA Solar, Shanghai JA Solar, JingAo and Ningbo Qixin.

b.      The CPC and CPPCC: Background

The CPPCC functions as a political consulting organization and provides representative supervision to the management and discussion of state affairs. The Chinese Constitution's Preamble states that the CPPCC has "played a significant historical role and will continue to do so in the political and social life of the country." *SolarWorld's March 2012 Separate Rates Comments* at Ex. 25, PR 913, CR 979-980. China's government presents the CPPCC as an organization with wide representation across various sectors in China including "the CPC, other political parties, mass organizations, and representative public personages from all walks of life."

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

*Id.* at Ex. 24, PR 913, CR 979.  While the CPPCC is not listed as an official government body, it is another organization under the Chinese government's control.

The CPC is the controlling political party in China, as noted in the country's constitution. The DOC itself recently confirmed that the CPC exercises its authority throughout the state and society via formal and informal institutions. Case Br. at 112, PR 1352, CR 1564.  The CPPCC's website states that it is "under the leadership of the CPC." *SolarWorld's March 2012 Separate Rates Comments* at Ex. 26, PR 913, CR 980.  Further, because the CPC appoints CPPCC members, the CPPCC essentially remains under CPC's leadership.  Many of China's highest ranking government officials at both the national and provincial levels are members of the CPPCC.  *Id.* at Ex. 24, PR 913, CR 979.

Additionally, in its exercise of "democratic supervision," the CPPCC is responsible for "implementation of major policies formulated by the CPC Central Committee and state organs," and "implementation of the national economic and social development plans and financial budget." *Id.*  According to its website, "all participating units and individuals have the obligation to observe and carry out the decisions" of the CPPCC.  *Id.* Indeed, even if a member is not a member of the CPC, CPPCC members are "expected to uphold the leadership of the {CPC}." *Id.*

As SolarWorld described in its case brief to the agency, both the CPPCC and the NPC voted to approve China's 12th Five-Year Plan, which specifically emphasized growth in the solar photovoltaic industry.  *See* Case Br. at 113, PR 1352, CR 1564.  Several Chinese solar producers have senior managers or board members that are members of the CPPCC and are tasked with carrying out the decisions of the CPPCC – including the approval of the Five-Year Plan for the Solar Photovoltaic Industry.  As CPPCC members charged with this decision, several companies directly benefited from it, increasing their production and exports of solar cells and modules.

A number of applicants to whom the DOC granted a separate rate have board members

and/or senior managers who are members of the CPPCC, including [                    ], [

    ], [        ], [                ], [              ], [          ], [              ], [          ],

[          ], [          ] and [          ]. *Id.* at 113-114, PR 1352, CR 1564.

          c.    <u>The DOC Improperly Found an Absence of *De Facto* Government
                 Control over Separate Rate Applicants Controlled by Members of
                 the NPC, CPC or the CPPCC</u>

DOC's decision to grant separate rates to NPC-, CPC- or CPPCC-controlled companies

was not supported by substantial evidence and was otherwise not in accordance with law.

First, the DOC did not adequately explain its finding that the separate rate applicants

controlled by the NPC, CPC or CPPCC effectively rebutted the presumption of government

control.  Rather, the DOC addressed the significant evidence and argument on the record with a

few conclusory statements (*e.g.,* "{t}he record does not show that the membership or position of

senior managers or board directors of certain SRAs in these organizations resulted in a lack of

autonomy on the part of the respondent to set prices, negotiate and sign agreements, select

management, or decide how to dispose of profits or financing of losses").  I&D Memo at 35.  In

response to SolarWorld's argument that the traditional separate rate analysis may not be

applicable to current NME governments and thus that it should consider NPC, CPC and/or

CPPCC connections in the analysis, *see SolarWorld's March 2012 Separate Rates Comments* at

37, PR 911, CR 976, the DOC merely stated that "there is no record evidence of PRC

government direction with respect to the day-to-day export related operations of any of the

companies."  I&D Memo at 36, PR 1397.  In other words, the DOC simply stated its conclusions

on the factors considered in the *de facto* analysis, without any reasonable explanation of how it

reached those conclusions.  The DOC thus failed to "articulate a satisfactory explanation for its

action including a 'rational connection between the facts found and the choice made.'"  *See*

**NON-CONFIDENTIAL VERSION**
*Business Proprietary Information Has Been Deleted*

*Motor Vehicle Mfrs. Ass'n of the U.S.*, 463 U.S. at 43.  The Court is only able to affirm the

agency's determination if the grounds that it acted upon are clearly disclosed.  *See Atlantic Sugar,*

*Ltd. v. United States*, 744 F.2d 1556, 1563 (Fed. Cir. 1984).

Second, the DOC failed to adequately address SolarWorld's arguments regarding the

separate rate applicants controlled by members of the NPC, CPC and/or CPPCC.  For example,

SolarWorld presented significant evidence that Chint Solar is controlled by an elected Chinese

government official and member of the 11th NPC, Mr. Nan Cunhui, resulting in *de facto*

government control over Chint Solar.  *See* Letter from Wiley Rein LLP to Sec'y Commerce, re:

*CSPV from China: Add'l Comments on Separate Rate Application Responses*, (Apr. 20, 2012),

PR 1046, CR 1117, at 5.  A remand is appropriate where, as here, an agency failed to address

material arguments raised by a party. *See, e.g., Union Steel Mfg.*, 837 F. Supp. 2d at 1311.

Finally, to the extent that the DOC did provide an explanation of its finding that the

separate rate applicants controlled by the NPC, CPC or CPPCC demonstrated their *de facto*

independence, such finding was not supported by substantial evidence.  Beyond the conclusory

statements noted above, in support of its finding, the DOC only discussed its examination of

government involvement in Trina's operations, in connection with its president's, Mr. Gao's,

membership on the Changzhou local council.  *See* I&D Memo at 36.  Such an examination does

not constitute substantial evidence on the question of government control over the respondents

identified in sections VI.B.3.a and b above, in connection with the presence of NPC, CPC and/or

CPPCC members on their Boards and/or in their senior management.  The DOC noted that

Changzhou's council has 390 members and meets only once a year. *Id.* This may be true, but it

does not serve as substantial evidence to disprove lengthy arguments and evidence presented by

SolarWorld with regard to, *e.g.*, the primacy of the NPC and the CPC in China's system of

government, and the involvement of such government officials in the governance of the various separate rate applicants. *See, e.g.*, *SolarWorld's March 2012 Separate Rates Comments* at 35-38, PR 911, CR 976; Case Br. at 100-114, PR 1352, CR 1564.

### 4.   Conclusion

The DOC improperly granted separate rates to a number of respondents in the underlying investigation, granting such rates to nearly every company that applied, despite their failures to rebut the presumption of *de jure* and/or *de facto* government control and despite significant record evidence with regard to the Chinese government's control over these entities.

In addition, to the extent that the antidumping margins of mandatory respondents Trina and Suntech are revised, DOC must revise the margin for separate rate respondents accordingly.

## VII.   CONCLUSION

SolarWorld respectfully requests that the Court find that the contested portions of the DOC's final determination are not supported by substantial evidence and are not in accordance with law and should be remanded for redetermination consistent with the Court's opinion.

Respectfully submitted,

Timothy C. Brightbill
Tessa V. Capeloto
Laura El-Sabaawi

**WILEY REIN LLP**

1776 K Street, NW
Washington, DC 20006
(202) 719-7000

August 30, 2013

*Counsel to SolarWorld Industries America, Inc.*

## CERTIFCATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(2), the undersigned certifies that this brief complies with the page limitation set by paragraph 5 of the Court's Severance and Consolidation Order, issued in Consol. Court No. 13-00012 on June 12, 2013, which we understand to supersede the word limitation requirement outlined in Chamber Procedure 2(B)(1). The substantive text of Petitioner-Plaintiff's Brief in Support of Its Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2010), is 40 pages long.

(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

SolarWorld Industries America, Inc.
(Representative Of)

August 29, 2013
(Date)

## CERTIFICATE OF SERVICE

### PUBLIC SERVICE

*Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States*
**U.S. Court of International Trade**
**Consol. Court No. 13-00012**

I certify that a copy of this document was served on the following parties, via first-class

mail, on August 30, 2013.

**On behalf of Hanwha Solarone (Qidong) Co., Ltd., Jiangsu Jiasheng Photovoltaic Technology Co., Ltd.:**

Francis J. Sailer
**Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP**
1201 New York Avenue, NW
Suite 650
Washington, DC 20005

**On behalf of LDK Solar Hi-Tech (Nanchang) Co., Ltd., LDK Solar Hi-Tech (Suzhou) Co., Ltd., Ningbo Etdz Holdings Ltd., Ningbo Komaes Solar Technology Co., Ltd., Ningbo Qixin Solar Electrical Appliance Co., Ltd.:**

Gregory S. Menegaz
**deKieffer & Horgan**
729 15th Street, NW
Suite 800
Washington, DC 20005-2105

**On behalf of Changzhou Trina Solar Energy Co., Ltd., JA Solar Technology Yangzhou Co., JingAo Solar Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Suntech America, Inc., Suntech Arizona, Inc., Trina Solar (U.S.) Inc., Wuxi Suntech Power Co., Ltd.:**

John M. Gurley
**Arent Fox LLP**
1717 K Street, NW
Washington, DC 20036-5342

**On behalf of the United States:**

Melissa M. Devine
**U.S. Department of Justice**
Commercial Litigation Branch – Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

13364841.1

**On behalf of Yingli Green Energy Americas,
Inc., Yingli Green Energy Holding
Company Limited:**

Neil R. Ellis
**Sidley Austin, LLP**
1501 K Street, NW
Washington, DC 20005-1401

13364841.1