**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE DONALD C. POGUE, CHIEF JUDGE

| | | |
|---|---|---|
| JIANGSU JIASHENG PHOTOVOLTAIC TECHNOLOGY CO., LTD., *et al.*, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Consol. Ct. No. 13-0012 |
| v. | : | **PUBLIC** |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| HANWHA SOLARONE (QUIDONG) CO., LTD., *et al.*, | : | |
| | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS'
RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

STUART F. DELERY
Assistant Attorney General

JEANNE E. DAVIDSON
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL

Rebecca Cantu
Attorney
Office of the Chief Counsel
For Trade Enforcement & Compliance
U.S. Department of Commerce

L. MISHA PREHEIM
Senior Trial Counsel
MELISSA M. DEVINE
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-3087
Facsimile: (202) 305-8640

January 29, 2014

Attorneys for Defendant

# TABLE OF CONTENTS

**Page**

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD ...........................1

STATEMENTS PURSUANT TO RULE 56.2 ...............................................................................2

     I.     Administrative Determination Under Review ...........................................................2

     II.    Issues Presented For Review ....................................................................................2

STATEMENT OF FACTS .............................................................................................................2

     I.     Respondent Selection and Separate Rates Applications ..........................................3

     II.    Preliminary Determination .......................................................................................5

     III.   Final Determination .................................................................................................7

     IV.   Amended Final Determination And Order ...............................................................8

     V.    Present Action ..........................................................................................................9

SUMMARY OF THE ARGUMENT .............................................................................................9

ARGUMENT ...............................................................................................................................10

     I.     Standard Of Review ...............................................................................................10

     II.    Commerce's Determination To Deny Jiasheng A Separate Rate Is In
           Accordance With Law ............................................................................................12

           A.    Legal Framework .......................................................................................12

                 1.     Commerce Utilizes Q&V Questionnaires For Respondent
                        Selection ..................................................................................... 12

                 2.     Time Limits For Submission Of Factual Information ..................14

                 3.     Commerce Is Authorized To Disregard Untimely Or Deficient
                          Submissions ................................................................................14

           B.    Commerce Did Not Abuse Its Discretion In Rejecting Jiasheng's
               Untimely Q&V Questionnaire Response ...................................................15

i

1.      Despite Instructions From Commerce, Jiasheng Failed To Meet The Deadline For Timely Filed Q&V Questionnaire Responses.................................................................16

2.      Commerce Properly Exercised Its Discretion................................18

      a.      Burden Upon Commerce In Accepting Late Responses...........................................................19

      b.      Jiasheng's Interest In Presenting Its Untimely Information ..........................................................23

3.      Commerce Had No Obligation To Notify Jiasheng That It Failed ToTimely File Its Questionnaire Response.........................29

III.    Because Jiasheng Did Not Demonstrate That It Was Eligible For a Separate Rate, Commerce Did Not Abuse Its Discretion In Applying The PRC-Wide Rate To Jiasheng .............................................................................32

IV.   Commerce's Use Of Thai HTS Category 7604 To Value Aluminum Frames Is Supported By Substantial Evidence .......................................34

    A.      Legal Framework .................................................................34

    B.      Commerce's Surrogate Value Selection For Aluminum Frames Is Reasonable And Supported By Substantial Evidence ...............36

V.    Commerce's Determination To Grant Certain Companies A Separate Rate Is Supported By Substantial Evidence.......................................................42

    A.      Legal Framework .................................................................44

    B.      Commerce's Separate Rate Determinations Are Supported By Substantial Evidence .................................................45

      1.      Commerce's Determination To Grant Certain Respondents A Separate Rate Is Supported By Substantial Evidence...................46

      2.      Commerce's Determination To Grant A Separate Rate To Certain Respondents Indirectly Owned By SASAC Is Supported By Substantial Evidence ...............................50

      3.      Commerce's Determination To Grant A Separate Rate To Certain Respondents With Managers Or Board Members That Are Also Members Of The CPC, NPC, Or The CPPCC Is Supported By Substantial Evidence...............................56

CONCLUSION..................................................................................................................................58

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE(S)**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
   925 F. Supp. 2d 1315 (Ct. Int'l Trade 2013) ................................................................. 32, 45, 49

*Advanced Tech. & Materials Co. v. United States,*
   938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013) ................................................................. 33, 51

*Advanced Tech. and Materials Co. v. United States,*
   885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012) ........................................................................... 50

*Allegheny Ludlum Corp. v. United States,*
   215 F. Supp. 2d 1322 (Ct. Int'l Trade 2000) ................................................................. 31, 32

*AMS Assocs. v. United States,*
   719 F.3d 1376 (Fed. Cir. 2013) .................................................................................................. 32

*Atl. Sugar, Ltd. v. United States,*
   744 F.2d 1556 (Fed. Cir. 1984) .................................................................................................. 18

*Butler v. Principi,*
   244 F.3d 1337 (Fed. Cir. 2001) .................................................................................................. 25

*Carpenter Tech. Corp. v. United States,*
   26 Ct. Int'l Trade 830 (2002) ............................................................................................. 11, 25

*China Steel Corp. v. United States,*
   264 F. Supp. 2d 1339 (Ct. Int'l Trade 2003) ........................................................................... 26

*Consol. Fibers, Inc. v. United States,*
   535 F. Supp. 2d 1345 (Ct. Int'l Trade 2008) ........................................................................... 11

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) .................................................................................................................... 15

*Cosco Home & Office Prods. v. United States,*
   350 F. Supp. 2d 1294 (Ct. Int'l Trade 2004) ................................................................. 24, 29

*Dongguan Sunrise Furniture Co. v. United States,*
   865 F. Supp. 2d 1216 (Ct. Int'l Trade 2012) ........................................................................... 28

*Downhole Pipe & Equipment LP v. United States,*
   887 F. Supp. 2d 1311 (Ct. Int'l Trade 2012) ........................................................................... 35

iv

*Essar Steel Ltd. v. United States*,
    678 F.3d 1268 (Fed. Cir. 2012).............................................................. 18, 32

*Fine Furniture (Shanghai) Ltd. v. United States*,
    865 F. Supp. 2d 1254 (Ct. Int'l Trade 2012) ................................... passim

*Fischer S.A. Comercio, Industria & Agricultura v. United States*,
    700 F. Supp. 2d 1364 (Ct. Int'l Trade 2010) ....................................... 21, 23

*Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*,
    No. 10-00059, 2011 Ct. Intl. Trade LEXIS 123, at *27-29, 33
    (Ct. Int'l Trade Oct. 12, 2011) ................................................................ 22

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*,
    815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ....................................... 19, 23

*Huaiyin Foreign Trade Corp. v. United States*,
    322 F.3d 1369 (Fed. Cir. 2003)............................................................... 44

*Hyosung Corp. v. United States*,
    No. 10-00114, 2011 Ct. Intl. Trade LEXIS 54, at *4-6, 8-13, 15-17
    (Ct. Int'l Trade Mar. 31, 2011) ................................................... 22, 25, 30

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992).................................................................................. 11

*Isaac Indus. v. United States*,
    780 F. Supp. 2d 1372 (Ct. Int'l Trade 2011) ......................................... 25

*Jiangsu Changbao Steel Tube Co. v. United States*,
    884 F. Supp. 2d 1295 (Ct. Int'l Trade 2012) ......................................... 30

*Kawasaki Steel Corp. v. United States*,
    110 F. Supp. 2d 1029 (Ct. Int'l Trade 2000) ..................................... 26, 31

*Max Fortune Indus. Co. v. United States*,
    No. 11-00340, 2013 Ct. Intl. Trade LEXIS 57 (Ct. Int'l Trade Apr. 15, 2013) ...................... 22

*Mukand Ltd. v. United States*,
    No. 11-00401, 2013 Ct. Intl. Trade LEXIS 46, at *16 n.5
    (Ct. Int'l Trade Mar. 25, 2013), *appeal pending*, Fed. Cir. No. 2013-1425 ............................ 25

*Murata Mfg. Co. v. United States*,
    820 F. Supp. 603 (Ct. Int'l Trade 1993) ................................................ 30

*National Steel Corp. v. United States*,
  870 F. Supp. 1130 (Ct. Int'l Trade 1994) ............................................... 31

*Nippon Steel Corp. v. United States*,
  118 F. Supp. 2d 1366 (Ct. Int'l Trade 2000) ........................................ 31

*NTN Bearing Corp. v. United States*,
  74 F.3d 1204 (Fed. Cir. 1995).............................................................. 21, 23

*Persico Pizzamiglio, S.A. v. United States*,
  18 Ct. Int'l Trade 299 (1994) ............................................................... 26

*PSC VSMPO-Avisma Corp. v. United States*,
  688 F.3d 751 (Fed. Cir. 2012)............................................................. 18, 21, 22

*Qingdao Sea-Line Trading Co. v. United States*,
  No. 10-00304, 2012 Ct. Intl. Trade LEXIS 44, at *21-22 n.9
  (Ct. Int'l Trade Mar. 21, 2012) .......................................................... 29

*Qingdao Taifa Group Co., Ltd. v. United States*,
  637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) ...................................... 47, 48

*Reiner Brach GmbH & Co. KG v. United States*,
  206 F. Supp. 2d 1323, 1333-34 (Ct. Int'l Trade 2002) ....................... 22, 31

*Shakeproof Assembly Components v. United States*,
  268 F.3d 1376 (Fed. Cir. 2001).......................................................... 41, 42

*Sigma Corp. v. United States*,
  117 F.3d 1401 (Fed. Cir. 1997)........................................................... 33, 44, 45

*SmithKline Beecham Corp. v. Apotex Corp.*,
  439 F.3d 1312 (Fed. Cir. 2006).......................................................... 55

*Shakeproof Assembly Components v. United States*,
  268 F.3d 1376, 1381 (Fed. Cir. 2001) ................................................ 36

*Sugiyama Chain Co. v. United States*,
  797 F. Supp. 989 (Ct. Int'l Trade 1992) ............................................. 30

*Ta Chen Stainless Steel Pipe, Ltd. v. United States*,
  No. 97-08-01344, 1999 Ct. Intl. Trade LEXIS 110,
  *41-49 (Ct. Int'l Trade Oct. 28, 1999), *aff'd*, 298 F.3d 1330 (Fed. Cir. 2002) ....................... 31

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
  298 F.3d 1330 (Fed. Cir. 2002).......................................................... 30

*Taian Ziyang Food Co., Ltd. v. United States,*
   918 F. Supp. 2d 1345 (Ct Int'l Trade 2013) ....................................................... 35, 36

*Tianjin Mach. Imp. & Exp. Corp. v. United States,*
   806 F. Supp. 1008, 1013–14 (Ct. Int'l Trade 1992) ............................................... 45

*Tianjin Mach. Imp. & Exp. Corp. v. United States,*
   353 F. Supp. 2d 1294, 1303-04 (Ct. Int'l Trade 2004),
   *aff'd*, 146 F. App'x 493 (Fed. Cir. 2005)......................................................... 18, 22

*Timken Co. v. United States,*
   699 F. Supp. 300 (Ct. Int'l Trade 1988) ................................................................ 11

*Timken U.S. Corp. v. United States,*
   434 F.3d 1345 (Fed. Cir. 2006)........................................................................... 21, 23

*Transcom, Inc. v. United States,*
   294 F.3d 1371 (Fed. Cir. 2002)........................................................................... 33, 34

*Tung Mung. Dev. Co. v. United States,*
   25 Ct. Int'l Trade 752, 786 (2001) ........................................................................ 31

*U.K. Carbon and Graphite Co., Ltd. v. United States,*
   931 F. Supp. 2d 1322 (Ct. Int'l Trade 2013) ......................................................... 37

*Uniroyal Marine Exps. Ltd. v. United States,*
   626 F. Supp. 2d 1312 (Ct. Int'l Trade 2009) ................................................. passim

*United States v. Chem. Found., Inc.,*
   272 U.S. 1 (1926)...................................................................................................... 25

*United States v. Eurodif S.A.,*
   555 U.S. 305 (2009).............................................................................................. 10, 11

*United States v. Mead Corp.,*
   533 U.S. 218 (2001).................................................................................................. 11

*Universal Camera Corp. v. NLRB,*
   340 U.S. 474 (1951).................................................................................................. 10

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,,*
   435 U.S. 519 (1978).................................................................................................. 18

*World Finer Foods, Inc. v. United States,*
   24 Ct. Int'l Trade 541 (2000) .................................................................................. 26

*Yantai Timken Co. v. United States*,
   521 F. Supp. 2d 1356, 1371 (Ct. Int'l Trade 2007),
   *aff'd*, 300 F. App'x 934 (Fed. Cir. 2008).............................................................. 18

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*,
   707 F. Supp. 2d 1355 (Ct. Int'l Trade 2010) ..................................................... 41, 53

## REGULATIONS

19 C.F.R. § 351.104(a)(2) ........................................................................................ 7

19 C.F.R. § 351.301(c)(2)(i)-(ii)............................................................................. 14

19 C.F.R. § 351.302 ............................................................................................ 7, 14

19 C.F.R. § 351.303 .................................................................................... passim

## ADMINISTRATIVE DETERMINATIONS

*Certain Circular Welded Carbon Quality Steel Line Pipe from China*,
   74 Fed. Reg. 14,514 (Dep't of Commerce Mar. 31, 2009) ....................................... 53

*Certain Frozen Warmwater Shrimp from China*,
   72 Fed. Reg. 72,668 (Dep't of Commerce Dec. 21, 2007)................................... 48, 49

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*,
   75 Fed. Reg. 47,771 (Dep't of Commerce Aug. 9, 2010) ................................... 21, 33

*Certain Lined Paper Products from the People's Republic of China*,
   73 Fed. Reg. 58,540 (Dep't of Commerce Oct. 7, 2008) ....................................... 12

*Certain New Pneumatic Off-the-Road Tires from China*,
   78 Fed. Reg. 22,513 (Dep't of Commerce Apr. 16, 2013)....................................... 40

*Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*,
   73 Fed. Reg. 2,4458 (Dep't of Commerce Jan. 15, 2008)................................... 13, 33

*Circular Welded Carbon Quality Steel Line Pipe from China*,
   74 Fed. Reg. 14,514 (Dep't of Commerce Mar. 31, 2009)....................................... 48

*Citric Acid and Certain Citrate Salts from China*,
   74 Fed. Reg. 16,838 (Dep't of Commerce Apr. 13, 2009)....................................... 40

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From China*,
   76 Fed. Reg. 70,960 (Dep't of Commerce Nov. 16, 2011) .................................... 2,3

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China*,
   77 Fed. Reg. 31,3090 (Dep't of Commerce May 25, 2012) ...................................................... 4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from China*,
   77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012) ......................................................... 2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from China*,
   77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012).......................................................... 2

*Drawn Stainless Steel Sinks from the People's Republic of China*,
   77 Fed. Reg. 18,2070 (Dep't of Commerce Mar. 27, 2012) ................................................... 12

*Drawn Stainless Steel Sinks from the People's Republic of China*,
   78 Fed. Reg. 13,019 (Dep't of Commerce Feb. 26, 2013) ....................................................... 13

*Electrolytic Maganese Dioxide from China*,
   73 Fed. Reg. 48,195 (Dep't of Commerce Aug. 18, 2008) ...................................................... 35

*Initiation Notice*,
   76 Fed. Reg. at 70,964 ................................................................................................. 16, 17, 21

*Narrow Woven Ribbons with Woven Selvedge from China*,
   75 Fed. Reg. 41,808 (Dep't of Commerce July 19, 2010) ....................................................... 35

*Porcelain-on-Steel Cooking Ware*,
   71 Fed. Reg. 24,641 (Dep't of Commerce April 26, 2006)................................................ 48, 49

*Magnesium Metal from China*,
   75 Fed. Reg. 65,450 (Dep't of Commerce Oct. 25, 2010) ...................................................... 39

*Silicon Carbide from China*,
   59 Fed. Reg. 22,5857 (Dept. of Commerce May 2, 1994) ...................................................... 45

*Small Diameter Graphite Electrodes From the People's Republic of China*,
   77 Fed. Reg. 33,4050 (Dep't of Commerce June 6, 2012)...................................................... 37

*Sodium Hexametaphosphate from China*,
   75 Fed. Reg. 64,695 (Dep't of Commerce Oct. 20, 2010) ...................................................... 44

*Sodium Hexametaphosphate from China*,
   77 Fed. Reg. 59,375 (Dep't of Commerce Sept. 27, 2012)...................................................... 39

*Sparklers from China*,
   56 Fed. Reg. 20,5889 (Dep't of Commerce May 6, 1991)....................................................... 44

*Steel Wire Garment Hangers from the Socialist Republic of Vietnam*,
   77 Fed. Reg. 46,044 (Dep't of Commerce Aug. 2, 2012)........................................................ 13

*Wooden Bedroom Furniture from China*,
   75 Fed. Reg. 50,992 (Dep't of Commerce Aug. 18, 2010) ....................................................... 44

*Wooden Bedroom Furniture from the People's Republic of China*,
   76 Fed. Reg. 10,8801 (Dep't of Commerce Feb. 28, 2011) .......................................... 12, 13, 39

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE DONALD C. POGUE, CHIEF JUDGE

| | | |
|---|---|---|
| JIANGSU JIASHENG PHOTOVOLTAIC TECHNOLOGY CO., LTD., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Consol. Ct. No. 13-0012 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| HANWHA SOLARONE (QUIDONG) CO., LTD., *et al.*, | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

### ORDER

Upon consideration of plaintiffs' motions for judgment upon the agency record, all responses thereto, and all other papers and proceedings herein, and upon due deliberation, it is hereby

ORDERED that plaintiffs' motions for judgment upon the agency record are DENIED; and it is further

ORDERED that judgment is entered in favor of the United States.

Dated: _____, 2014        _____
             New York, New York                                       JUDGE

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE DONALD C. POGUE, CHIEF JUDGE

| | |
|---|---|
| JIANGSU JIASHENG PHOTOVOLTAIC TECHNOLOGY CO., LTD., *et al.*, : : : | |
| Plaintiffs, : | |
| v. : | Consol. Ct. No. 13-0012 |
| : | **PUBLIC VERSION** |
| UNITED STATES, : : | |
| Defendant, : : | |
| and : : | |
| HANWHA SOLARONE (QUIDONG) CO., LTD., *et al.*, : : : | |
| Defendant-Intervenors. : : | |

### DEFENDANT'S OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of this Court's rules, defendant, the United States, respectfully submits this response to the motions for judgment upon the agency record filed by plaintiffs, SolarWorld Industries America Inc. (SolarWorld) and Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. (Jiasheng). SolarWorld and Jiasheng challenge certain aspects of the Department of Commerce's (Commerce) antidumping investigation covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China (PRC). As demonstrated below, Commerce's determination is based upon substantial evidence and is otherwise in accordance with law. Accordingly, we respectfully request that the Court sustain Commerce's final determination.

1

## STATEMENTS PURSUANT TO RULE 56.2

**I.     Administrative Determination Under Review**

The administrative determination under review is Commerce's final determination of sales at less than fair value: *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from China,* 77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012) (final determ.) (*Final Determination*), and accompanying Issues and Decision Memorandum, Public Document (P.D.) 1397, attached as exhibit 21 to SolarWorld's appendix; and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from China*, 77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012) (amended final determ. and order).

**II.     Issues Presented For Review**

1.     Whether Commerce's determination to deny Jiasheng a separate rate and treat the company as part of the PRC-wide entity is supported by substantial evidence.

2.     Whether Commerce's determination to use Thai Harmonized Tariff Schedule (HTS) categories covering alloyed aluminum profiles as a surrogate value for aluminum frames is supported by substantial evidence.

3.     Whether Commerce's determination to grant certain companies a separate rate is supported by substantial evidence.

## STATEMENT OF FACTS

On October 19, 2011, SolarWorld filed a petition with Commerce and the U.S. International Trade Commission (ITC) alleging that imports of crystalline silicon photovoltaic cells (solar cells) from China were being, or were likely to be, sold in the United States at less than fair value and that such imports were materially injuring, or threatening material injury to, an industry in the United States. *See Crystalline Silicon Photovoltaic Cells, Whether or Not*

*Assembled into Modules, From China*, 76 Fed. Reg. 70,960 (Dep't of Commerce Nov. 16, 2011)

(initiation) (*Initial Notice*).  On November 16, 2011, Commerce published a notice that it had

initiated an antidumping duty investigation to determine whether imports of solar cells from

China were being, or were likely to be, sold in the United States at less than fair value. *Id.*  In the

initiation notice, Commerce explained that it would issue quantity and value (Q&V)

questionnaires to the 75 producers/exporters of solar cells named in the petition and that it would

make its respondent selection decision based upon the Q&V questionnaire responses that it

received. *Id.* at 70,964.  Commerce also explained that it would post the Q&V questionnaire on

its website and that parties that did not receive a Q&V questionnaire could file a response by

November 29, 2011 "if they wish{ed} to be included in the pool of companies from which

{Commerce would} select mandatory respondents." *Id.*  Commerce further explained that

separate-rate applications would be due 60 days after publication of the *Initiation Notice*, and

that respondents were required to "submit a response to both the {Q&V} questionnaire and the

separate-rate application by the respective deadlines in order to receive consideration for

separate-rate status." *Id.*

## I.  <u>Respondent Selection and Separate Rates Applications</u>

On November 9, 2011, Commerce issued a Q&V questionnaire to the 75 companies

identified in the petition as potential exporters of solar cells from China, including Jiasheng, and

posted the questionnaire on its website. *See* P.D. 225, Attach 2 at 42, attached as exhibit 1 to our

appendix; P.D. 275 at 1-2, attached as exhibit 2 to our appendix.  The Q&V questionnaire

explained that "{a}ll submissions must be made electronically using {Commerce's} IA ACCESS

website," unless the response qualified for manual filing.  P.D. 225, Attach. III at 86.  All of the

Q&V questionnaires issued by Commerce were delivered, including the questionnaire sent to

Jiasheng. *See* P.D. 275; P.D. 225 at 100 (listing Jiasheng), 104 (indicating that the tracking

number for Jiasheng's questionnaire was "1ZA610W90498461594"), 111-12 (indicating

delivery of package with tracking number "1Z A61 0W9 04 9846 159 4" on 11/12/2011).

On November 29, 2011, Commerce received timely filed Q&V questionnaire responses

from 80 exporters who filed their responses using Commerce's IA ACCESS website. P.D. 275

at 2. After close of business on November 29, Jiasheng transmitted its questionnaire response by

e-mail to an analyst identified in the *Initiation* rather than submitting it electronically on

Commerce's record using IA ACCESS. *See* P.D. 764 at Ex. A.

On December 8, 2011, Commerce selected two mandatory respondents based upon the

timely filed record information that it had received on IA ACCESS: Wuxi Suntech Power Co.,

Ltd. (Wuxi Suntech) and Changzhou Trina Solar Energy Co., Ltd. (Trina Solar). P.D. 275 at 5.

On December 9, 2011, Commerce notified nine Chinese exporters who had filed their

submissions using IA ACCESS that their Q&V questionnaire responses had substantive or

procedural deficiencies, and provided them until December 14, 2011, to re-file their responses.

*See* P.D. 226-234, 264 at 3. Although Commerce did not grant Jiasheng an opportunity to re-

submit its improperly filed and untimely Q&V questionnaire response, Jiasheng filed its

response using IA ACCESS on December 12, 2011. *See* P.D. 356, attached as exhibit 3 to our

appendix. On January 6, 2012, Commerce notified Jiasheng that it was rejecting the December

12 filing as untimely, that it would not rely upon the filing during the investigation, and that the

submission would be removed from the record. *Id.*; P.D. 576.

In January 2012, Commerce received timely filed separate rate applications (SRAs) from

68 companies. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into*

*Modules, from China*, 77 Fed. Reg. 31,309, 31,310 (Dep't of Commerce May 25, 2012) (prelim.

4

determination) (*Preliminary Determination*). Jiasheng submitted an SRA using IA ACCESS on January 19, 2012. *See* P.D. 623 at 1. On February 10, 2012, Commerce rejected Jiasheng's application for a separate rate because Jiasheng had not timely filed a Q&V questionnaire response. *Id.* at 1-2.

On February 29, 2012, Jiasheng protested Commerce's rejection of its Q&V questionnaire and SRA. P.D. 764, attached as exhibit 4 to our appendix. On March 29, 2012, Commerce officials met with Jiasheng regarding its rejection of Jiasheng's submissions. *See* P.D. 926 at 1. On April 3, 2012, Commerce notified Jiasheng that its decision rejecting the company's SRA was unchanged because companies were required to file timely Q&V questionnaire responses to be considered for a separate rate, and Jiasheng had not timely filed its Q&V questionnaire response. *See id.* at 1-2.

## II.   **Preliminary Determination**

On May 16, 2012, Commerce issued its preliminary determination that sales were dumped by the mandatory respondents, the Suntech Group[1] and Trina[2]. *See Preliminary Determination*, 77 Fed. Reg. at 31,309. Commerce calculated a preliminary weighted-average dumping margin of 31.22 percent for the Suntech Group and 31.14 percent for Trina. *See id.* at 31,322. Commerce also preliminarily granted separate rate status to 59 of the 68 companies that timely filed SRAs. *Id.* at 31,315, 31,322-23. Commerce preliminarily assigned these companies

---

[1] Commerce determined that the producers Wuxi Suntech, Luoyang Suntech Power Co., Ltd., Suntech Power Co., Ltd. and Wuxi Sun-Shine Power Co., Ltd. were affiliated and should be treated as a collapsed entity, the "Suntech Group." *Preliminary Determination*, 77 Fed. Reg. at 31,315; P.D. 1174.

[2] Commerce determined that the producers Changzhou Trina Solar Energy Co. Ltd. (Trina Solar) and Trina Solar (Changzhou) Science & Technology Co., Ltd. (Trina S&T) were affiliated and should be treated as a collapsed entity, "Trina." *Preliminary Determination*, 77 Fed. Reg. at 31,315; P.D. 1173.

5

a rate of 31.18 percent, the rate equal to an average of the rate calculated for the mandatory

respondents. *Id.* at 31,318, 31,322-23. With respect to Jiasheng, Commerce preliminarily

determined that the company was not eligible for a separate rate and should be treated as part of

the PRC-wide entity because it had failed to file a timely response to the Q&V questionnaire. *Id.*

at 31,317. Commerce also preliminarily determined that eight other companies were not eligible

for separate rates because they either did not sell subject merchandise to the United States or

failed to submit a timely response to Commerce's supplemental separate rate questionnaire. *Id.*

Commerce also identified the data sources that it had preliminarily determined to use to

value the factors of production reported by the mandatory respondents, in accordance with 19

U.S.C. § 1677b(c). P.D. 1194, attached as exhibit 16 to SolarWorld's appendix. Commerce

preliminarily determined that it would use Thai HTS category 7610.10 ("doors, windows and

their frames and thresholds for doors") rather than the category requested by petitioners, 7616.99

("articles of aluminum, not elsewhere specified or indicated"), as a surrogate source to value

aluminum frames used in the production of subject merchandise. P.R. 1194, at 3. Commerce

explained that Thai HTS category 7610.10 was the best information available for valuing

aluminum frames because (1) category 7616.99 is an "other" category that could reflect imports

of various types of products, (2) category 7610.10 reflects imports of a product most similar to

the aluminum frames used in modules, *i.e.*, aluminum window frames, and (3) it was unclear

whether HTS 7616.99, which covers other aluminum structures, includes any framing. *Id.*

On May 21, 2012, five days after Commerce issued its preliminary determination,

Jiasheng attempted to re-file its SRA. *See* P.D. 1165.

On May 25, 2012, Commerce published its preliminary determination in the Federal

Register. *Preliminary Determination*, 77 Fed. Reg. 31,309. That same day, Commerce informed

Jiasheng that it was rejecting the May 21, 2012 submission as untimely new factual information, removing the submission from the record, and was not relying upon it in the investigation, in accordance with 19 C.F.R. §§ 351.104(a)(2) and 351.302(d).  P.D. 1224.

On July 30 and July 31, 2012, Jiasheng, Yingli,[3] Chaori,[4] Trina Solar, SolarWorld, and Wuxi Suntech, filed case briefs.  *Final Determination*, 77 Fed. Reg. at 63,791.  On August 6 and August 7, 2012, Sun Power Corporation, Trina Solar, certain separate rate applicants,[5] Wuxi Suntech, and SolarWorld submitted rebuttal briefs.  *Id.*

## III.   Final Determination

On October 17, 2012, Commerce published its final determination in which it calculated weighted-average dumping margins of 31.73 percent and 18.32 percent for Suntech Group and Trina, respectively.  *Final Determination*, 77 Fed. Reg. at 63,795.  Commerce continued to find that Jiasheng did not qualify for a separate rate based upon its failure to submit a timely Q&V questionnaire response.  *See* Issues and Decision Memorandum, at cmt. 45.  As a result, Commerce continued to treat Jiasheng as part of the PRC-wide entity and assigned the PRC-wide entity a rate of 249.96 percent.  *Id.*

Commerce continued to find that each of the companies that had been preliminarily granted a separate rate in its preliminary determination had demonstrated both *de facto* and *de*

---

[3] Yingli Green Energy Holding Company Limited and Yingli Green Energy Americas, Inc. (collectively, Yingli).

[4] Shanghai Chaori Solar Energy Science & Technology Co., Ltd. and Shanghai International Trading Corporation Ltd. (collectively, Chaori).

[5] Sumec Hardware & Tools Co., Ltd.; Ningbo Etdz Holdings Ltd.; LDK Solar Hi-Tech (Nanchang) Co., Ltd.; LDK Solar Hi-Tech (Suzhou) Co., Ltd.; Ningbo Qixin Solar Electrical Appliance Co., Ltd.; Ningbo Komaes Solar Technology Co., Ltd.; Zhejiang Jiutai New Energy Co., Ltd.; ET Solar Industry Limited; JingAo Solar Co., Ltd.; Dongfang Electric (Yixing) MAGI Solar Power Technology Co., Ltd.; Shanghai JA Solar Technology Co., Ltd.; Jiangsu Sunlink PV Technology Co., Ltd.; and JA Solar Technology Yangzhou Co., Ltd.

*jure* absence of government control and should be granted separate rates in the final

determination. *Final Determination*, 77 Fed. Reg. at 63,794-96. Commerce assigned these

companies a rate of 25.96 percent based on the average of the weighted-average margins

calculated for the mandatory respondents. *Id.* at 63,795-6.

With respect to the valuation of aluminum frames, Commerce, in a change from the

preliminary determination, determined that it would use Thai HTS 7604.29.90001 ("aluminum

alloy ... profiles, other than hollow profiles...other profiles") to value Trina's aluminum frames

and Thai HTS 7604.21 ("aluminum alloy hollow profiles") to value Wuxi Suntech's aluminum

frames because these categories were consistent with the companies' descriptions of their

respective aluminum frames. Issues and Decision Memorandum, at cmt. 16.

## IV.   Amended Final Determination And Order

Following notification on November 30, 2012, by the ITC of its affirmative

determination of material injury to the United States industry, on December 7, 2012, Commerce

published its amended final determination and antidumping duty order on solar cells, whether or

not assembled into modules, from China. *See* amended final determination and order, 77 Fed.

Reg. 73,018. Commerce determined that it had made ministerial errors with respect to

calculating net United States price, calculating the weighted-average unit value of reported

silicon wafers, and the valuation of Wuxi Suntech's installation manuals. *Id.* at 73,019.

Accordingly, Commerce revised the margin for Wuxi Suntech from 31.73 percent to 29.14

percent. *Id.* at 73,020. Because the cash deposit rate for the separate rate respondents was based

upon the average of the margins for the mandatory respondents, Commerce also revised the rate

assigned to the separate rate respondents from 25.96 percent to 24.48 percent. *Id.*

## V.     Present Action

In February 2013, SolarWorld and Jiasheng each filed a complaint with this Court to seek judicial review of Commerce's final determination. *See* Complaint, *SolarWorld v. United States* (No. 13-06), EC/ECF No. 8; Complaint, *Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States* (No. 13-12), EC/ECF No. 8. In June 2013, the Court consolidated case 13-06 with case 13-12. *Id.*, EC/ECF No. 18.

## SUMMARY OF THE ARGUMENT

Commerce's determination that Jiasheng was ineligible for a separate rate because the company did not timely file its Q&V questionnaire response is not arbitrary or capricious and is supported by substantial evidence and in accordance with law. Commerce's determination to reject Jiasheng's Q&V questionnaire response as untimely is reasonable because Jiasheng failed to submit its Q&V questionnaire response using IA ACCESS until 13 days after the filing deadline. As a result of Jiasheng's failure to timely and properly file its Q&V questionnaire response, Commerce properly rejected Jiasheng's SRA and properly determined that Jiasheng was ineligible for a separate rate.

Commerce's selection of Thai HTS category 7604 as a surrogate value for the aluminum frame inputs used by the mandatory respondents to produce subject merchandise is supported by substantial evidence. Consistent with the statute's mandate to select the best available evidence, Commerce reasonably concluded that Thai HTS category 7604 was the best available evidence with which to value the aluminum frame inputs used by the mandatory respondents. In addition, Commerce properly considered all of the record evidence regarding the valuation of aluminum frames but reasonably limited its discussion in the Final Determination to the important aspects of the aluminum frame valuation issue.

9

Finally, Commerce's determination that certain respondents were eligible for a separate rate is supported by substantial evidence. Commerce based its determination upon record evidence that indicated that the separate rate respondents operated free from *de jure* and *de facto* control by the Chinese government. Given this information, and the absence of any evidence indicating that the Chinese government actually exercised control over the respondent's respective day-to-day export activities, Commerce reasonably determined that direct or indirect ownership of these respondents by the government was insufficient evidence to support a finding that they are subject to government control.

## ARGUMENT

### I.    Standard Of Review

This Court sustains Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 315 n.6 (2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). Substantial evidence is also "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Moreover, "it is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing

interpretation of the record." *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988). Rather, when Congress has entrusted an agency to administer a statute in fact intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).

Further, Commerce's statutory "interpretation{s} govern{} in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *Eurodif*, 555 U.S. at 316 (citing *United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001).

This Court reviews Commerce decisions to reject untimely filings under the abuse of discretion standard. *See Carpenter Tech. Corp. v. United States*, 26 Ct. Int'l Trade 830, 837 (2002); *Uniroyal Marine Exps. Ltd. v. United States*, 626 F. Supp. 2d 1312, 1316 (Ct. Int'l Trade 2009). Under this standard, the Court "(1) must consider whether {Commerce's} decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between {Commerce's} factfindings and its ultimate action." *Consol. Fibers, Inc. v. United States*, 535 F. Supp. 2d 1345, 1352-54 (Ct. Int'l Trade 2008) (distinguishing "abuse of discretion" review from "substantial evidence" review); *see also Carpenter Tech.*, 26 Ct. Int'l Trade at 837 (explaining that Commerce's determination in this respect is "narrower" than the substantial evidence standard, and asks "whether there was a rational basis in fact for the decision") (citation omitted); *Uniroyal Marine*, 626 F. Supp. 2d at 1316 (stating that review of Commerce's determination under abuse of discretion review is "less demanding than substantial evidence review") (citation omitted).

**II.    Commerce's Determination To Deny Jiasheng A Separate Rate Is In Accordance With Law**

Commerce did not err in rejecting Jiasheng's Q&V questionnaire response and its SRA, and properly determined that Jiasheng was ineligible for a separate rate.

A.    Legal Framework

1.    Commerce Utilizes Q&V Questionnaires For Respondent Selection

Commerce must determine a weighted average dumping margin for each known exporter or producer of the merchandise under investigation. *See* 19 U.S.C. § 1677f-1(c)(1).  If it is "not practical" to do so because there is a large number of exporters or produces involved in the investigation, Commerce may limit its examination to (1) a sample of exporters, producers, or types of products, or (2) exporters and producers accounting for the largest volume of the subject merchandise. *See id.* § 1677f-1(c)(2).

The statute does not dictate the method by which Commerce may select from the largest exporters by volume.  Commerce normally selects respondents by examining U.S. Customs and Border Protection (CBP) data of subject entries and selecting respondents accounting for the largest volume of exports of subject merchandise, as specified in 19 U.S.C. § 1677f-1(c)(2)(B). *See, e.g.*, *Certain Lined Paper Products from the People's Republic of China*, 73 Fed. Reg. 58,540 (Dep't of Commerce Oct. 7, 2008) (prelim. determ.), *unchanged in* 74 Fed. Reg. 17,160 (Dep't of Commerce Apr. 14, 2009) (final determ.).  Commerce, however, may elect instead to send Q&V questionnaires to all of the producers and exporters identified in the petition and use the information collected to select the respondents for individual examination. *See, e.g.*, *Drawn Stainless Steel Sinks from the People's Republic of China*, 77 Fed. Reg. 18,207, 18,210 (Dep't of Commerce Mar. 27, 2012) (initiation inv.); *Wooden Bedroom Furniture from the People's*

*Republic of China*, 76 Fed. Reg. 10,880, 10,881 (Dep't of Commerce Feb. 28, 2011) (initiation

admin. rev.).

   Those companies that receive a Q&V questionnaire from Commerce must timely respond

to the questionnaire to receive consideration for a separate rate. *See Policy Bulletin 05.1:*

*Separate–Rates Practice and Application of Combination Rates in Antidumping Investigations*

*involving Non–Market Economy Countries* at 4 (Dep't of Commerce Apr. 5, 2005), *available at*

http://enforcement.trade.gov/policy/bull05-1.pdf.  Commerce established this requirement "to

ensure that {it} has the necessary information to appropriately select mandatory respondents."

*Id.*  Commerce's practice is to reject untimely filed Q&V questionnaire responses, reject any

separate rate application or certification subsequently filed by the company that filed an untimely

Q&V questionnaire response, and deny the company a separate rate. *See, e.g., Drawn Stainless*

*Steel Sinks from the People's Republic of China*, 78 Fed. Reg. 13,019, 13021 (Dep't of

Commerce Feb. 26, 2013) (final determ. inv.), and accompanying issues and decision

memorandum at cmt. 14 (denying Kehuaxing a separate rate because it did not file a timely

Q&V questionnaire response); *Steel Wire Garment Hangers from the Socialist Republic of*

*Vietnam*, 77 Fed. Reg. 46,044, 46,044-45, 46,049 (Dep't of Commerce Aug. 2, 2012) (prelim.

determ.) (denying Angang Clothes Rack Manufacture Co. and Vietnam Hangers Joint Stock

Company a separate rate because they did not file timely Q&V questionnaire responses),

*unchanged in* 77 Fed. Reg. 75,980 (Dep't of Commerce Dec. 26, 2012); *Circular Welded*

*Carbon Quality Steel Pipe from the People's Republic of China*, 73 Fed. Reg. 2,445, 2,448

(Dep't of Commerce Jan. 15, 2008) (prelim. determ.), *unchanged in* 73 Fed. Reg. 31,970 (Dep't

of Commerce June 5, 2008) (final determ.).

2.   Time Limits For Submission Of Factual Information

Commerce may request that any interested party submit factual information at any time in the proceeding. 19 C.F.R. §§ 351.301(c)(2)(i)-(ii). That party may request an extension of the time limit to file its response. *Id.* § 351.302(c). It must do so in writing before the applicable time limit expires, file its request consistent with the requirements of 19 C.F.R. § 351.303, and state the reasons for the request. *Id.* Unless expressly precluded by statute, Commerce may, "for good cause," extend any time limit for the submission of factual information. *Id.* § 351.302(b). If Commerce determines that it will not extend the time limit, Commerce will not consider or retain in the official record untimely filed factual information and will reject that information with, "to the extent practicable, written notice stating the reasons for rejection." *Id.* § 351.302(d).

3.   Commerce Is Authorized To Disregard Untimely Or Deficient Submissions

If an interested party, "promptly after receiving a request for {} information, ... notifies {Commerce} that {it} is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information," then Commerce must consider the ability of the interested party to submit the information in the requested form and manner and may modify those requirements to the extent necessary to avoid imposing an unreasonable burden on that party. 19 U.S.C. § 1677m(c)(1). In addition, Commerce must take into account any difficulties experienced by interested parties, particularly small companies, in supplying information requested by Commerce and shall provide to those interested parties any assistance that is practicable in supplying the information. *Id.*

14

When Commerce determines that a response to a request for information does not comply with its request, Commerce must promptly inform the party submitting the information of the nature of the deficiencies in its response and provide the party, to the extent practicable, the opportunity to remedy or to explain the deficiencies. *Id.* § 1677m(d). In addition, Commerce cannot decline to consider information that is provided by an interested party and is necessary to the determination, but fails to satisfy Commerce's requirements, if the following criteria are satisfied:  (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching a determination; (4) the interested party has demonstrated that it acted to the best of its ability in responding to Commerce's requests for information; and (5) the information can be used without undue difficulties. *Id.* § 1677m(e). Thus, if the party's explanation of its deficiency is insufficient, and one or more of the above factors is not met, Commerce may disregard all or part of the information provided and use the facts otherwise available. *Id.* §§ 1677e(a), 1677m(d)-(e).

      B.    Commerce Did Not Abuse Its Discretion In Rejecting Jiasheng's Untimely Q&V Questionnaire Response

Commerce properly refused to accept Jiasheng's late Q&V questionnaire response. Commerce's deadline for filing of Q&V questionnaire responses is crucial for its timely analysis and disposition of investigations, particularly in this complex investigation involving a very large number of importers of solar cells from China. Commerce provided explicit instructions regarding its filing deadline and the consequences of failure to file, but Jiasheng missed the deadline. Further, 19 U.S.C. § 1677m(d) did not obligate Commerce to ensure Jiasheng satisfied the deadline or to contact it when it failed to do so.

15

1.   Despite Instructions From Commerce, Jiasheng Failed To Meet The
     Deadline For Timely Filed Q&V Questionnaire Responses

In light of the large number of exporters and producers subject to the investigation,

Commerce notified all interested parties – at the initiation of the investigation – that it intended

to issue Q&V questionnaires to the companies named in the petition and to select respondents

based upon the responses, in accordance with 19 U.S.C. § 1677f-1(c)(2). *Initiation Notice*, 76

Fed. Reg. at 70,964.  Commerce also informed all of the interested parties, including Jiasheng, of

the requisite dates and procedures for consideration of separate-rate status.  Specifically,

Commerce alerted interested parties to the importance of timely filing their responses to the

Q&V questionnaire by the November 29, 2011, deadline, stating that it "*requires* that the

respondents submit a response to both the {Q&V} questionnaire and the separate-rate

application by the respective deadlines *in order to receive consideration for separate-rate

status*." *Id.* (emphasis added).

Similarly, in the Q&V questionnaire, Commerce identified the deadline for the response

and explained that it would be "limited in its ability to extend the deadline for the response"

because of investigation time constraints.  P.D. 225 at 42; *see id.* at 82, Attach. III at 86.

Commerce also specified in the questionnaire that "{a}ll submissions must be made

electronically using {Commerce's} IA ACCESS website" unless the response qualified for

manual filing.  *Id.*, Attach. III at 86, 87.  Consistent with 19 C.F.R. § 303(b)(1), Commerce

stated that an "electronically filed document must be received successfully in its entirety by IA

ACCESS by 5 p.m. Eastern Time (ET) on the due date{} . . . ." P.D. 225 at 86.; *see* 19 C.F.R.

§ 303(b)(1) ("An electronically filed document must be received successfully in its entirety by

{Commerce's} electronic records system, IA ACCESS, by 5 p.m. Eastern Time on the due

date.").  Further, Commerce explained that if a respondent was unable to comply with the

electronic filing requirement, it was required to "promptly notify the official in charge and submit a full written explanation of the reasons {it was} unable to file the document electronically" and suggest alternative forms in which to submit the information. P.D. 225 at 88. Commerce also stated that it would "not give consideration to any separate-rate status application made by parties that fail to timely respond to the {Q&V} Questionnaire or fail to timely submit the requisite separate-rate status application." *Id.*; *see id.* at 82.

Commerce issued the Q&V questionnaire to Jiasheng on November 9, 2011, one day after it initiated the investigation. *Id.* at 42; *Initiation Notice*, 76 Fed. Reg. at 70,965 (noting the November 8, 2011 signature date). Commerce also posted the Q&V questionnaire on its website soon after initiating the investigation. *See* P.D. 275 at 2. On December 8, 2011, Commerce confirmed that Jiasheng had received the Q&V questionnaire on November 12, 2011, only three days after Commerce mailed the questionnaire, and 17 days before the deadline for Q&V questionnaire responses. *See* P.D. 225 at 100, 104, 111-112.

Contrary to Commerce's explicit instructions that all responses be submitted using IA ACCESS and its regulations, Jiasheng transmitted its questionnaire response as an attachment to an e-mail sent to a Commerce official identified in the *Initiation Notice*. *See* P.D. 764 at Ex. A. In its e-mail (with a time stamp of "2011-11-30 10:59"), Jiasheng provided no indication that it had experienced any difficulties in responding to the Q&V questionnaire, stating only that it was "{s}orry for submit{ting the attachment} so late." *Id.* Ten days after the deadline for Q&V questionnaire responses, Jiasheng sent another e-mail to the same Commerce official (with a time stamp of "2011-12-09 05:12") to inquire whether Commerce had received the original e-mail and attachment, and acknowledging that it had transmitted the Q&V questionnaire response "a little late." *Id.* Jiasheng submitted its Q&V questionnaire response using IA ACCESS on

17

December 12, 2011. *See* P.D. 356. Because Jiasheng did not officially file its response using IA ACCESS until 13 days *after* the deadline, Commerce notified Jiasheng on January 6, 2012, that it was rejecting the company's December 12 submission as untimely, and that it would not rely upon the submission in the investigation. *Id.*; *see* Issues and Decision Memorandum at 103-105.

2.    Commerce Properly Exercised Its Discretion

Commerce did not abuse its discretion in rejecting Jiasheng's untimely filed submission. "Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012) (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, Inc., 435 U.S. 519, 543-44 (1978) (internal quotations and quotation marks omitted)). Therefore, Commerce has substantial discretion to set deadlines in its administrative proceedings for submission of information. *See Fine Furniture (Shanghai) Ltd. v. United States*, 865 F. Supp. 2d 1254, 1266 (Ct. Int'l Trade 2012) (citation omitted); *Yantai Timken Co. v. United States*, 521 F. Supp. 2d 1356, 1371 (Ct. Int'l Trade 2007), *aff'd*, 300 F. App'x 934 (Fed. Cir. 2008)).

These deadlines allow Commerce to complete its statutory administrative proceedings timely, *see Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1560 (Fed. Cir. 1984), and serve the interests of efficiency and finality, *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277 (Fed. Cir. 2012); *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 353 F. Supp. 2d 1294, 1303-04 (Ct. Int'l Trade 2004), *aff'd*, 146 F. App'x 493 (Fed. Cir. 2005).

Commerce's discretion is not unbounded. This Court reviews Commerce's actions under the abuse of discretion standard of review, *see, e.g., Uniroyal Marine*, 626 F. Supp. 2d at 1316,

18

and has held that Commerce abuses its ample discretion in refusing to accept untimely information when "the concerns for accuracy and fairness outweigh concerns of finality and agency burden." *See Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342, 1365 (Ct. Int'l Trade 2012), *appeal pending*, Fed. Cir. No. 2013-1033; *Fine Furniture*, 865 F. Supp. 2d at 1267. The Court's inquiry into Commerce's enforcement of its deadlines is on a "case-by-case" basis. *Grobest*, 815 F. Supp. 2d at 1365.

Jiasheng analogizes this case to *Grobest*, arguing that Commerce improperly failed to waive its deadline in favor of Jiasheng. *See* Jiashseng Br. at 9-11 (discussing *Grobest*, 815 F. Supp. 2d 1342). Jiasheng's arguments should be rejected.

> ### a.   Burden Upon Commerce In Accepting Late Responses

In addressing the first part of the *Grobest* balancing test, Jiasheng argues that accepting late Q&V questionnaire responses would not burden Commerce. Jiasheng Br. at 11-13. Timely receipt of Q&V questionnaire responses, however, is essential to Commerce's timely completion of its distinct mandatory respondent selection determination, which, in turn, is instrumental for it to conduct the remaining investigation by the statutory deadlines.

As Commerce explained, it uses the Q&V questionnaire responses to select mandatory respondents. Issues and Decision Memorandum at 104. Examination of the selected respondents – the main focus of the investigation – cannot begin until the Q&V questionnaire responses are received and analyzed. *Id.* Thereafter, Commerce must conduct an extensive investigatory process prior to the preliminary determination, which was due less than six months after it received the Q&V questionnaire responses. Commerce explained that it must "analyze questionnaire responses, issue and analyze supplemental questionnaire responses, calculate dumping margins for the respondents and in this case, analyze nearly 70 SRAs and a significant

amount of comments on various issues including scope, separate rates and critical circumstances." *Id.*; *see* 19 U.S.C. §§ 1673b(b)(1)(a) (providing 140 days from the date of initiation for a preliminary determination), 1673b(c)(1)(A) (providing 190 days from the date of initiation for extraordinarily complicated cases).

To ensure that it meets the preliminary determination deadline, Commerce chooses mandatory respondents promptly following its receipt of Q&V questionnaire responses. Issues and Decision Memorandum at 104. "If {Commerce} were to allow parties to file Q&V questionnaire responses at various points after the due date for such responses it would continually be restarting the respondent selection process and could delay the start of the investigatory process as outlined above." *Id.* Accepting late responses would signal to others that they could file Q&V questionnaire responses well beyond the established deadline and still remain eligible for a separate rate, which would accordingly extend the time that Commerce would expend in selecting mandatory respondents further into the time when it should be investigating the companies. That Commerce conducts its mandatory respondent selection early in the investigation does not detract from the timing within which Commerce requires the quantity and value information.

This need was particularly acute in this investigation because of the voluminous number of Chinese solar cell companies comprising the pool of potential mandatory respondents. Commerce could not let the deadline lapse; doing so would delay selection of the respondents from whom Commerce needed to request information to conduct its investigation. As Commerce explained, it established a firm deadline, notified parties including Jiasheng of the deadline, and applied it consistently to all respondents so that it could understand the universe of Chinese companies as soon as possible. Thus, Commerce required *all* Q&V questionnaire

responses to be properly filed by 5:00 p.m. on November 29, 2011. *Initiation Notice*, 76 Fed. Reg. at 70,964; *see* 19 C.F.R. 351.303(b)(1). There is *no* dispute that Jiasheng did not meet this deadline. It did not file its Q&V questionnaire response using IA ACCESS until 13 days after it was due. Issues and Decision Memorandum at 103.

      *Grobest* involved Commerce's rejection of an untimely filed separate rate certification. 815 F. Supp. 2d at 1364-65. Commerce's determination in *Grobest* to reject the respondent's separate rate certification has different consequences from its rejection of Jiasheng's Q&V questionnaire response. The former occurred after the respondent selection process and, thus, the untimely separate rate certification did not affect the pool of potential mandatory respondents. Further, in *Grobest*, Commerce relied upon CBP data of subject entries to select the respondents for individual review. *See Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 75 Fed. Reg. 47,771 (Dep't of Commerce Aug. 9, 2010) (final determ.), and accompanying issues and decision memorandum at cmt. 5. Therefore, the requirements for separate rate eligibility applicable to the *Grobest* respondent and to Jiasheng differ; the *Grobest* respondent need only have timely filed a separate rate certification, while Jiasheng was required to timely file *both* a Q&V questionnaire response and SRA.

      In addition, there is a distinction between information correcting errors, which Commerce must accept late in certain circumstances, and supplemental information, which Commerce can almost always reject if untimely. *See Fine Furniture*, 865 F. Supp. 2d at 1267 n. 16 (discussing *PSC VSMPO-Avisma*, 688 F.3d 751; *Timken U.S. Corp. v. United States*, 434 F.3d 1345 (Fed. Cir. 2006); *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995)); *see also Fischer S.A. Comercio, Industria & Agricultura v. United States*, 700 F. Supp. 2d 1364, 1375 (Ct. Int'l Trade 2010). The United States Court of Appeals for the Federal Circuit and this Court have

sustained Commerce's enforcement of its deadlines and rejection of untimely information when parties seek to present untimely new gap-filling information, as Jiasheng sought to do in this case. *See, e.g., PSC VSMPO-Avisma*, 688 F.3d at 757, 760-62; *Tianjin Mach.*, 353 F. Supp. 2d at 1303-04; *Yantai*, 521 F. Supp. 2d at 1361-62, 1370-71.[6]

In particular, this Court has sustained Commerce's enforcement of its deadline and filing requirements for Q&V questionnaire responses. In *Hyosung*, plaintiff failed to timely or correctly file its response to Commerce's Q&V questionnaire. *Hyosung Corp. v. United States*, No. 10-00114, 2011 Ct. Intl. Trade LEXIS 54, at *4-6, 8-13, 15-17 (Ct. Int'l Trade Mar. 31, 2011). The Court held that Commerce had the discretion to reject untimely filed Q&V questionnaire responses and to refuse to place that information upon the record or to consider it in its determination. *Id.* at *9. This is precisely what Commerce did in this case. *See also Uniroyal Marine*, 626 F. Supp. 2d at 1314-17 (sustaining Commerce's rejection of untimely, incorrectly filed response to Q&V questionnaire response). *Compare Fine Furniture*, 865 F. Supp. 2d at 1267-68 & n.16, 1269; *id.* at 1269 (finding an abuse of discretion when plaintiffs did not originally provide timely information by the deadline to respond to the Q&V questionnaire, but Commerce later requested new factual information and placed new information upon the record).

In contrast, cases finding abuse of discretion involve untimely submitted simple corrective information that Commerce could plug into its calculations and that did not require

---

[6] *See also, e.g., Max Fortune Indus. Co. v. United States*, No. 11-00340, 2013 Ct. Intl. Trade LEXIS 57 (Ct. Int'l Trade Apr. 15, 2013); *Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, No. 10-00059, 2011 Ct. Intl. Trade LEXIS 123, at *27-29, 33 (Ct. Int'l Trade Oct. 12, 2011); *Reiner Brach GmbH & Co. KG v. United States*, 206 F. Supp. 2d 1323, 1333-34 (Ct. Int'l Trade 2002).

Commerce to begin its substantive analysis anew. *See, e.g., Timken*, 434 F.3d at 1347-48, 1351; *NTN Bearing*, 74 F.3d at 1208; *Fischer*, 700 F. Supp. 2d at 1375, 1377.

This case does not involve the submission of untimely information correcting erroneously submitted record data. Rather, Jiasheng sought to introduce late quantity and value information that serves as the basis for selecting mandatory respondents. Consideration of Jiasheng's new information would involve Commerce comparing and reevaluating the universe of respondents, and possibly amending its selection of mandatory respondents. This is not a simple, straightforward mathematical adjustment. It involves a completely new, substantive analysis of record information as well as perhaps consequent alterations to questionnaires and inspection of sales and company data.

       b.    <u>Jiasheng's Interest In Presenting Its Untimely Information</u>

Addressing the second part of the *Grobest* balancing test, 815 F. Supp. 2d at 1366, Jiasheng argues that its interest in presenting its untimely information outweighs any burden that Commerce sustains in accepting late Q&V questionnaire responses. *See* Jiasheng Br. at 13-14. Jiasheng is incorrect.

That the PRC-wide cash deposit is higher than the 24.48 percent separate rate cash deposit does not mean that Jiasheng's interest in a separate rate outweighs the burden to Commerce. In *Grobest*, this Court had before it the fourth administrative review of an established antidumping duty order. 815 F. Supp. 2d at 1347. Because the respondent had established its eligibility for a separate rate in the investigation and had maintained its separate rate status in each of the three subsequent administrative reviews, the Court concluded that it "appear{ed} likely, that, but for the untimeliness of its submission {the respondent} would have received a separate rate in the fourth administrative review, as it remain{ed} wholly foreign-

owned." *Id.* at 1366. The Court thus held that the respondent was likely to qualify for a separate rate had Commerce accepted its untimely separate rate certification.

In this case, Commerce was faced with investigating a new product that is manufactured and imported by numerous previously unknown companies, and there were no prior separate rate findings from previous administrative reviews. Jiasheng neglected to timely file a document that was essential to Commerce's mandatory respondent selection determination in the investigation, and Commerce was on a tight schedule to allow sufficient time to request and to analyze information from the mandatory respondents. *Cf. Cosco Home & Office Prods. v. United States*, 350 F. Supp. 2d 1294, 1302 (Ct. Int'l Trade 2004) (holding that "if interested parties were free to depart from the filing requirements, the cumulative administrative burden on Commerce would be enormous."), *aff'd*, 158 F. App'x 284 (Fed. Cir. 2005).

Moreover, the Court in *Grobest* found that the respondent was "diligent" in its participation in the review, curing its omission immediately upon discovery. 815 F. Supp. 2d at 1367. Jiasheng's claim that it was similarly diligent in responding to Commerce's questionnaire rings hollow. Jiasheng argues that it was unaware of the Q&V questionnaire until the day the response was due, but fails to cite to any record evidence to support its claim. *See* Jiasheng Br. at 6, 13-14; *Uniroyal Marine*, 626 F. Supp. 2d at 1316 (faulting plaintiff for failure to present evidence that it was unaware that Commerce did not receive its Q&V questionnaire response), 1317 (distinguishing cases in which plaintiffs presented "verifiable evidence to support the determination that they had not received the questionnaires, and thus were uninformed of their duty to respond.").

In fact, all indications are to the contrary. The United Parcel Service confirmed that delivery of the Q&V questionnaire occurred on November 12, 2011, P.D. 225 at 111-12, 17 days

before the due date for responses. Jiasheng neither acknowledges nor explains this record evidence in its brief to the Court. In any event, Commerce is presumed to have sent the information to Jiasheng, and Jiasheng is presumed to have received it. *See Butler v. Principi*, 244 F.3d 1337, 1340 (Fed. Cir. 2001) (citing *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)). And because the *Initiation Notice* was published in the *Federal Register*, Jiasheng had constructive notice that it was required to send a timely Q&V questionnaire response to Commerce. *See Isaac Indus. v. United States*, 780 F. Supp. 2d 1372, 1375 (Ct. Int'l Trade 2011).

That Jiasheng had not previously participated in an antidumping duty proceeding and was not represented by counsel at the time of the issuance of the Q&V questionnaires does not alter the analysis. *See Hyosung*, 2011 Ct. Intl. Trade LEXIS 54, at *8 (rejecting plaintiff's assertions that "it was not familiar with Commerce's procedures, was not represented by counsel, Commerce did not follow-up with Hyosung regarding its failure to respond, and Hyosung made repeated, good-faith attempts to cooperate."); *see also Carpenter Tech.*, 26 Ct. Int'l Trade at 835 (stating that "{t}he generic experience of a respondent in prior proceedings offers little, if any, insight into its actions during a particular proceeding."). Jiasheng is similarly situated to many of the other respondents in this investigation that filed responses correctly, *i.e.*, through IA ACCESS, and timely. Jiasheng had ample time – 17 days – to respond to the Q&V questionnaire, but it failed to do so. Jiasheng Br. at 20. Before the deadline, Jiasheng could have requested clarification or an extension of time. *Hyosung*, 2011 Ct. Intl. Trade LEXIS 54, at *9, 15; *Mukand Ltd. v. United States*, No. 11-00401, 2013 Ct. Intl. Trade LEXIS 46, at *16 n.5 (Ct. Int'l Trade Mar. 25, 2013), *appeal pending*, Fed. Cir. No. 2013-1425. Before the deadline, it could also have informed Commerce "promptly" of its inability to comply with the requirements of filing the Q&V questionnaire response and sought Commerce's assistance in filing its

response. *See* 19 U.S.C. § 1677m(c)(1); *see also Persico Pizzamiglio, S.A. v. United States*, 18 Ct. Int'l Trade 299, 304 (1994) ("any ambiguity should have been resolved through consultation with Commerce *before the time . . . the response was due*") (emphasis added). It did not do so.

Jiasheng argues that Commerce failed to offer it sufficient consideration, given Jiasheng's limitations, as required under 19 U.S.C. § 1677m(c)(2). But Commerce could not – and is not required under section 1677m(c) to – assist Jiasheng with its difficulties if Commerce has no notice of Jiasheng's difficulties. *See China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1357-58 (Ct. Int'l Trade 2003); *Kawasaki Steel Corp. v. United States*, 110 F. Supp. 2d 1029, 1035 (Ct. Int'l Trade 2000). Commerce's duty, pursuant to section 1677m(c)(2), applies if the interested party notifies Commerce – *before the filing deadline* – that it is unable to submit the information in the form and manner requested, explains why it is unable to do so, and suggests alternative forms. *See* 19 U.S.C. § 1677m(c)(1).

In this case, Commerce's duty to assist interested parties experiencing difficulties was not triggered, because Jiasheng failed to notify Commerce that it was unable to submit its Q&V questionnaire response by the November 29 deadline, to explain why it was unable to do so, or to request an extension. *See* P.D. 764, Ex. A (e-mail dated November 30, 2011). It was not until December 9, 2011, that Jiasheng provided any indication as to why its response was untimely. *Id.* (e-mail dated December 9, 2011) (claiming that it received the Q&V questionnaire on November 28, 2011). Indeed, in *World Finer Foods*, to which Jiasheng cites, Jiasheng Br. at 22, the Court faulted Commerce for failing to offer assistance to plaintiff *when plaintiff contacted Commerce to request that assistance prior to the filing deadline*. *World Finer Foods, Inc. v. United States*, 24 Ct. Int'l Trade 541, 543-44 (2000).

26

Contrary to Jiasheng's position, nothing about the *Initiation Notice* is ambiguous. Perhaps Jiasheng was not concerned about becoming a mandatory respondent, but that is irrelevant. Jiasheng presumably wanted a separate rate, and the *Initiation Notice* as well as the Q&V questionnaire explicitly stated that, to obtain a separate rate, Jiasheng was required to file a timely Q&V questionnaire response. The *Initiation Notice* explicitly stated this *twice*. 76 Fed. Reg. at 70,964 (stating, in the "Respondent Selection" section, that "{Commerce} requires that the respondents submit a response to *both* the {Q&V} questionnaire and the {SRA} by the respective deadlines in order to receive consideration for separate-rate status.")(emphasis added); *id.* (stating, in the "Separate-Rate Application" section, that "{a}s noted in the 'Respondent Selection' section above, {Commerce} requires that respondents submit a response to both the {Q&V} questionnaire and the {SRA} by the respective deadlines in order to receive consideration for separate-rate status."). Commerce reiterated in its Q&V questionnaire that "{Commerce} will not give consideration to any separate-rate status application made by parties that fail to timely respond to the {Q&V questionnaire.}" P.D. 225 at 82. Commerce's instructions could not have been clearer. Indeed, the other producers or exporters that wished to participate in the investigation submitted timely responses through IA ACCESS, whether or not represented by counsel.

Jiasheng also argues that Commerce did not need timely Q&V questionnaire responses because it allowed nine companies, none of which were selected as mandatory respondents, to correct certain deficiencies in the filings. Jiasheng Br. at 13. It emphasizes the fact that these companies' corrected filings were not due until after the respondent selection had occurred. *Id.* As Commerce explained, however, these nine companies filed their responses on IA ACCESS *on time*. Issues and Decision Memorandum at 103, 105. Commerce requires timely responses to

27

begin analyzing documents for Q&V information *as well as deficiencies requiring correction.*
*Id.* at 105 ("If {Commerce} were to accept late-filed Q&V questionnaire responses such as
Jiasheng's, {Commerce}'s process of identifying filing deficiencies in such Q&V questionnaire
responses would be ongoing, detracting from its focus on the investigatory process of those
entities that were timely in their responses."). Commerce does not act arbitrarily by strictly
enforcing filing deadlines that control the outcome of the proceeding, while continuing to request
clarification or correction of timely submitted information. *See, e.g., Dongguan Sunrise
Furniture Co. v. United States*, 865 F. Supp. 2d 1216, 1231-32 (Ct. Int'l Trade 2012).

     Jiasheng characterizes its failure to file as analogous to the filing deficiencies contained
in the other nine companies' submissions. Jiasheng Br. at 19. But the two situations are
significantly different. Commerce's regulations require that respondents submit their responses
using IA ACCESS. *See* 19 C.F.R. § 351.303(b)(1); *see also* P.D. 225, Attach. III at 86.
Jiasheng's failure to submit the information using IA ACCESS meant that the company failed to
submit the information to the official record of the proceeding. 19 C.F.R. § 351.303(b)(1). In
contrast, the other companies' information was placed timely and properly upon the record
through IA ACCESS.

     Jiasheng then argues that, if Commerce considered the nine companies' information in
the deficient filings, then it could easily have looked at Jiashing's information. Jiasheng Br. at
13 n.4. Again, however, the nine companies' information was timely placed upon the official
record, but Jiasheng's was not.

     Finally, the interests of all the interested parties are best served by strictly and uniformly
enforcing the deadline, so that Commerce can choose mandatory respondents in a reasonable and
transparent manner. Issues and Decision Memorandum at 104. As Commerce explained, if it

accepted late Q&V questionnaire responses, late filers would not only benefit from additional time to prepare their responses, but also would have "an opportunity to examine other Q&V questionnaire responses prior to submitting their own response." *Id.* Filing deadlines serve to provide "certainty and predictability for all parties" to the proceeding. *Cosco*, 350 F. Supp. 2d at 1302.

3.   Commerce Had No Obligation To Notify Jiasheng That It Failed To
     Timely File Its Questionnaire Response

Next, Jiasheng argues that Commerce was required under 19 U.S.C. § 1677m(d) to notify Jiasheng that it filed its response incorrectly and offer it an opportunity to correct its submission. Jiasheng Br. at 14-23. As an initial matter, section 1677m(d) is applicable in situations only when Commerce applies facts available or adverse facts available (AFA). *See Qingdao Sea-Line Trading Co. v. United States*, No. 10-00304, 2012 Ct. Intl. Trade LEXIS 44, at *21-22 n.9 (Ct. Int'l Trade Mar. 21, 2012). As we explain below, Commerce did not apply either facts available or adverse facts available in refusing Jiasheng's SRA.

Commerce's actions are consistent with 19 U.S.C. § 1677m(d), which requires that Commerce "promptly inform the person submitting the response of the nature of the deficiency" and, "to the extent practicable, provide the person with an opportunity to remedy or explain the deficiency{.}" Because Commerce's regulations require that parties file their documents using IA ACCESS unless certain exceptions apply, Jiasheng's e-mailing of its response to Commerce does not constitute "submi{ssion} of the response" on the record of the proceeding. *See* 19 C.F.R. § 351.303(b)(1); Issues and Decision Memorandum at 103. Once Jiasheng officially submitted its response using IA ACCESS on December 12, 2011, Commerce complied with section 1677m(d) and notified Jiasheng on January 6, 2012, that the Q&V questionnaire response was untimely. P.D. 356; *see* Issues and Decision Memorandum at 103-105.

Contrary to Jiasheng's assertions, Commerce was under no 19 U.S.C. § 1677m(d) obligation to inform Jiasheng – *before* it filed its document through IA ACCESS – that it had failed to timely file its Q&V questionnaire response within the established deadline. Jiasheng provides no authority for its claim that Commerce is required to inform potential respondents of their failure to timely file documents at all, as opposed to the situation when a potential respondent has correctly and timely filed a document with certain deficiencies. *See* Jiasheng Br. at 18. In fact, the Federal Circuit and this Court have rejected that argument. *See, e.g., Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1338 (Fed. Cir. 2002) (holding that because Ta Chen did not respond to Commerce's questionnaire, section 1677m(d) did not apply; "Commerce was under no statutory duty to formally tell Ta Chen that its failure to respond was deficient."); *Hyosung*, 2011 Ct. Intl. Trade LEXIS 54, at *10.

To expect that Commerce police all potential respondents' fulfillment of filing deadlines would instill an unacceptably high burden upon the agency, especially in administrative proceedings involving such a large number of respondents as this one. *See Murata Mfg. Co. v. United States*, 820 F. Supp. 603, 607 (Ct. Int'l Trade 1993); *Sugiyama Chain Co. v. United States*, 797 F. Supp. 989, 994-95 (Ct. Int'l Trade 1992). "{Section 1677m(d)} is not intended . . . to allow parties to submit . . . information that cannot be evaluated adequately within the applicable deadlines." *Jiangsu Changbao Steel Tube Co. v. United States*, 884 F. Supp. 2d 1295, 1307 (Ct. Int'l Trade 2012) (quoting Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-826, at 865 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040).

Further, as this Court has recognized, the provisions of subsection (d) "are not triggered unless the respondent has met *all* of the five enumerated criteria {in section 1677m(e).}"

30

*Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1340 (Ct. Int'l Trade 2000).

Included in these criteria is the requirement that "the information is submitted by the deadline

established for its submission{.}" 19 U.S.C. § 1677m(e)(1).  When, as in this case, the

information was not timely submitted, the proffering party has not satisfied the criteria and

subsection (d) does not apply.  *Allegheny Ludlum Corp.*, 215 F. Supp. 2d at 1340.

Section 1677m(d) also contemplates correction of deficiencies only if the deadline has not

passed, allowing Commerce to reject a party's purported corrected filing if not corrected "within

the applicable time limits." 19 U.S.C. § 1677m(d)(2); *see also Nippon Steel Corp. v. United*

*States*, 118 F. Supp. 2d 1366, 1377 n.10 (Ct. Int'l Trade 2000) (noting a distinction between a

"deficient" submission from an untimely submission).  This makes logical sense; a party cannot

correct a "deficiency" when that "deficiency" is that the document was late.

     Further, Jiasheng was on notice of Commerce's requirements and had an obligation to

respond, section 1677m(d) notwithstanding. "This is not a {case} . . . where the shortcomings in

the response were arguably due to the existences of new governing laws and unclear requests by

Commerce for information." *Tung Mung. Dev. Co. v. United States*, 25 Ct. Int'l Trade 752, 786

(2001).  Commerce's instructions were explicit, and its explanation of the consequences of

failure to file a response were enumerated.  Jiasheng was "on notice as to the effect of { } late

submissions." *National Steel Corp. v. United States*, 870 F. Supp. 1130, 1134 (Ct. Int'l Trade

1994).  Commerce did not "hid{e} the ball" in its Q&V questionnaire. *Allegheny Ludlum Corp.*,

215 F. Supp. 2d at 1339. *Compare Ta Chen Stainless Steel Pipe, Ltd. v. United States*, No. 97-

08-01344, 1999 Ct. Intl. Trade LEXIS 110, *41-49 (Ct. Int'l Trade Oct. 28, 1999), *aff'd*, 298

F.3d 1330 (Fed. Cir. 2002), *with Reiner Brach*, 206 F. Supp. 2d at 1331; *Kawasaki Steel Corp.*,

110 F. Supp. 2d at 1035.  Section 1677m(d) does not relieve Jiasheng of the obligation to

"prepare an accurate and complete record in response to questions plainly asked by Commerce."

*Allegheny Ludlum Corp.*, 215 F. Supp. 2d at 1340 (citation omitted).

**III.    Because Jiasheng Did Not Demonstrate That It Was Eligible For a Separate Rate, Commerce Did Not Abuse Its Discretion In Applying The PRC-Wide Rate To Jiasheng**

Jiasheng also argues that Commerce applied AFA to it without explicitly making that determination and that the PRC-wide rate is punitive. *See, e.g.,* Jiasheng Br. at 14-16, 23-24. But, in denying Jiasheng a separate rate, Commerce did not apply AFA. Commerce, rather, applied its presumption of state control because no SRA or other information was contained in the administrative record bearing upon Jiasheng's independence from the Chinese government. *Final Determination*, 75 Fed. Reg. at 31,317. By the plain terms of Commerce's *Initiation Notice*, because Jiasheng missed the filing deadline for its Q&V questionnaire response, it could not file an SRA and therefore could not qualify for a separate rate. 76 Fed. Reg. at 70,964. Jiasheng had the responsibility to build the record. *Essar Steel*, 678 F.3d at 1277. The record did not contain information to rebut the presumption of state control. The presumption, therefore, applied.[7]

Jiasheng's contention to the contrary is unfounded. It is true that Commerce sometimes uses AFA to apply the presumption, when it determines that certain record evidence is unreliable or it finds that parties did not cooperate in the proceedings. *See, e.g., AMS Assocs. v. United States*, 719 F.3d 1376, 1378-79 (Fed. Cir. 2013); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1318-24 (Ct. Int'l Trade 2013); *Changbao*, 884 F. Supp. 2d at 1309-10. But that is not this case. Commerce assumes that a respondent operates subject to government control if the respondent does not satisfy the separate rate eligibility requirements

---

[7] Jiasheng does not argue that Commerce used facts available, but the same reasoning applies in that context as well.

32

(*i.e.*, submit both a Q&V questionnaire response and SRA, if sent a Q&V questionnaire) and absent information placed upon the record demonstrating absence of government control. *See Sigma Corp. v. United States,* 117 F.3d 1401, 1405-06 (Fed. Cir. 1997); *see also Transcom, Inc. v. United States*, 294 F.3d 1371, 1373, 1381 (Fed. Cir. 2002). Because Jiasheng failed to meet the prerequisite for separate rate eligibility, the record in this case contained absolutely *no* information regarding Jiasheng's relationship to the Chinese government. In such cases, Commerce applies the presumption as it did in this investigation. *See, e.g., Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 75 Fed. Reg. at 47,776 and accompanying issues and decision memorandum at cmt. 11.

Jiasheng also emphasizes that its SRA was submitted properly and on time. Jiasheng Br. at 14. But whether or how Jiasheng filed an SRA does not matter. Jiasheng forfeited its right to file an SRA by failing to timely and correctly file its Q&V questionnaire response. *See Policy Bulletin 05.1* at 4; *Drawn Stainless Steel Sinks from China*, at cmt. 14; *Steel Wire Garment Hangers from the Socialist Republic of Vietnam*, 77 Fed. Reg. at 46,044-45, 46049; *Circular Welded Carbon Quality Steel Pipe from China*, 73 Fed. Reg. at 2,448. As a result, no SRA for Jiasheng was placed upon the record of this investigation.

Finally, applying the PRC-wide rate to companies that are part of the PRC-wide entity is not punitive or unfair to Jiasheng, nor is Commerce obligated to explain in its determination why Jiasheng deserves that particular rate. In calculating the PRC-wide rate, Commerce does not tie that rate to each specific company that earns that rate. *See  Advanced Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1350-51 (Ct. Int'l Trade 2013); *Changbao*, 884 F. Supp. 2d at 1311. Although these cases relate to Commerce's application of AFA to bring a company within the PRC-wide entity, the reasoning is equally applicable in this situation. Neither

Commerce nor the Court analyzes the reasonableness of the actual rate as it relates to each individual company that has not earned a separate rate. *See Transcom, Inc.*, 294 F. 3d at 1381.

## IV.    Commerce's Use Of Thai HTS Category 7604 To Value Aluminum Frames Is Supported By Substantial Evidence

Commerce's use of the Thai HTS category 7604, which covers aluminum profiles, to value the aluminum frame inputs used by Trina and Wuxi Suntech to produce subject merchandise is supported by substantial evidence. SolarWorld contends that this determination is unreasonable for three reasons: because Commerce (1) improperly declined to rely on CBP ruling N139353, which classified Wuxi Suntech's aluminum frames under Harmonized Tariff Schedule of the United States (HTSUS) category 7616.99; (2) deviated from a "practice" of relying on CBP rulings to select surrogate values without providing a reasoned explanation for its contradictory treatment of CBP rulings in the underlying investigation; and (3) improperly concluded that HTS category 7616.99 did not include aluminum alloy products. SolarWorld Br. at 9-21.

As explained below, Commerce reasonably concluded that Thai HTS category 7604 was the best available evidence to value the aluminum frame inputs used by the mandatory respondents. Commerce also reasonably determined that CBP ruling N139353 was not dispositive evidence in selecting a surrogate value for aluminum frames. In addition, Commerce properly considered all of the record evidence regarding the valuation of aluminum frames but reasonably limited its discussion in its Final Determination to the important aspects of the aluminum frame valuation issue.

### A.    Legal Framework

In proceedings involving NME countries, the statute directs Commerce to calculate the normal value of subject merchandise "on the basis of the value of the factors of production

utilized in producing the merchandise ...." 19 U.S.C. § 1677b(c)(1). The statute directs

Commerce to calculate these surrogate values "based on the best available information regarding

the values of such factors in a market economy country or countries considered to be appropriate

by {Commerce}." *Id.* When selecting surrogate values, Commerce's practice is to select, to the

extent practicable, surrogate values that are publicly available, product-specific, representative of

a broad market average, tax-exclusive, and contemporaneous with the period of investigation.

*See, e.g., Narrow Woven Ribbons with Woven Selvedge from China*, 75 Fed. Reg. 41,808 (Dep't

of Commerce July 19, 2010) (*Ribbons*), and accompanying issues and decision memorandum, at

cmt. 2; *Electrolytic Maganese Dioxide from China*, 73 Fed. Reg. 48,195 (Dep't of Commerce

Aug. 18, 2008), and accompanying issues and decision memorandum, at cmt. 2; *see also* Import

Administration Policy Bulletin 04.1, "Non–Market Economy Surrogate Country Selection

Process," at "Data Considerations" (March 1, 2004), *available at*

http://enforcement.trade.gov/policy/bull04-1.html. Consistent with this practice, Commerce

"must weigh the available information with respect to each input value and make a product-

specific and case-specific decision as to what the 'best' surrogate value is for each input."

*Ribbons*, issues and decision memorandum, at cmt. 2.

　　　The statue accords Commerce "wide discretion" in the valuation of factors of production

pursuant to 19 U.S.C. § 1677b(c). *Taian Ziyang Food Co., Ltd. v. United States*, 918 F. Supp. 2d

1345, 1355 (Ct Int'l Trade 2013); *see Downhole Pipe & Equipment LP v. United States*, 887 F.

Supp. 2d 1311, 1321 (Ct. Int'l Trade 2012) ("Commerce has 'broad discretion to determine the

'best available information' in a reasonable manner on a case-by-case basis.'"). Thus, courts

have recognized Commerce's expertise in administering the antidumping law as well as the

"difficult and necessarily imprecise" process of constructing foreign market value for a producer

in a NME. *Taian Ziayang*, 918 F. Supp. 2d at 1355 (*citing Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001)). Commerce must exercise its discretion with the purpose of the antidumping statute in mind – that is, to determine antidumping margins and to select a surrogate value that is as representative of the producer's experience in the NME country as is feasible. *Id.* at 1355-56.

      B.    Commerce's Surrogate Value Selection For Aluminum Frames Is Reasonable
            And Supported By Substantial Evidence

        Commerce determined that Thai import data for HTS headings 7604.29.90001 and 7604.21 were the best available information with which to value Trina's and Wuxi Suntech's aluminum frames, respectively. Issues and Decision Memorandum, at 62-63; P.D. 1404 at 3 (final surrogate value memorandum), attached as exhibit 24 to SolarWorld's appendix. Specifically, Commerce found that the description for HTS category 7604.29.90001("aluminum alloy …profiles, other than hollow profiles…other profiles") was consistent with Trina's description of its aluminum frames as an "'aluminum profile made frame,'" that "'do not consist of hollow profiles,'" and are made from aluminum alloy. Issues and Decision Memorandum, at 62. Commerce also determined that the description for HTS category 7604.21 ("aluminum alloy hollow profiles") was consistent with Wuxi Suntech's description of its aluminum frames as "hollow profiles made of alloyed steel." *Id.* Commerce explained that both mandatory respondents consistently described their aluminum frames as alloyed aluminum profiles, and that it did not find anything on the record or during verification to call into question the accuracy of either respondent's description of its aluminum frames. *Id.* at 63. Commerce explained that although categories 7604.21 and 7604.29.90001 are basket categories covering alloyed aluminum profiles not specified elsewhere in the HTS, the types of aluminum that Trina and

Wuxi Suntech used to assemble aluminum frames are not specified elsewhere in the Thai HTS

and thus, are properly classified under the selected basket categories. *Id.*

SolarWorld contends that Commerce's selected surrogate value for aluminum frames is

in error because the "best information available" to value this input is a CBP ruling classifying

Wuxi Suntech's aluminum frames under HTSUS category 7616.99 ("articles of aluminum, not

elsewhere specified or indicated"). SolarWorld Br. 10-12; *see* P.D. 1036 at Ex. 1 (CBP ruling

N139353 (Jan 13, 2011)), attached as exhibit 3 to SolarWorld's appendix. Commerce, however,

reasonably determined that CBP ruling N139353 was not dispositive in selecting a surrogate

value for aluminum frames. SolarWorld ignores the fact that, simply because CBP rulings are

binding with respect to how importers classify their merchandise at the time of entry, does not

grant the rulings greater weight in the context of Commerce's surrogate value selection.

As Commerce explained, it "is not bound by rulings for U.S. imports when selecting

import values from surrogate countries, *but instead must select a value using the best available*

*information.*" Issues and Decision Memorandum, at 63 (emphasis added). This conclusion is

consistent with Commerce's position that, although CBP's country of origin and substantial

transformation determinations may be instructive, they are not binding on Commerce's

antidumping and countervailing duty determinations. *See, e.g.*, *U.K. Carbon and Graphite Co.,*

*Ltd. v. United States*, 931 F. Supp. 2d 1322, 1333 (Ct. Int'l Trade 2013) (finding that Commerce

provided "ample reasoned explanation" for its decision to not rely on the classification rulings on

the record); *Small Diameter Graphite Electrodes From the People's Republic of China*, 77 Fed.

Reg. 33,405, 33,410 (Dep't of Commerce June 6, 2012) ("rulings from other agencies (whether a

European BOI or {CBP} ruling) are not legally binding for the purposes of antidumping

proceedings in the United States, as we make these decisions for different reasons, including

37

circumvention and whether the merchandise is subject to the antidumping order."). Further, this approach is consistent with the ruling itself, which acknowledges that CBP rulings are distinct from Commerce's determinations. P.D. 1036 at Ex. 1 (stating that the merchandise "may be subject to antidumping duties or countervailing duties. {Scope rulings issued by Commerce} are *separate from tariff classification and origin rulings issued by {CBP}.*" (emphasis added)).

SolarWorld also disregards that several aspects of the ruling detract from its value, rendering it not the best available information for valuing aluminum frames. First, HTS category 7616.99, the category advocated by SolarWorld, is an "other" category that would contain only other articles of aluminum not already identified elsewhere in the HTS.[8]  Issues and Decision Memorandum, at 63; P.D. 1267, Ex. 2 at 11, attached as exhibit 5 to our appendix. Second, the descriptions for the sub-categories under HTS 7616.99 indicate that this category includes a number of products that are wholly unrelated to the aluminum frame inputs used by Trina and Wuxi Suntech, including "ferrules used in the manufacture of pencils" (HTS 7616.99.20), "slugs" (HTS 7616.99.30), "bobbins, spools, reels and similar supports for textile yarn" (HTS 7616.99.40), and "spouts and cups for latex collection" (HTS 7616.99.60). P.D. 1267, Ex. 2 at 11; Issues and Decision Memorandum, at 63. Third, the descriptions in HTS 7604 ("Aluminum bars, rods, and profiles") and 7604.21 ("of aluminum alloys: hollow profiles") indicate the category used by Commerce – HTS 7604.21 – includes alloyed aluminum profiles, the same type of input used by both mandatory respondents. P.D. 1267, Ex. 2 at 7; Issues and Decision Memorandum, at 63. Fourth, CBP ruling N139353 provides no explanation as to why CBP determined that Wuxi Suntech's aluminum frames should be classified under HTSUS category

---

[8] Specifically, the description for HTS 7616 indicates that the category includes "Other articles of aluminium," and the description for HTS 7616.99 indicates only that the category includes "Other" aluminum products. P.D. 1267, Ex. 2 at 11.

38

7616.99, even though the products could be classified under HTS category 7604 ("Aluminum

bars, rods, and profiles") and HTS category 7616.99 includes "other" aluminum products

dissimilar to aluminum frames. In the absence of an explanation, there is no context for why

CBP found this category to be appropriate when the record evidence demonstrates that other

categories are more appropriate. Given the lack of clarity in the ruling and the incongruity of

classifying aluminum frames in an "other" category, Commerce reasonably determined that CBP

ruling N139353 was not dispositive evidence in selecting a surrogate value for aluminum frames.

Citing *Magnesium Metal from China*,[9] *Sodium Hexametaphosphate from China*,[10] and

*Wooden Bedroom Furniture from China*,[11] SolarWorld contends that Commerce deviated from a

"practice" of relying on CBP rulings to select surrogate values without providing a reasoned

explanation for its contradictory treatment of the CBP rulings in this investigation. SolarWorld

Br. at 12-14. No such practice exists, however. Rather, Commerce's "practice" is to "weigh the

available information with respect to each input value and make a product-specific and case-

specific decision as to what the 'best' surrogate value is for each input," as required by the

---

[9] *Magnesium Metal from China*, 75 Fed. Reg. 65,450 (Dep't of Commerce Oct. 25, 2010) (final determ.) and accompanying issues and decision memorandum, at cmt 10 (finding that a CBP ruling "support{ed} a finding" that magnesium "stubs," which the respondent might introduce into its production process, were properly classified under subheading 8104.11).

[10] *Sodium Hexametaphosphate from China*, 75 Fed. Reg. 64,695 (Dep't of Commerce Oct. 20, 2010) (final determ.) and accompanying issues and decision memorandum, at cmt. 3 (finding that TSPP is best classified under HTS 2835.39.00 "because it is more specific to the input in question," and noting that "{i}n the TSPP Customs Ruling the International Trade Commission states that it analyzed trisodium polyphosphate in its lab and concluded that it should be classified under HTS 2835.39 because this HTS covers phosphates.").

[11] *Wooden Bedroom Furniture from China*, 75 Fed. Reg. 50,992 (Dep't of Commerce Aug. 18, 2010) (final determ.) and accompanying issues and decision memorandum, at cmt 7 (finding that respondent's input could not be classified under HTS subheading 9403.90, "consistent with" a Customs ruling, and valuing the respondent's input using Philippine imports under HTS subheading 4421.90.99).

statute's mandate to select the "best available information." 19 U.S.C. § 1677b(c)(1); *Ribbons*, issues and decision memorandum, at cmt. 2; *see also Certain New Pneumatic Off-the-Road Tires from China*, 78 Fed. Reg. 22,513 (Dep't of Commerce Apr. 16, 2013) (final results), and accompanying issues and decision memorandum, at cmt 5.A (Commerce's practice is to "carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis of valuing the {factors of production} on a case-by-case basis."). As a result, Commerce may, in some instances, rely on CBP rulings to determine which import values are the "best available information" to value a particular input. This does not mean, however, that a CBP ruling will guide Commerce's import value in *every* instance, nor does it mean that Commerce has developed a practice of preferring CBP rulings to other types of information for valuation purposes. *See, e.g., Sodium Hexametaphosphate from China*, 77 Fed. Reg. 59,375 (Dep't of Commerce Sept. 27, 2012), and accompanying issues and decision memorandum, at cmt. 8 (finding the customs rulings cited by petitioner unpersuasive given the facts of the review); *Citric Acid and Certain Citrate Salts from China*, 74 Fed. Reg. 16,838 (Dep't of Commerce Apr. 13, 2009) (final determ.), and accompanying issues and decision memorandum at cmt. 5B (finding that the customs ruling cited by respondents to be inapposite to the facts of the investigation).

Further, contrary to SolarWorld's claim, Commerce explained why it did not rely on additional CBP rulings to select surrogate values for a number of inputs in this case. As recounted above, Commerce explained that it did not rely on CBP ruling N139353 to value aluminum frames. Issues and Decision Memorandum, at 63. Commerce also explained that it did not rely on a CBP ruling in selecting appropriate import values for diamond wire saw blades because the "proposed HTS category descriptions alone provided an adequate basis for selecting

the appropriate surrogate value," and because the CBP ruling "cover{ed} diamond coated wire, rather than saw blades, and {was}, therefore, not specific to the input at issue." *Id.* at 97. Commerce also declined to rely on a CBP ruling to select a surrogate value for quartz crucibles because the rulings provided by the interested parties indicated that the respondents' crucibles could be classified under two different HTS categories. *See id.* at 60 (relying instead on the HTS explanatory notes).

SolarWorld also contends that Commerce's selection of HTS 7604 to value aluminum frames is in error because Commerce purportedly failed to address certain record evidence and arguments that detract from its surrogate value selection. SolarWorld Br. 15-20. "Commerce is presumed to have considered all the record evidence," however, "and need not address every argument raised by a respondent in its briefing." *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 707 F. Supp. 2d 1355, 1382 (Ct. Int'l Trade 2010) (citations omitted), *reversed on other grounds, Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011). In this investigation, Commerce reasonably limited its discussion to the important aspects of the aluminum frame valuation issue, and its decision not to discuss every argument or piece of evidence put forth by SolarWorld does not constitute error.

For instance, Commerce addressed SolarWorld's assertion that HTS category 7604 is inapplicable because the respondents' aluminum frames are finished articles and category 7604 includes aluminum extrusions that require further processing. Issues and Decision Memorandum, at 63. Commerce explained that although the record contains CBP rulings classifying certain unfinished aluminum articles under HTSUS 7604, the rulings do not constitute evidence that the category contains *only* unfinished aluminum profiles. This is because HTS category 7604 does not specify whether it contains finished or unfinished

41

aluminum profiles, unlike other HTS categories, which do identify whether they contain finished or unfinished items. *Id.* Further, as discussed above, Commerce also addressed CBP ruling N139353 and provided sufficient explanation to substantiate its determination that the ruling was not dispositive in selecting a surrogate value for aluminum frames.

Finally, SolarWorld contends that Commerce's valuation of aluminum frames is unreasonable because Commerce erred in concluding that HTS category 7616.99 does not cover aluminum alloy products. SolarWorld Br., at 21. Commerce declined to use HTS category 7616.99, however, not because it did not include aluminum alloy products, but rather, because this category "would only contain other articles of aluminum not already identified elsewhere" and because "alloyed aluminum profiles are identified under HTS category 7604." Issues and Decision Memorandum, at 63. In addition, Commerce determined that it was not appropriate to use HTS category 7616.99 to value aluminum frames because this category covers a number of inputs that are "dissimilar" to aluminum frames (such as ferrules used in pencils, slugs, bobbins, spools, reels, spouts, cups, handles for travelling bags, cigarette cases or boxes, and blinds). Given the distortive effect that would result from using a HTS category comprised of products so dissimilar from aluminum frames, Commerce's determination to use HTS categories 7604.29 and 7604.21 is reasonable and should be sustained.

## V. Commerce's Determination To Grant Certain Companies A Separate Rate Is Supported By Substantial Evidence

Commerce's determination that certain respondents were eligible for a separate rate is supported by substantial evidence. SolarWorld contends that Commerce's determination granting separate rates to Trina and 30 other respondents[12] is in error because Commerce

---

[12] (1) Baoding Tianwei Yingli New Energy Resources Co., Ltd. ("Baoding Tianwei"); (2) CEEG (Shanghai) Solar Science Technology Co., Ltd. ("CEEG Shanghai"); (3) CEEG Nanjing

improperly (1) granted separate rates to respondents that did not disclose the controlling

shareholders of their ultimate owners, (2) concluded that respondents ultimately owned by

China's State-Owned Assets Supervision and Administration Commission (SASAC) operated

free from *de facto* and *de jure* government control, and (3) concluded that respondents whose

board members or senior managers, or both, are members of the People's Congress (NPC), the

Communist Party of China (CPC), or the Chinese People's Political Consultative Conference

(CPPCC), operated free from *de facto* government control.[13]  SolarWorld Br. at 23-40.  As

demonstrated below, Commerce properly relied on record information demonstrating that the

separate rate applicants operated free of *de facto* and *de jure* government control over their

---

Renewable Energy Co., Ltd. ("CEEG Nanjing"); (4) China Sunergy (Nanjing) Co., Ltd. ("China
Sunenergy"); (5) Chint Solar (Zhejiang) Co., Ltd. ("Chint Solar"); (6) CSG PV Tech Co., Ltd.
("CSG PV"); (7) Dongfang Electric (Yixing) MAGI Solar Power Technology ("Dongfang
Electric"); (8) Eopolly New Energy Technology Co., Ltd. ("Eopolly"); (9) ET Solar Industry
Limited ("ET Solar"); (10) Green Energy Holding Company Limited ("Green Energy"); (11)
Hanwha Solarone (Qidong) Co., Ltd. ("Solarone Qidong"); (12) Hanwha Solarone Hong Kong
Limited ("Solarone Hong Kong"); (13) JA Solar Technology Yangzhou Co., Ltd. ("JA Solar");
(14) Jetison Solar (China) Co., Ltd. ("Jetison Solar"); (15) Jiangyin Hareon Power Co., Ltd.
("Jiangyin Hareon"); (16) Jiawei Solarchina (Wuhan) Co., Ltd. ("Jiawei Solarchina"); (17)
JingAo Solar Co., Ltd. ("JingAo"); (18) Konca Solar Cell Co., Ltd. ("Konca"); (19) LDK Solar
Co., Ltd. ("LDK"); (20) Motech (Suzhou) Renewable Energy Co., Ltd. ("Motech"); (21) Ningbo
ETDZ Holdings Ltd. ("Ningbo ETDZ"); (22) Ningbo Komaes Solar Technology Co., Ltd.
("Ningbo Komaes"); (23) Ningbo Qixin Solar Electrical Appliance Co., Ltd. ("Ningbo Qixin");
(24) Shanghai BYD Company Limited ("Shanghai BYD"); (25) Shanghai JA Solar Technology
Co., Ltd. ("Shanghai JA Solar"); (26) Sumec Hardware & Tools Co., Ltd. ("Sumec Hardware");
(27) tenKsolar (Shanghai) Co., Ltd. ("tenKsolar"); (28) Tianwei New Energy (Chengdu) PV
Module Co., Ltd. ("Tianwei New Energy"); (29) Yingli Energy (China) Company Limited
("Yingli"); (30) Zhejiang Jiutai New Energy Co., Ltd. ("Zhejiang Jiutai").  SolarWorld Br. at 8
n.3.

[13] There appear to be a number of discrepancies between the names SolarWorld uses to
identify the companies whose separate rates it is challenging and the companies Commerce
reviewed in the investigation.  Specifically, "Green Energy Holding Company Limited" appears
to be a reference to Yingli Green Energy Holding Company Limited ("Yingli Green Energy");
"Jetison Solar" appears to be a reference to Jetion Solar (China) Co., Ltd. ("Jetion Solar"); and
"LDK Solar Co., Ltd." appears to be a reference to two companies, LDK Solar Hi-Tech
(Nanchang) Co., Ltd. ("LDK Nanchang") and LDK Solar Hi-tech (Suzhou) Co., Ltd. ("LDK
Suzhou").

export activities.  In the absence of any evidence indicating that the government exercised control over the respondent's day-to-day export activities, Commerce reasonably determined that indirect ownership of these respondents by the government, alone, was insufficient evidence to support a finding of government control.

A.    Legal Framework

In proceedings involving non-market economy countries, Commerce uses a rebuttable presumption that all companies within the country are subject to government control and should be assessed a single antidumping duty rate.  *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1372 (Fed. Cir. 2003); *Sigma Corp. v. United States*, 117 F.3d 1401, 1404-06 (Fed. Cir. 1997).  Under this presumption, a respondent receives the non-market economy countrywide rate unless it affirmatively demonstrates an absence of both *de jure* (in law) and *de facto* (in fact) control by the Chinese government.  *Sigma*, 117 F.3d at 1405.

Commerce considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate:  (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of the company; and (3) other formal measures by the government decentralizing control of companies.  *See Sparklers from China*, 56 Fed. Reg. 20,588, 20,589 (Dep't of Commerce May 6, 1991) (final determ.)); Policy Bulletin No. 05.1 at 2 (Dep't of Commerce Apr. 5, 2005), *available at* http://enforcement.trade.gov/policy/bull05-1.pdf.

Typically, Commerce considers four factors in evaluating whether each respondent is subject to *de facto* government control of its export functions:  (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has the authority to negotiate and to sign contracts and other agreements; (3) whether the respondent maintains autonomy from the government in making decisions regarding the selection of

44

management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses. *See Silicon Carbide from China*, 59 Fed. Reg. 22,585, 22,587 (Dept. of Commerce May 2, 1994) (final determ.); Policy Bulletin No. 05.1 at 2.

"Absence of *de jure* government control can be demonstrated by reference to legislation and other governmental measures that decentralize control. Absence of *de facto* government control can be established by evidence that each exporter sets its prices independently of the government and of other exporters, and that each exporter keeps the proceeds of its sales." *Sigma*, 117 F.3d at 1405 (*citing Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008, 1013–14 (Ct. Int'l Trade 1992)). "Where record evidence supports a respondent's eligibility for separate rate status, Commerce must treat the respondent as separate from the countrywide entity unless the agency makes a specific finding, supported by substantial evidence, that the evidence regarding separate rate eligibility is deficient or otherwise unreliable." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1320 (Ct. Int'l Trade 2013) (*citing Changbao*, 884 F. Supp. 2d at 1309–10).

B.   Commerce's Separate Rate Determinations Are Supported By Substantial Evidence

Commerce considered whether all of the respondents applying for a separate rate, who were either joint ventures between Chinese and foreign companies, or were wholly Chinese-owned, could demonstrate the absence of both *de jure* and *de facto* government control over their export activities. *Preliminary Determination*, 77 Fed. Reg. at 31,316, *unchanged in Final Determination*, 77 Fed. Reg. at 63,794. Commerce determined that the evidence provided by the respondents supported a finding of *de jure* absence of government control because the three criteria were satisfied. *Id.*

45

Commerce also determined that the respondents had demonstrated an absence of *de facto* government control because the record indicated that (1) their export prices were not set by, and were not subject to, the approval of a governmental agency, (2) they had authority to negotiate and sign contracts and other agreements, (3) they had autonomy from the government in making decisions regarding the selection of management, and (4) they retained the proceeds of their export sales and made independent decisions regarding the disposition of profits or financing of losses. *Preliminary Determination*, 77 Fed. Reg. at 31,316-17, *unchanged in Final Determination*, 77 Fed. Reg. at 63,794.

As a result, Commerce assigned a separate rate to 59 companies, including 27 of the 30 companies that SolarWorld now challenges. Commerce determined, however, that eight companies, including Solarone Hong Kong and Jiawei Solarchina, which did not sell subject merchandise to the United States, and Jiangyin Hareon, which failed to submit a timely response to Commerce's supplemental separate rate questionnaire, were not eligible for a separate rate. *Preliminary Determination*, 77 Fed. Reg. at 31,317.

        1.     Commerce's Determination To Grant Certain Respondents A Separate Rate Is Supported By Substantial Evidence

SolarWorld contends that Commerce improperly granted a separate rate to 14 respondents[14] that did not identify their ultimate owners. SolarWorld Br. at 23-27. As an initial matter, SolarWorld's claim with respect to Solarone Hong Kong has no merit. Commerce determined that Solarone Hong Kong was ineligible for a separate rate because the company did not sell subject merchandise to the United States during the period of investigation. *See Preliminary Determination*, 77 Fed. Reg. at 31,317 ("We have not granted a separate rate to the

---

[14] Trina, Chint Solar, Shanghai BYD, Solarone Qidong, Solarone Hong Kong, Motech, tenKsolar, Zeijang Juitai, CEEG Shanghai, Jetion Solar, CSG PV, CEEG Nanjing, Ningbo Komaes, and China Sunergy. SolarWorld Br. at 24.

following companies for the following reasons: ... (2) ... Hanwa Solarone Hong Kong {Limited} ... did not sell merchandise under consideration to the United States"), *unchanged in Final Determination*, 77 Fed. Reg. at 63,794.

SolarWorld's claim also lacks merit, as a general matter, because the remaining 13 respondents provided Commerce with evidence demonstrating that they operated free of *de facto* government control over their export activities. *See* Issues and Decision Memorandum, at 31-32. The respondents also "placed record laws, regulations, business licenses, export licenses, and other documents demonstrating *de jure* independence from the government on the relevant issues." *Id.* Moreover, the record did not contain any evidence of specific government direction and control of the respondents with respect to the respondent's export activities. *Id.* Absent such evidence, Commerce could not reasonably deny the respondents a separate rate even if they had identified the Chinese government as an ultimate owner. *See Qingdao Taifa Group Co., Ltd. v. United States*, 637 F. Supp. 2d 1231, 1244 (Ct. Int'l Trade 2009) (holding that "Commerce may not apply an NME country-wide rate where there is evidence {of government ownership}, but there is no evidence that the government exercised *de facto* control over the respondent's prices, export activities, or operations."). Given the above, Commerce reasonably concluded that these companies were eligible for a separate rate, notwithstanding the absence of information on the ultimate owners of their parent companies.

In addition, SolarWorld presumes that the ultimate ownership of the company could demonstrate relevant government control. SolarWorld Br. at 25. However, the existence of government ownership is not one of the *de jure* or *de facto* criteria that Commerce examines to determine whether there is an absence of government control over export related activities. Issues and Decision Memorandum, at 31. Moreover, the mere existence of government-owned

47

shares in a company or government ownership among one of the layers of a separate rate

respondent's ownership is not a basis for denying separate rate status. *Id.* This is because

Commerce's determination of whether a separate rate respondent has rebutted the presumption of

government control is fact-specific and based on the totality of the evidence related to a

particular respondent. As a result, Commerce previously has granted separate rate status to

companies who are wholly or partially owned by a government state assets management

company. *Id.* (*citing Certain Circular Welded Carbon Quality Steel Line Pipe from China*, 74

Fed. Reg. 14,514 (Dep't of Commerce Mar. 31, 2009) (final determ.), and accompanying issues

and decision memorandum, at cmt. 11); *see Qingdao Taifa*, 637 F. Supp. 2d at 1242-43

(recognizing that Commerce has applied separate rates when a government entity has an

ownership interest in the respondent but does not exercise *de facto* control over the respondent's

prices or export activities).

     SolarWorld also contends that Commerce previously has denied a separate rate to

companies that have failed to provide necessary information on their ownership structures.

SolarWorld Br. at 26 (citing *Certain Frozen Warmwater Shrimp from China,* 72 Fed. Reg.

72,668 (Dep't of Commerce Dec. 21, 2007), and accompanying issues and decision

memorandum, at cmt. 1; *Porcelain-on-Steel Cooking Ware*, 71 Fed. Reg. 24,641 (Dep't of

Commerce April 26, 2006), and issues and decision memorandum, at cmt. 1). Both *Certain*

*Frozen Warmwater Shrimp from China* and *Porcelain-on-Steel Cooking Ware* are readily

distinguishable from the underlying investigation. *See* Issues and Decision Memorandum, at 32.

In *Certain Frozen Warmwater Shrimp from China,* Commerce conducted a verification of the

separate rate respondent and determined that it could not verify critical information regarding the

respondent's corporate structure, ownership, affiliations with certain entities, and its export sales

negotiation process. *See Certain Frozen Warmwater Shrimp from China,* issues and decision memorandum, at cmt. 1.  Similarly, in *Porcelain-on-Steel Cooking Ware*, Commerce conducted a verification of the separate rate respondent's submissions and determined that it could not verify information concerning the respondent's corporate formation, corporate structure, and business operation. *See Porcelain-on-Steel Cooking Ware*, issues and decision memorandum, at cmt. 1.  Here, in contrast, Commerce did not conduct a verification of any separate rate respondents, and there is no record evidence calling into question the reliability of the respondents' information regarding their eligibility for a separate rate.

SolarWorld's reliance on *Ad Hoc Shrimp Trade Action Committee v. United States*, 925 F. Supp. 2d 1315 (Ct. Int'l Trade 2013), is also misplaced. SolarWorld Br. at 24.  In the administrative review in *Ad Hoc Shrimp*, Commerce denied the respondent a separate rate because the respondent's withholding of critical information regarding its affiliation with another company and repeated misrepresentations undermined the credibility of its statements as a whole, including those related to separate rate eligibility. *See* 925 F. Supp. 2d at 1320-1324. Because the record contained "*no other reliable information* to rebut the presumption of government control," the Court held that Commerce properly determined that the respondent had failed to demonstrate its eligibility for a separate rate. *Id.* at 1324 (emphasis added).  The absence of credible evidence to rebut the presumption of government control in the review underlying *Ad Hoc Shrimp* is distinguishable from this investigation because the separate rate respondents provided sufficient information to demonstrate their eligibility for a separate rate, and there was no evidence that called into question the reliability of their information.

2.   Commerce's Determination To Grant A Separate Rate To Certain
Respondents Indirectly Owned By SASAC Is Supported By Substantial
Evidence

SolarWorld contends that Commerce improperly granted a separate rate to Sumec

Hardware, Tianwei New Energy, Ningbo ETDZ, and Donfang Electric, which are owned by

SASAC owned companies or have SASAC at some point in the chain of ownership, because the

companies failed to rebut the presumption of *de jure* government control. SolarWorld Br. at 29-

33. Commerce, however, examined the record evidence, applied its criteria, and reasonably

concluded – based on the absence of restrictive stipulations associated with the companies'

business licenses and export certificates of approval, as well as the existence of pertinent

legislative enactments that protect the operational and legal independence of companies

incorporated in China – that the companies had demonstrated *de jure* independence from the

Chinese government with respect to their export activities. Issues and Decision Memorandum, at

26-28.

Citing *Advanced Technology and Materials*, SolarWorld contends the contradictory

provisions of China's Interim Regulations[15] undermine Commerce's determination with respect

to these four companies and that Commerce failed to address adequately the conflicting

provisions. SolarWorld Br. at 29-31 (citing *Advanced Tech. and Materials Co. v. United States*,

885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012) (*Advanced Tech. II*)). SolarWorld's reliance on

*Advanced Tech. II* is misplaced. In that case, Commerce concluded on remand that "the Interim

---

[15] Decree of the State Council of the People's Republic of China No. 378: Interim
Regulations on Supervision and Management of State-owned Assets of Enterprises (Interim
Regulations). P.D. 912, Ex. 3, attached as exhibit 23 to SolarWorld's appendix. Articles 1 and
2 of the Interim Regulations provide that the regulations are formulated to establish a State-
owned assets supervision and management system and are applicable to state-owned enterprises
and assets as well as enterprises with state-owned equity. *See id.*; *Preliminary Determination*, 77
Fed. Reg. at 31,316.

Regulations do not automatically demonstrate *de jure* control of a state-owned enterprise{,}'…

and that the Interim Regulations 'set{} aside particular protections for the autonomy of

companies operating under SASAC, showing that SASAC *solely* provides oversight and is not

intended to *direct* day-to-day business operations' and does not 'interfere in or influence' the

latter." 885 F. Supp. 2d at 1350-51 (emphasis in original).  The Court explained that it "fail{ed}

to discern from the record why {Commerce arrived at its conclusion}, as various provisions

among the Interim Regulations directly conflict with these observations." *Id.* at 1351.  The Court

also stated that Article 11 of the Interim Regulations seemed to be an obvious declaration of re-

centralized *de jure* control of invested enterprises, and observed that other provisions in the

Interim Regulations and China's Company Law seemed to contradict Commerce's conclusion.

*Id.*  As a result, the Court remanded to Commerce for further explanation. *Id.* at 1362-63.

      Following Commerce's second remand redetermination, the Court clarified its prior

decision.  With regard to its observation related to Article 11 of the Interim Regulations, the

Court explained that "{c}onsistent with the standard of review …, such an observation by the

court is properly construed as dicta, not a 'holding'…." *Advanced Tech. and Materials Co. v.*

*United States*, 938 F. Supp. 2d 1342, 1346-47 (Ct. Int'l Trade 2013).  Further, the Court

explained that "the opinion only attempted circumspect examination of whether the substantial

evidence of record supported Commerce's conclusions on the Interim Regulations …." *Id.*

Because the Court's statements regarding the Interim Regulations and Company Law were *dicta*,

they are of little relevance to whether Commerce's determination in this case is supported by

substantial evidence.

      In any event, Commerce addressed SolarWorld's arguments with respect to the Interim

Regulations (*see Preliminary Determination*, 77 Fed. Reg. at 31,316; Issues and Decision

Memorandum, at 26), and reasonably limited its discussion to the relevant and important provisions in the Interim Regulations – that is, Articles 1, 2, 6, 7, and 10. *Id.*; *see DunAn Hetian Metal Co.*, 707 F. Supp. 2d at 1382. For instance, Commerce found that the Interim Regulations (1) provide for the "separation of government functions from enterprise management and separation of ownership from management," (2) state that companies operating under SASAC "enjoy autonomy in their operation," and (3) state that SASAC "shall support the independent operation of enterprise according to law, and shall not interfere in their production and operation activities...." Issues and Decision Memorandum, at 26-27; *see also Preliminary Determination*, 77 Fed. Reg. at 31,316. Commerce also found, given SASAC's role in approving the development of certain investment and business plans and in approving the appointment of the board and certain key senior management positions, that "there are contradictions in the Interim Regulations with respect to the separation of the government from the enterprise management." *Preliminary Determination*, 77 Fed. Reg. at 31,316. Notwithstanding that the "Chinese law may provide SASAC with a role in overseeing the overall regulation, development and structure of a state-owned sector, and also provide{s} SASAC with the rights of an investor," Commerce concluded that the Interim Regulations did not automatically demonstrate *de jure* control over the export activities of SASAC-owned companies because there was "nothing on the record to indicate that SASAC's reason extended as a matter of law to such day-to-day activities as export pricing of the companies in question." Issues and Decision Memorandum, at 27. Further, Commerce found that the information provided by the separate rate respondents demonstrated an absence of *de jure* control over their export activities through an absence of restrictive stipulations associated with the companies' business licenses and export certificates of approval,

and by virtue of pertinent legislative enactments that protect the operation and legal

independence of companies incorporated in China. *Id.*, at 26.

SolarWorld also argues that China's Company Law[16] undermines Commerce's

determination with respect to these four separate rate respondents and that Commerce failed to

adequately address SolarWorld's arguments regarding the Company Law. SolarWorld Br. at 31.

Again, SolarWorld ignores that Commerce need not address every argument made by a party and

that Commerce reasonably limited its discussion to the relevant and important aspects of the

issue. *See DunAn Hetian Metal Co.*, 707 F. Supp. 2d at 1382. As Commerce explained in the

*Final Determination*, although the Chinese Company Law provides SASAC with certain rights

and powers over its holdings, Commerce previously has recognized that the Chinese

government's legal control of the relevant day-to-day activities devolves to other parties when it

sets these companies as "owned by all the people" entities or, as in this case, distributed this

ownership to individual parties, as long as the government does not directly exercise its rights to

vote on ownership boards. Issues and Decision Memorandum, at 27. Commerce also found that

the Company Law states that a company is an enterprise legal person, that shareholders shall

assume liability towards the company to the extent of their shareholdings, and that the company

shall be liable for its debts to the extent of all its assets. *Id.* at 27-28. Commerce also explained

that all of the separate rate respondents at issue reported that neither SASAC nor the government

was involved in the activities of the board of directors. *Id.*

---

[16] The Company Law of the People's Republic of China. P.D. 912, Ex. 4, attached as exhibit 23 to SolarWorld's appendix. Article 1 of the Company Law provides that the law was "formulated for the purposes of regulating the organization and operation of companies, protecting the legitimate rights and interests of companies, shareholders and creditors, maintaining the socialist economic order, and promoting the development of the socialist market economy." *Id.*

Further, Commerce discussed evidence provided by Sumec Hardware, Tianwei New Energy, Ningbo ETDZ, and Donfang Electric to support their claims. *Id.* For example, Sumec Hardware provided board of directors' resolutions regarding the establishment of overseas subsidiaries, and managers meeting minutes, demonstrating that two of its owners, neither of which were SASAC or the government of China, were involved in Sumec Hardware's board decisions. *Id.* at 27. Additionally, Tianwei New Energy reported that SASAC was not involved in selecting its board and to support that claim provided the appointment letter of its board. *Id.* And all four companies certified to Commerce that they "have autonomy from all levels of the government . . . and from any government entities in making decisions regarding the selection of management . . . and that all managers and board of director members did not work in or have any significant relationship with any level of the government and/or they selected management independent of the government agency during the past three years." *Id.*

Citing *Advanced Tech. II*, SolarWorld contends that Commerce's finding that the respondents demonstrated an absence of *de jure* government control is in error because it improperly conflated its *de jure* and *de facto* analyses by considering whether the record contained evidence that the Chinese government actually exercised control over the respondent's export pricing activities. SolarWorld Br. at 32. For the reasons explained above, SolarWorld's reliance on *Advanced Tech. II* is misplaced. Further, Commerce's evaluation of the record to determine whether any evidence of government control existed is reasonable given the *de jure* evidence cited above. Moreover, if SolarWorld is correct in its assertion that China's Interim Regulation and the Company Law bestow SASAC with the power to control the respondents' day-to-day activities, there should be *some* evidence that the government actually exercises its control. No such evidence exists on the record of this proceeding.

SolarWorld also contends that Commerce improperly concluded that certain companies ultimately owned by SASAC – Jiawei Solarchina, Ningbo ETDZ, and Dongfang Electric – rebutted the presumption of *de facto* government control.[17]  Solar World Br. 33-35.  Solar World's claim fails for several reasons.  First, Commerce did not grant a separate rate to Jiawei Solarchina because the company did not sell subject merchandise to the United States during the period of investigation.  *See Preliminary Determination*, 75 Fed. Reg. at 31,317, *unchanged in Final Determination*, 77 Fed. Reg. at 63,794.[18]  Second, the record evidence related to Ningbo ETDZ supports Commerce's conclusion that the company operates free from *de facto* government control.  Even though Ningbo ETDZ reported that its board was chosen by its shareholders, the information provided by the company demonstrates that neither SASAC nor the PRC government was directly involved in the company's board activities.[19]  Issues and

---

[17] Although SolarWorld attempts to include additional respondents by citing a portion of the case brief it filed in the underlying administrative proceeding, SolarWorld elected not to identify the specific evidence and argument regarding *de facto* control over "a number" of SASAC-owned companies in its opening brief.  This failure to fully brief the issue constitutes waiver of the claim with respect to any companies other than those identified and discussed on pages 34 and 35 of SolarWorld's opening brief.  *See, e.g., SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319-20 (Fed. Cir. 2006) (holding that arguments not raised in the opening brief and undeveloped arguments are waived).

[18] Commerce mistakenly identified Jiawei Solarchina in the *Preliminary Determination* as "Jiawei Solar (Wuhan) Co., Ltd." *Preliminary Determination*, 77 Fed. Reg. at 31,317.  Also, Jiawei Solarchina is a distinct entity from "Jiawei Solarchina Co. Ltd.," which did receive a separate rate in the *Final Determination. See Final Determination*, 77 Fed. Reg. at 31,322; P.D. 110 at 1-2, attached as exhibit 7 to our appendix ("Jiawei Solarchina Co. Ltd. ('Jiawei Hong Kong')" is the parent company of Jiawei Solarchina (Wuhan) Co., Ltd. and Jiawei Solarchina (Shenzen) Co. Ltd.).

[19] Specifically, the record evidence indicated that even though [    

]. *See* C.D. 1613 at 1.  Further, although [

55

Decision Memorandum, at 27; *see* C.D. 1613 at 1-2, attached as exhibit 28 to SolarWorld's

appendix. Further, the record indicates that Ningbo ETDZ's board of directors selected the

company's chief financial officer. Issues and Decision Memorandum, at 33. Third, the record

evidence related to Dongfang Electric also supports Commerce's conclusion that the company

operates free from *de facto* government control. As Commerce explained, Dongfang Electric

reported that to its knowledge neither its board members, nor those of its majority owner(s), have

any significant relationship with SASAC or the PRC government and that its board members

"carry out their role as members of {Dongfang's} board of directors considering the interests of

{Dongfang} itself." *Id.* at 27, 33. In addition, Dongfang Electric's board determines its profit

distribution and the company retains its export revenues. *Id.* at 33. In light of the above,

Commerce reasonably concluded that there was no evidence that the PRC government was

involved in the export activity decisions of Ningbo ETDZ and Dongfang Electric even if the

government was one of the ultimate owners of these companies.

        3.      Commerce's Determination To Grant A Separate Rate To Certain
                   Respondents With Managers Or Board Members That Are Also Members
                   Of The CPC, NPC, Or The CPPCC Is Supported By Substantial Evidence

SolarWorld argues that Commerce improperly granted a separate rate to fourteen other

certain respondents whose mangers or board members are also members of the CPC, NPC[20]

and/or the CPCC[21]. SolarWorld Br. 36-40. SolarWorld's claim lacks merit with respect to

---

]. *Id.* at 1-2.

[20] Chint Solar, JA Solar, Shanghai JA Solar, JingAo, and Ningbo Qixin. SolarWorld Br.
at 36.

[21] [

]. SolarWorld Br. at 38.

[                    ] and [                    ] because Commerce did not grant these two

companies a separate rate.  Commerce denied [                    ] a separate rate because it

failed to submit a timely separate rate response to Commerce's supplemental separate rate

questionnaire.  *See Preliminary Determination*, 77 Fed. Reg. at 31,317, unchanged in *Final*

*Determination*, 77 Fed. Reg. at 63,794.  In addition, Commerce did not grant a separate rate to

[                    ], but rather, granted it to the company's *affiliates*, [         ] and

[                    ].  *See Final Determination*, 77 Fed. Reg. at 31,322; [                    ],

attached as exhibit 6 to our appendix (stating that [         ] and [              ] are the

affiliates of [                                                            ]).

    SolarWorld's claim also lacks merit with respect to the 12 other companies that it

identifies because Commerce's determination that these companies had demonstrated an absence

of *de facto* control by the Chinese government is supported by substantial evidence.[22]

Commerce examined the record evidence related to the companies whose managers or directors

are members of the CPC, NPC, the CPPCC, or are affiliated with certain universities, and

determined that the companies had demonstrated the absence of *de facto* government control.

*Preliminary Determination*, 77 Fed. Reg. at 31,317, *unchanged in Final Determination*, 77 Fed.

Reg. at 63,794; Issues and Decision Memorandum, at 35-36.  Specifically, these companies

demonstrated that their export prices were not set by, and were not subject to, the approval of a

governmental agency; that they had authority to negotiate and to sign contracts and other

agreements; that they had autonomy from the government in making decisions regarding the

---

[22] Commerce also found that these companies had demonstrated an absence of *de jure*
government control.  *See Preliminary Determination*, 77 Fed. Reg. at 31,316, *unchanged in*
*Final Determination*, 77 Fed. Reg. at 63,794.  SolarWorld does not challenge Commerce's
determination that these twelve companies operated free of *de jure* government control.
SolarWorld Br. at 36-40.

selection of management; and, that they retained the proceeds of their export sales and made independent decisions regarding the disposition of profits or financing of losses. *Id.*

In addition, Commerce found that the record did not include any evidence demonstrating that the membership or position of senior managers or board directors in the CPC, NPC, or the CPPCC actually resulted in a lack of autonomy on the part of the respondents to set prices, to negotiate and sign agreements, to select management, or to decide how to dispose of profits or to finance losses. Issues and Decision Memorandum, at 35; *Preliminary Determination*, 77 Fed. Reg. at 31,317. In other words, Commerce found that the record contained no evidence of Chinese government direction with respect to export activities or day-to-day export related operations of the respondents at issue. Issues and Decision Memorandum, at 36. Given the dearth of evidence that would in any way support a finding that membership in the CPC, NPC, or the CPPCC by managers or directors of the respondents had any actual effect on the export activities of these organizations at issue, Commerce reasonably relied on the record evidence provided by the respondents that indicated that they operated free from government control and reasonably determined on the basis of this information that the respondents were eligible for separate rates.

## CONCLUSION

For these reasons, we respectfully request that the Court deny the plaintiffs' motions for judgment upon the administrative record and enter judgment for the United States.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL

Rebecca Cantu
Attorney
Office of the Chief Counsel
For Trade Enforcement & Compliance
U.S. Department of Commerce

/s L. Misha Preheim
L. MISHA PREHEIM
Senior Trial Counsel
MELISSA M. DEVINE
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-3087
Facsimile: (202) 305-8640

January 29, 2014

Attorneys for Defendant

59