Slip Op. 14 - 134

UNITED STATES COURT OF INTERNATIONAL TRADE

| JIANGSU JIASHENG PHOTOVOLTAIC TECHNOLOGY CO., LTD., Plaintiff, v. UNITED STATES, Defendant. | Before: Donald C. Pogue, Senior Judge<br>Consol. Court No. 13-00012[1] |
|---|---|

OPINION and ORDER

[affirming in part and remanding in part the Department of Commerce's final results of antidumping investigation]

Dated: November 20, 2014

Francis J. Sailer, Mark E. Pardo, Andrew T. Schutz, and Brandon M. Petelin, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for Plaintiff and Defendant-Intervenor Jiangsu Jiasheng Photovoltaic Technology, Co., Ltd. and Defendant-Intervenor Hanwha Solarone (Qidong) Co., Ltd.

Timothy C. Brightbill, Tessa V. Capeloto, and Laura El-Sabaawi, Wiley Rein LLP, of Washington, DC, for Plaintiff and Defendant-Intervenor SolarWorld Industries America, Inc.

L. Misha Preheim, Senior Trial Counsel, and Melissa M. Devine, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant. Also on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel was Rebecca Cantu, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

---

[1] This action is consolidated with SolarWorld Indus. Am., Inc. v. United States, Ct. No. 13-00006. Order June 12, 2013, ECF No. 18.

John M. Gurley, Diana Dimitriuc Quaia, and Tina Termei, Arent Fox LLP, of Washington, DC, for Defendant-Intervenors Changzhou Trina Solar Energy Co., Ltd., Trina Solar (U.S.), Inc., Wuxi Suntech Power Co., Ltd., Suntech America, Inc., Suntech Arizona, Inc., JA Solar Technology Yahngzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd., and JingAo Solar Co., Ltd.

Neil R. Ellis, Richard L.A. Weiner, Brenda A. Jacobs, Rajib Pal, and Raphaelle E. Monty, Sidley Austin LLP, of Washington, DC, for Defendant-Intervenors Yingli Green Energy Americas, Inc. and Yingli Green Energy Holding Co., Ltd.

Gregory S. Menegaz, J. Kevin Horgan, and John J. Kenkel, deKieffer & Horgan PLLC, of Washington, DC, for Defendant-Intervnors Ningbo Komaes Solar Technology Co., Ltd., Ningbo Etdz Holdings Ltd., Ningbo Qixin Solar Electrical Appliance Co., Ltd., LDK Solar Hi-Tech (Nanchang) Co., Ltd., and LDK Solar Hi-Tech (Suzhou) Co., Ltd.

**Pogue, Senior Judge:** This consolidated action arises from the United States Department of Commerce's ("Commerce") antidumping investigation of crystalline silicon photovoltaic cells ("CSPC") from the People's Republic of China ("PRC" or "China").[2] Plaintiff Jiangsu Jiasheng Photovoltaic Technology

---

[2] See [CSPC], Whether or Not Assembled into Modules, from the [PRC], 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) (final determination of sales at less than fair value, and affirmative final determination of critical circumstances, in part) ("Final Results") and accompanying Issues & Decision Mem., A-570-979, Antidumping Duty ("AD") Investigation (Oct. 9, 2012) ("I&D Mem."). The subject merchandise includes solar cells used to make solar energy panels and modules. See [CSPC], Whether or Not Assembled into Modules, from the [PRC], 76 Fed. Reg. 70,960, 70,965 (Dep't Commerce Nov. 16, 2011) (initiation of antidumping duty investigation) ("Notice of Initiation") (Appendix I: Scope of the Investigation) (providing a full description of the merchandise covered by this investigation); id. at 70,960 (noting that the period of investigation ("POI") was April 1,

(footnote continued . . .)

Company, Limited ("Jiasheng") challenges Commerce's determination, in its investigation, to reject Jiasheng's application for "separate-rate status."[3] In addition, Plaintiff SolarWorld Industries America, Incorporated ("SolarWorld") challenges 1) Commerce's decision, in constructing a home market or "normal value",[4] to calculate the cost of aluminum frames (a component used to make the subject merchandise) based on goods classified under Thai Harmonized Tariff Schedule ("HTS") Heading 7604, rather than Thai HTS Heading 7616; and 2) Commerce's determination to grant separate-rate status to certain respondents.[5]

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[6] and 28 U.S.C. § 1581(c) (2012).

---

2011, through September 30, 2011).

[3] Mem. of L. in Supp. of Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 41 ("Jiasheng's Br."). See *infra* Discussion Section I.A of this opinion (explaining "separate-rate status").

[4] See *infra* note 65 (explaining the process for constructing "normal" comparison prices in investigations of merchandise from the PRC).

[5] See Pet'r-Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF Nos. 43 (conf. version) & 44 (pub. version) ("SolarWorld's Br.").

[6] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code,
(footnote continued . . .)

For the reasons presented below, Commerce's Final Results are sustained against the challenges presented here,[7] except with regard to separate rate issues for which Commerce has requested a voluntary remand.[8] Commerce's request for remand is granted. Following a statement of the standard of review, each challenge to the Final Results presented in this action is addressed in turn.

**STANDARD OF REVIEW**

The court will sustain Commerce's antidumping determinations if they are supported by substantial evidence and otherwise in accordance with law. See 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," SKF USA, Inc. v. United States, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938), and the substantial evidence standard of review can be roughly translated to mean "is the determination unreasonable?" Nippon Steel Corp. v. United

---

2012 edition.

[7] These Final Results are also subject to challenges presented in two additional actions before this Court, SolarWorld Indus. Am., Inc. v. United States, Ct. No. 13-00219, and Changzou Trina Solar Energy Co. v. United States, Consol. Ct. No. 13-00009. See Severance & Consolidation Order June 12, 2013, ECF No. 18.

[8] Def.'s Mot. for Voluntary Remand, ECF No. 81 ("Def.'s Mot.").

States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quotation and alteration marks and citation omitted). In this context, substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).[9]

"It is not for [the courts] to reweigh the evidence before the [agency]," Henry v. Dep't of the Navy, 902 F.2d 949, 951 (Fed. Cir. 1990), but there must be a rational connection between the facts found based on the record evidence and the choices made in the agency's determination. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962). Although the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given, [the court] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)

---

[9] See also, e.g., Technoimportexport, UCF Am. Inc. v. United States, 16 CIT 13, 18, 783 F. Supp. 1401, 1406 (1992) ("When Commerce is faced with the decision to choose between two reasonable alternatives and one alternative is favored over the other in their eyes, then they have the discretion to choose accordingly.").

(citations omitted).

In addition, where the agency is vested with discretion to set the procedures by which it administers its governing statute,[10] the court reviews such decisions for abuse of discretion. See, e.g., Dongtai Peak Honey Indus. Co. v. United States, __ CIT __, 971 F. Supp. 2d 1234, 1239 (2014). "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represent an unreasonable judgment in weighing relevant factors." Id. (quoting WelCom Prods., Inc. v. United States, 36 CIT __, 865 F. Supp. 2d 1340, 1344 (2012) (citing Star Fruits S.N.C. v. United States, 393 F.3d 1277, 1281 (Fed. Cir. 2005))). In abuse of discretion review, "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." See SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

## DISCUSSION

### I. Commerce's Rejection of Jiasheng's Application for Separate-Rate Status

[10] See, e.g., Yantai Timken Co. v. United States, 31 CIT 1741, 1755, 521 F. Supp. 2d 1356, 1370 (2007) ("Commerce has broad discretion to establish its own rules governing administrative procedures, including the establishment and enforcement of time limits.") (quotation marks and citation omitted).

*A. Background*

Because Commerce considers the PRC to be a non-market economy ("NME"),[11] when investigating merchandise from China, the agency presumes that the export operations of all Chinese producers and exporters are controlled by the PRC government, unless respondents show otherwise.[12] As a result, Commerce's practice is to assign to all exporters from the PRC a single "countrywide" antidumping duty rate unless they affirmatively demonstrate eligibility for a "separate rate."[13] Applying this

---

[11] See Notice of Initiation, 76 Fed. Reg. at 70,962 ("The presumption of NME status for the PRC has not been revoked by [Commerce] and, therefore, in accordance with [19 U.S.C. 1677(18)(C)(i)], remains in effect for purposes of the initiation of this investigation.").

[12] See Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1373 (Fed. Cir. 2013) ("[In] [p]roceedings involving a nonmarket economy, such as China, . . . Commerce begins with a rebuttable presumption that all respondents in the investigation are under foreign government control and thus should receive a single countrywide dumping rate.") (citation omitted); [CSPC], Whether or Not Assembled into Modules, from the [PRC], 77 Fed. Reg. 31,309, 31,315 (Dep't Commerce May 25, 2012) (preliminary determination of sales at less than fair value, postponement of final determination and affirmative preliminary determination of critical circumstances) ("Prelim. Results") ("In proceedings involving NME countries, [Commerce] has a rebuttable presumption that all companies within the country are subject to government control and thus should be assessed a single AD rate.") (citation omitted).

[13] See Transcom, Inc. v. United States, 294 F.3d 1371, 1373 (Fed. Cir. 2002) ("Commerce determined that NME exporters would be subject to a single, countrywide antidumping duty rate unless they could demonstrate legal, financial, and economic independence from the Chinese government (referred to by

(footnote continued . . .)

practice, in announcing the initiation of this investigation, Commerce reminded respondents that to obtain "separate-rate status," exporters and producers must submit a separate-rate application ("SRA"), and that a timely response to Commerce's questionnaire regarding the quantity and value of exported merchandise ("Q&V questionnaire") is a pre-requisite to separate-rate eligibility.[14]

Commerce sent Q&V questionnaires to 75 PRC-based producers and exporters.[15] The United Parcel Service ("UPS") confirmed delivery of the Q&V questionnaire to Respondent-Plaintiff Jiasheng on November 12, 2011, seventeen days prior to

---

Commerce as 'the NME entity'). . . . Under [this] NME presumption, a company that fails to demonstrate independence from the NME entity is subject to the countrywide rate, while a company that demonstrates its independence is entitled to an individual rate as in a market economy.") (relying on Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997) ("[I]t was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy.")) (additional citations omitted).

[14] Initiation Notice, 76 Fed. Reg. at 70,964 (citing Import Admin., U.S. Dep't Commerce, Separate-Rates Practice & Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries, Policy Bulletin No. 05.1 (Apr. 5, 2005) ("Commerce Policy 5.1"), available at http://enforcement.trade.gov/policy/bull05-1.pdf (last visited Oct. 22, 2014)); Commerce Policy 5.1 at 4 ("Firms to whom [Commerce] sends a Quantity and Value ('Q&V') questionnaire, which is used in certain investigations to select mandatory respondents, must respond to the Q&V questionnaire to receive consideration for a separate rate.").

[15] Notice of Initiation, 76 Fed. Reg. at 70,964.

the stated response deadline.[16] This correspondence apprised Jiasheng of Commerce's investigation and requested information on the quantity and U.S. dollar value of Jiasheng's sales of subject merchandise to the United States during the POI.[17] The cover letter sent with the questionnaire informed Jiasheng that its response was due no later than November 29, 2011,[18] and the questionnaire warned that failure to timely respond would forfeit Jiasheng's opportunity to be considered for separate-rate status in this investigation.[19]

In addition, the cover letter notified Jiasheng that instructions for responding to the Q&V questionnaire were

---

[16] See Mem. re Issuance of Quantity and Value Questionnaires, [CSPC], Whether or Not Assembled into [Modules,] from the [PRC], A-570-979, AD Investigation (Dec. 8, 2011), reproduced in Pub. App. of Docs. in Supp. of Def.'s Opp'n to Pls.' Mots. for J. on the Agency R. ("Def.'s App."), ECF No. 56-1 at P.D. 225 (listing UPS tracking number 1ZA610W90498461594 for the Q&V questionnaire sent to Jiasheng, and listing that tracking number as delivered and signed for on November 12, 2011, at 4:10pm); Notice of Initiation, 76 Fed. Reg. at 70,964 ("A response to the quantity and value questionnaire is due no later than November 29, 2011.") (footnote omitted).

[17] Quantity & Value Questionnaire, [CSPC], Whether or Not Assembled into Modules, from the [PRC], A-570-979, AD Investigation (Nov. 9, 2011) ("Jiasheng Q&V Quest."), reproduced in App. to Br. in Supp. of Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. ("Jiasheng's App."), ECF No. 45 at Doc. 15.

[18] Cover Letter to Jiasheng Q&V Quest., ECF No. 45 at Doc. 15.

[19] Jiasheng Q&V Quest., ECF No. 45 at Doc. 15, at 2 ("[Commerce] will not give consideration to any separate-rate status application made by parties that fail to timely respond to the Quantity and Value Questionnaire . . . .").

included in the package as Attachment III, and advised Jiasheng to utilize the included check list (Attachment V) "to make certain [that Jiasheng] fully complie[s] with all filing requirements."[20] Paragraph A.1 of the General Instructions included in Attachment III to the Q&V questionnaire received by Jiasheng states that "[a]ll submissions must be made electronically using [Commerce's] IA ACCESS website at http://iaaccess.trade.gov."[21] Paragraph A.3 explains that "[a]n electronically filed document must be received successfully in its entirety by IA ACCESS by 5 p.m. Eastern Time (ET) on the due date, unless an earlier time is specified."[22] The check list included in Attachment V warns respondents: "*Do not* submit your response via email or facsimile. Your response must be electronically filed using IA [ACCESS] unless you meet one of the exceptions listed under the 'Manual Filing' section of the General Instructions."[23]

---

[20] Cover Letter to Jiasheng Q&V Quest., ECF No. 45 at Doc. 15.

[21] Attach. III to Jiasheng Q&V Quest., ECF No. 45 at Doc. 15.

[22] Id.

[23] Attach. V to Jiasheng Q&V Quest., ECF No. 45 at Doc. 15, at ¶ 4. (emphasis in original). The manual filing exceptions apply to unusually large documents or data files, or when the IA ACCESS system is unable to accept filings. See Attach. III to Jiasheng Q&V Quest., ECF No. 45 at Doc. 15, at ¶ C.1. It is undisputed that these manual filing exceptions are not relevant to this case. See Oral Arg. Tr., ECF No. 83, at 7 (Jiasheng's counsel's concession that the manual filing exceptions refer to

(footnote continued . . .)

Commerce received timely-filed Q&V questionnaire responses from 80 exporters – who all filed their responses using Commerce's IA ACCESS website[24] – but not from Jiasheng. Rather, on November 30, 2011, at 10:59 local time (i.e., after the November 29, 2011, deadline), Jiasheng sent an email message to one of the contact persons listed on the Q&V questionnaire.[25] This email invited the official to "check the attachment" and apologized for the late submission, without providing any explanation.[26]

Nine days after receiving the questionnaire responses

---

a "different issue").

[24] Mem. re Resp't Selection, [CSPC], Whether or Not Assembled into Modules, from the [PRC], A-570-979, AD Investigation (Dec. 8, 2011) ("Resp't Selection Mem."), reproduced in Def.'s App., ECF No. 56-1 at P.D. 275, at 2 (noting also that nine of the 80 Q&V questionnaire responses were rejected as improperly filed and those respondents were provided with an opportunity to correct the filing deficiencies, as well as that "many of the companies to which [Commerce] issued Q&V questionnaires did not respond to the questionnaire"). But see Prelim. Results, 77 Fed. Reg. at 31,309 ("Commerce received timely responses to its Q&V questionnaire from 76 companies.").

[25] See Ex. A (email correspondence) to Letter re Commerce's Rejection of Jiasheng's Q&V Resp. & Separate Rate Appl., [CSPC], Whether or Not Assembled into Modules, from the [PRC], A-570-979, AD Investigation (Feb. 29, 2012) ("Jiasheng's Feb. 29 Protest"), reproduced in Jiasheng App., ECF No. 45 at Doc. 2; see also Cover Letter to Jiasheng Q&V Quest., ECF No. 45 at Doc. 15 (naming two contact persons, and providing their phone numbers and email addresses, to whom to direct "any questions or comments").

[26] Ex. A to Jiasheng's Feb. 29 Protest, ECF No. 45 at Doc. 2.

through IA ACCESS, on December 8, 2011, Commerce completed its analysis of the 80 submissions and selected two respondents for individual examination (the "mandatory respondents"), pursuant to 19 U.S.C. § 1677f-1(c)(2)(B).[27] In doing so, Commerce made its selection without relying on data from a number of companies that had timely but deficiently submitted their responses through IA ACCESS.[28] Rather, Commerce permitted those companies to properly re-file their Q&V questionnaire responses by December 14, 2011, in order to preserve their eligibility for a separate rate.[29] Because Jiasheng did not timely submit its Q&V questionnaire response through IA ACCESS, Jiasheng was neither contacted by Commerce nor permitted an opportunity to preserve separate-rate eligibility by properly filing its Q&V

---

[27] See Resp't Selection Mem., ECF No. 56-1 at P.D. 275, at 4-5; 19 U.S.C. § 1677f-1(c)(2)(B) ("If it is not practicable to make individual weighted average dumping margin determinations [for each known exporter and producer of the subject merchandise] because of the large number of exporters or producers involved in the investigation . . ., [Commerce] may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to . . . exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.").

[28] See Resp't Selection Mem., ECF No. 56-1 at P.D. 275, at 2 n.4.

[29] See Letters to Certain Resp'ts, [CSPC], Whether or Not Assembled into Modules, from the [PRC], A-570-979, AD Investigation (Dec. 9, 2011), reproduced in Jiasheng's App., ECF No. 45 at Docs. 4-12; see also *supra* note 14 and accompanying text.

questionnaire response.[30]

Jiasheng then retained counsel and ultimately filed its Q&V questionnaire response through IA ACCESS on December 12, 2011.[31] Because this was the first filing of Jiasheng's response within the electronic filing system for this investigation, Commerce rejected the filing as untimely.[32]

Meanwhile, in December 2011 through January 2012, Commerce received 68 timely-filed SRAs from companies who had also timely filed their Q&V questionnaire responses through IA ACCESS.[33] Although Jiasheng also submitted an SRA by the applicable deadline, using IA ACCESS, Commerce rejected the submission because Jiasheng had not timely filed a Q&V questionnaire response.[34] In explaining its decision to reject

---

[30] I&D Mem. cmt. 45 at 103 ("Jiasheng failed to officially file a Q&V questionnaire response on the record of the case by the deadline for doing so; thus there was nothing on the record for [Commerce] to examine for filing deficiencies.").

[31] Jiasheng's Br., ECF No. 41, at 20.

[32] See Letter re Rejection of Jiasheng's Q&V Questionnaire Resp., [CSPC], Whether or Not Assembled into Modules, from the [PRC], A-570-979, AD Investigation (Jan. 6, 2012) ("Jiasheng Q&V Rejection"), reproduced in, Def.'s App., ECF No. 56-1 at P.D. 356 (informing Jiasheng that its submission dated December 12, 2011, was rejected as untimely filed).

[33] See Prelim. Results, 77 Fed. Reg. at 31,310, 31,315.

[34] See Letter re Rejection of Jiasheng's Separate Rate Appl., [CSPC], Whether or Not Assembled into Modules, from the [PRC], A-570-979, AD Investigation (Feb. 10, 2012) ("Jiasheng SRA Rejection Letter"), reproduced in, Jiasheng's App., ECF No. 45 (footnote continued . . .)

Jiasheng's SRA, Commerce emphasized that both the notice of initiation for this investigation and the specific Q&V questionnaire received by Jiasheng explicitly required respondents to timely file Q&V questionnaire responses as a precondition for separate rate eligibility.[35]

Those respondents that timely filed their Q&V questionnaire responses through IA ACCESS and whose separate-rate applications demonstrated sufficient independence from government control[36] were ultimately assigned an antidumping duty cash deposit rate of 25.96 percent, which was lower than that assigned to the PRC-wide entity.[37] This lower 25.96 percent

---

at Doc. 14 (informing Jiasheng that its separate rate questionnaire response dated January 17, 2012, was rejected because Jiasheng had not timely filed a Q&V questionnaire response and "a timely response to the Q&V Questionnaire is necessary to be considered for receipt of a separate rate"); Prelim. Results, 77 Fed. Reg. at 31,317 (explaining that Commerce did not grant a separate rate to Jiasheng because Jiasheng failed to submit a timely response to Commerce's Q&V questionnaire).

[35] Jiasheng SRA Rejection Letter, ECF No. 45 at Doc. 14, at 1 (quoting Initiation Notice, 76 Fed. Reg. at 70,964 ("[R]espondents [must] submit a response to both the quantity and value questionnaire and the separate rate application by the respective deadlines in order to receive consideration for separate-rate status."); Jiasheng Q&V Quest., ECF No. 45 at Doc. 15, at 2 ("[Commerce] will not give consideration to any separate-rate status application made by parties that fail to timely respond to the Quantity and Value Questionnaire . . . .")).

[36] See *supra* notes 11-13 and accompanying text.

[37] See Final Results, 77 Fed. Reg. at 63,794-95.

separate rate reflected an average of the rates calculated for the two mandatory respondents, who also qualified for separate rates.[38] The PRC-wide entity, on the other hand, comprised of all the remaining companies that did not qualify for a separate rate,[39] including Jiasheng, was assigned a 249.96 percent rate based on an adverse inference.[40] Commerce judged this rate, which

---

[38] See id. at 63,794 ("The separate rate is normally determined based on the weighted-average of the estimated dumping margins established for exporters and producers individually investigated, excluding zero and *de minimis* margins or margins based entirely on adverse facts available ('AFA'). [citing 19 U.S.C. § 1673d(c)(5)(A)] In this investigation, both [mandatory respondents] have estimated weighted-average dumping margins which are above *de minimis* and which are not based on total AFA. Because there are only two relevant weighted-average dumping margins for this final determination, using a weighted-average of these two margins risks disclosure of business proprietary information ('BPI') data. Therefore, [Commerce] has calculated both a simple average and a weighted-average of the two final dumping margins calculated for the mandatory respondents using public values for sales of subject merchandise reported by respondents and used the average that provides a more accurate proxy for the weighted-average margin of both companies calculated using BPI data, which in this investigation is 25.96 percent.") (additional citation omitted).

[39] See id. at 63,794 ("Because [Commerce] begins with the presumption that all companies within an NME country are subject to government control, and because only the mandatory respondents and certain Separate Rate Applicants have overcome that presumption, [Commerce] is applying a single antidumping rate to all other exporters of subject merchandise from the PRC. Such companies have not demonstrated entitlement to a separate rate.") (citation omitted).

[40] Id. at 63,794-96 (finding that the PRC-wide entity "failed to cooperate to the best of its ability" because "certain PRC exporters/producers did not respond to [Commerce]'s requests for information and did not establish that they were separate from

(footnote continued . . .)

was the highest dumping margin alleged in the petition to initiate these proceedings, to be derived from data that were "within the range of the U.S. prices and normal values for the respondents in this investigation."[41]

Jiasheng now challenges Commerce's determination to reject its SRA and assign to Jiasheng the PRC-wide rate. See Jiasheng's Br., ECF No. 41. Jiasheng does not challenge the PRC-wide rate itself, claiming only that this rate was

---

the PRC-wide entity"; accordingly employing an adverse inference when determining the dumping margin for the PRC-wide entity, pursuant to 19 U.S.C. § 1677e(b); and explaining that, when determining rates based on an adverse inference, Commerce's practice is "to select a rate that is sufficiently adverse as to . . . induce respondents to provide [Commerce] with complete and accurate information in a timely manner") (quotation marks and citation omitted); see 19 U.S.C. § 1677e(b) ("If [Commerce] finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce], [the agency] . . . may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."); Yangzhou Bestpak, 716 F.3d at 1373 ("Commerce may use adverse inferences when calculating a rate if an investigated respondent refuses to cooperate by impeding the investigation or not properly providing information. Commerce typically concludes that some part of the countrywide entity has not cooperated in the proceeding because those that have responded do not account for all imports of the subject merchandise. Commerce is required to corroborate chosen AFA rates to ensure that they fall within the purportedly acceptable range of margins determined.") (citing 19 U.S.C. § 1677e(b)-(c)); E. Sea Seafoods LLC v. United States, __ CIT __, 703 F. Supp. 2d 1336, 1354 n.15 (2010) ("[I]n most, if not all, cases involving a country-wide NME antidumping duty rate, the country-wide margin has been calculated using adverse inferences.") (citation omitted).

[41] Final Results, 77 Fed. Reg. at 63,795 (citation omitted).

improperly applied to Jiasheng. See id.; Oral Arg. Tr., ECF No. 83, at 13 (Jiasheng's confirmation that it is not challenging the China-wide rate).

*B. Analysis*

Commerce has discretion to set and enforce deadlines and reject untimely filed submissions,[42] and may make its determinations "us[ing] facts otherwise available" when, *inter alia*, a respondent "fails to provide [requested] information by the deadlines for submission of the information or in the form and manner requested." 19 U.S.C. 1677e(a)(2)(B).[43] Here, Commerce used facts otherwise available (i.e., the presumption of government control attaching to all exporters from NME countries like the PRC) because Jiasheng failed to provide information requested of it by the applicable deadline. See I&D Mem. cmt. 45 at 105. Jiasheng argues that its SRA,

---

[42] See NTN Bearing Corp. v. United States, 74 F.3d 1204, 1207 (Fed. Cir. 1995) ("Inasmuch as Congress has not specified the procedures [Commerce] must use to obtain information, it is within the discretion of [the agency] to promulgate appropriate procedural regulations.") (citation omitted); Yantai Timken, 31 CIT at 1755, 521 F. Supp. 2d at 1371 ("In order for Commerce to fulfill its mandate to administer the antidumping duty law, including its obligation to calculate accurate dumping margins, it must be permitted to enforce the time frame provided in its regulations.") (citation omitted).

[43] Reliance on this statutory provision is subject to the requirements of 19 U.S.C. §§ 1677m(c)(1), 1677m(d), and 1677m(e), which are discussed below.

which was filed using IA ACCESS by the deadline provided for respondents who timely filed Q&V responses, contained the information necessary to determine Jiasheng's actual separate-rate eligibility, in the form and manner requested by Commerce.[44] Jiasheng therefore contends that Commerce inappropriately used "facts otherwise available" when the actual information was in fact timely and properly submitted on the record of this investigation.[45]

But as Commerce explained, the agency unambiguously and consistently requires respondents to properly and timely file Q&V responses as a precondition for separate-rate eligibility, because doing so prevents respondents from circumventing the mandatory respondent selection process and benefitting from the all-others separate rate without the risk or burden of individual investigation.[46] Because Commerce has

---

[44] See Jiasheng's Br., ECF No. 41, at 14-15, 23.

[45] See id.

[46] See I&D Mem. cmt. 45 at 104-05; Oral Arg. Tr., ECF No. 83, at 32-33. Because Commerce generally makes its separate-rate determinations after selecting the mandatory respondents (based on Q&V submissions), without this link between separate-rate eligibility and timely Q&V data submission respondents would be free to submit their SRAs without having made any Q&V submissions. In this way, respondents would be able to avoid the possibility of detailed examination that accompanies selection as a mandatory respondent, but nonetheless benefit from the separate rate, which is usually based on the mandatory respondents' rates. See *supra* note 38 (explaining Commerce's

(footnote continued . . .)

broad discretion to set the procedures it needs in order to adequately perform and enforce its regulatory role, and because the agency's basis for this particular procedure is reasonable, Commerce's policy of requiring timely Q&V responses as a precondition of separate-rate eligibility is not a *prima facie* abuse of the agency's discretion.

Because Commerce's policy of predicating the timeliness of separate-rate applications on timely Q&V data submission is not a *prima facie* abuse of discretion, the next question raised by Jiasheng's challenge is whether Commerce's application of its policy in this case amounts to an abuse of discretion. In evaluating such an as-applied challenge to Commerce's timeliness requirements and procedures, the court asks "whether the interests of accuracy and fairness outweigh the burden [resulting from the late submission] placed on [Commerce] and the interest in finality."[47] In support of its argument that Commerce abused its discretion by rejecting Jiasheng's SRA in the circumstances presented here, Jiasheng relies on this Court's decisions in Grobest, __ CIT __, 815 F. Supp. 2d 1342, and Artisan Mfg. Corp. v. United States,

practice for calculating separate rates).

[47] Grobest & I-Mei Indus. (Vietnam) Co. v. United States, __ CIT __, 815 F. Supp. 2d 1342, 1365 (2012).

__ CIT __, 978 F. Supp. 2d 1334 (2014).[48] But the facts of this case are distinguishable from the issues presented in those actions.

In Grobest, an NME company that was wholly-owned by a market economy company had qualified for a separate rate in an antidumping investigation, and had then maintained separate-rate status in three subsequent administrative reviews by timely filing certifications of no material changes.[49] Then, in the fourth review, that company untimely submitted the same certification that it had consistently used over all the years during which its merchandise had been subject to the antidumping duty order.[50] Under such circumstances, Commerce's sudden

---

[48] See Jiasheng's Br., ECF No. 41, at 10-16 (relying on Grobest); Pl.'s Notice of Supplemental Auth., ECF No. 79 (advising the court of the decision in Artisan, and requesting that the court "take this decision into account in its deliberations").

[49] Grobest, __ CIT at __, 815 F. Supp. 2d at 1364 (noting that the company in question, "Amanda Foods," received separate-rate status in the initial investigation, which it retained "in all subsequent reviews prior to the fourth by filing [certifications of no material changes]"); id. at 1366 (noting that Amanda Foods' separate-rate status in the investigation and three subsequent reviews was based on evidence that this company "was wholly owned by foreign entities located in a market economy country"); see id. at 1364 ("If an exporter or producer received a separate rate in a prior review and has not undergone relevant changes, it may submit a separate-rate certification ('SRC') to maintain separate-rate status in subsequent reviews. All other companies seeking separate-rate status must file a separate-rate application ('SRA').") (citations omitted).

[50] See id. at 1366 ("Amanda Foods received separate-rate status

(footnote continued . . .)

rejection of the certification, without any evidence of an intervening change and where "every indication suggest[ed] that the burden of reviewing the [separate rate certification] would not be great," was an abuse of discretion.[51]

But Jiasheng's case is not analogous. Here Commerce had no prior history to rely on, and the issue before the court is not the rejection of a certification of continued separate rate eligibility in the absence of changed circumstances, but rather the untimely attempt to establish such eligibility in the first instance, under circumstances that would impose a significant burden on the agency (requiring Commerce to either begin its already-completed mandatory respondent selection process anew, or else undermine the agency's policy objective by permitting Jiasheng's effective circumvention of that process).

Nor is this case analogous to the facts in Artisan, where Commerce abused its discretion by rejecting a response filed via IA ACCESS after 5:00pm on the day of the deadline but

---

in the initial investigation and has maintained that status in each subsequent review prior to the fourth due to it being wholly foreign-owned; . . . [Amanda Foods' late certification in the fourth review shows that] it remains wholly foreign-owned."); id. at 1367 (finding that "the late-filed SRC appears to maintain the status quo").

[51] Id. at 1367.

before 9:00am on the following day.[52] Here, rather than properly submitting its response via IA ACCESS before the start of business on the day after the deadline, Jiasheng emailed its late response, despite clear instructions not to do so, and made no IA ACCESS filings until two weeks after the deadline.

Commerce's instructions, received by Jiasheng seventeen days before the filing deadline, clearly stated that 1) Q&V questionnaire responses were to be filed only by using the IA ACCESS website,[53] and were *not* to be emailed under any circumstances[54]; and 2) failure to timely file the Q&V questionnaire response would forfeit the opportunity to be considered for a separate rate.[55] Moreover, at the close of the

---

[52] Artisan, __ CIT at __, 978 F. Supp. 2d at 1338; see also id. at 1345 ("On the record evidence, . . . [the relevant] Q&V information was unavailable to Commerce only between the 5:00pm close of business on the due date, April 11, 2012, and a time at or near the beginning of the next business day. Such a brief period could not have delayed the investigation in any meaningful way.") (citation omitted); id. at 1344 (narrowing the holding to the particular facts of that case).

[53] Attach. III to Jiasheng Q&V Quest., ECF No. 45 at Doc. 15, at ¶¶ A.1, A.3.

[54] Attach. V to Jiasheng Q&V Quest., ECF No. 45 at Doc. 15, at ¶ 4; see also Attach III to Jiasheng Q&V Quest., ECF No. 45 at Doc. 15, at ¶ A.1 ("If an exception to the electronic filing requirement applies, you must address and *manually* submit your response to the address indicated on the cover page of this questionnaire.") (emphasis added).

[55] Jiasheng Q&V Quest., ECF No. 45 at Doc. 15, at 2; see *supra* note 19 (quoting relevant language).

IA ACCESS filing deadline, Commerce had received data from 80 respondents, which it then processed to select mandatory respondents within nine days, in order to adhere to a schedule for completing the investigation within the statutory time limitations.[56] Then, just as Commerce was compiling, organizing, and analyzing all of this information, Jiasheng sent a brief, uninformative email, with no explanation, attempting to submit its questionnaire response as an attachment, despite very clear instructions – followed by the vast majority of the respondents in this investigation – not to do so.[57] By the time of Jiasheng's actual untimely response, filed using IA ACCESS on December 12, 2011,[58] the investigation was already well under way.[59]

---

[56] See Resp't Selection Mem., ECF No. 56-1 at P.D. 275; I&D Mem. cmt. 45 at 104.

[57] It is true that the Q&V questionnaire had provided the email address along with an invitation for questions or comments. But the questionnaire also emphatically stated that the response was not to be emailed under any circumstances and must be submitted via IA ACCESS by November 29, 2011. The logical reading of this is that any questions or comments were to be sent in advance of the filing deadline, and that the email addresses provided were not to be used to submit the required responses.

[58] See *supra* notes 31 and 32 (providing relevant citations).

[59] See Prelim. Results, 77 Fed. Reg. at 31,309-10 (demonstrating that by December 12, 2011, Commerce had already selected the mandatory respondents, issued its antidumping questionnaires to those companies, and was starting to receive timely separate rate applications); see also I&D Mem. cmt. 45 at 104 ("The fully extended deadline for issuing the preliminary determination is

(footnote continued . . .)

Jiasheng's failure to follow Commerce's instructions and file its response through IA ACCESS by the November 29, 2011, deadline is also what distinguishes Jiasheng from the nine respondents who had timely, though deficiently, filed their Q&V questionnaire responses through IA ACCESS, and who were therefore permitted an opportunity to re-file and thus preserve their separate-rate eligibility.[60] Accordingly, Commerce's

---

less than six months from the due date for Q&V questionnaire responses. During this period [Commerce] must choose mandatory respondents, analyze questionnaire responses, issue and analyze supplemental questionnaire responses, calculate dumping margins for the respondents, and in this case, analyze nearly 70 SRAs and a significant amount of comments on various issues including scope, separate rates and critical circumstances. Jiasheng officially filed its Q&V questionnaire response almost two weeks after the due date for such responses."). Compare with Artisan, __ CIT at __, 978 F. Supp. 2d at 1345; see *supra* note 52 (quoting relevant language from Artisan).

Jiasheng argues that the Commerce official to whom Jiasheng emailed its late response should have opened the attachment, realized it was Jiasheng's attempt at filing the questionnaire response, promptly contacted Jiasheng to alert the company of its error, and then permitted Jiasheng to properly re-file and so preserve separate-rate eligibility. See, e.g., Jiasheng's Br., ECF No. 41, at 19. But Jiasheng's own failure to provide a timely explanation for its improper filing attempt precluded any such response. See *infra* note 60. Moreover, Commerce notified Jiasheng of its improper filing promptly after Jiasheng's response was finally filed through the IA ACCESS website. See Jiasheng Q&V Rejection, ECF No. 56-1 at P.D. 356 (informing Jiasheng, on January 6, 2012, that its December 12, 2011 filing was rejected as untimely).

[60] See I&D Mem. cmt. 45 at 103 ("While Jiasheng argues that it should have been notified that its Q&V questionnaire response was improperly filed because nine other respondents[] were notified of filing deficiencies in their Q&V questionnaire responses, these nine respondents submitted timely Q&V

(footnote continued . . .)

disparate treatment of Jiasheng vis-à-vis these nine companies is not arbitrary, as Jiasheng suggests,[61] because it has a reasonable basis. The nine companies that followed instructions and timely filed their responses through IA ACCESS were included within Commerce's initial data compilation and analysis, whereas Jiasheng did not enter that system until two weeks later. Given this distinction, Commerce did not act arbitrarily in treating Jiasheng differently from these nine companies.

Finally, while Commerce's use of "facts otherwise available" (here, the presumption of government control) pursuant to 19 U.S.C. § 1677e(a)(2)(B) is subject to the requirements of 19 U.S.C. §§ 1677m(c)(1), 1677m(d), and 1677m(e), none of these latter provisions is applicable on the facts presented. Section 1677m(c)(1) provides that if an interested party promptly notifies Commerce that it is unable to comply with the agency's request, "together with a full explanation and suggested alternative forms in which such party

---

questionnaire responses through IA ACCESS, albeit each of their submjissions had certain filing deficiencies. [In contrast,] Jiasheng failed to officially file a Q&V questionnaire response on the record of the case by the deadline for doing so . . . ."); id. at 105 ("The nine companies referenced by Jiasheng met the filing deadline. Jiasheng did not.").

[61] See, e.g., Jiasheng's Br., ECF No. 41, at 14; Pl.'s Br. in Reply to Def.'s & Pet'r-Pl.'s Opp'n to Pl.'s Mot. for J. on the Agency R. Pursuant to Rule 56.2, ECT No. 71, at 6.

is able to submit the information," then Commerce "shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party." 19 U.S.C. § 1677m(c)(1). This provision is not applicable here because, although Jiasheng received Commerce's request seventeen days prior to the submission deadline, Jiasheng neither notified Commerce of any anticipated difficulties nor provided any explanation therefor or offered any alternatives.[62]

Similarly, Section 1677m(e) – which provides that Commerce "shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by [Commerce]" if the five conditions listed in 19 U.S.C. § 1677m(e)(1)-(5) are met – is inapplicable because

---

[62] See Ex. A to Jiasheng's Feb. 29 Protest, ECF No. 45 at Doc. 2 (reproducing Jiasheng's initial email to Commerce, sent on November 30, 2011 (i.e., the day after the deadline for filing Q&V questionnaire responses), apologizing for the late submission and inviting the agency official to "check the attachment," without providing any explanation). Accordingly, Section 1677m(c)(1) is not applicable because Jiasheng did not, "promptly after receiving [Commerce's request] for information, notif[y] [Commerce] that [Jiasheng] [was] unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which [Jiasheng] [was] able to submit the information." See 19 U.S.C. § 1677m(c)(1).

Jiasheng did not submit the information requested of it "by the deadline established for its submission," see 19 U.S.C. § 1677m(e)(1), and did not demonstrate "that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce]," see id. at § 1677m(e)(4).

Finally, Section 1677m(d) requires the agency to promptly inform a party whose submission is determined to be deficient and, "to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency . . . ." 19 U.S.C. § 1677m(d). Commerce satisfied this requirement when it informed Jiasheng that its December 12, 2011, IA ACCESS filing was untimely,[63] and reasonably determined that permitting Jiasheng's tardy entry into the investigation was no longer practicable by the time of its late IA ACCESS submission, "in light of the time limits established for the completion of investigations." See 19 U.S.C. § 1677m(d); I&D Mem. cmt. 45 at 104. Accordingly, Commerce reasonably applied Section 1677e(a) to rely on facts otherwise available when Jiasheng failed to timely submit the information requested of it and did not properly submit such information until a time when its consideration was no longer practicable.

---

[63] Jiasheng Q&V Rejection, ECF No. 56-1 at P.D. 356.

II. Commerce's Valuation of Aluminum Frames

*A. Background*

In its investigation, Commerce calculated surrogate values for the factors of production ("FOPs") used by the two mandatory respondents, Trina Solar and Wuxi Suntech,[64] to produce subject merchandise.[65] Commerce valued all surrogate FOPs using data from Thailand, the primary surrogate market economy country selected for this investigation.[66] Among the FOPs required for producing the subject merchandise are the aluminum frames used

[64] Defendant-Intervenors Changzhou Trina Solar Energy Co., Ltd. ("Trina Solar") and Wuxi Suntech Power Co., Ltd. ("Wuxi Suntech") were "the two companies reporting the largest quantity of solar cell sales to the United States during the [POI]," Prelim. Results, 77 Fed. Reg. at 31,309, and were accordingly selected as mandatory respondents in this investigation. Id. (unchanged in the Final Results, 77 Fed. Reg. at 63,791). See 19 U.S.C. § 1677f-1(c)(2)(B) (permitting Commerce to limit its individualized examination to the "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined" if "it is not practicable to make individual weighted average dumping margin determinations . . . because of the large number of exporters or producers involved in the investigation or review").

[65] Because Commerce treats China as an NME country, the agency determines the home market or "normal" value of merchandise from China by using surrogate market economy data to calculate production costs, including FOPs, and profit. See 19 U.S.C. § 1677b(c)(1). In doing so, Commerce's valuation of the FOPs must be "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the [agency]." Id.

[66] See I&D Mem. cmt. 4 at 19-20.

to encase photovoltaic cells into solar panels.[67] For the Final Results of this investigation, Commerce "valued Trina [Solar]'s and Wuxi Suntech's aluminum frames using Thai HTS categories covering alloyed aluminum profiles."[68] Specifically, Commerce valued Trina Solar's frames using Thai HTS subheading 7604.29.90001 (aluminum alloy non-hollow profiles), based on Trina Solar's verified description of its frames as non-hollow alloyed aluminum profiles.[69] Because Wuxi Suntech described its frames as hollow alloyed aluminum profiles, Commerce valued Wuxi Suntech's frames using Thai HTS subheading 7604.21 (aluminum alloy hollow profiles).[70] SolarWorld argues that these

---

[67] See I&D Mem. cmt. 16.

[68] Id. at 62 & n.233 (noting that "interested party comments regarding the appropriate [surrogate value] for this material input [were] limited to specificity," and that "parties have not commented on contemporaneity, the inclusion or exclusion of taxes and import duties, public availability, etc."); see I&D Mem. cmt. 39 at 92 ("It is [Commerce]'s stated practice to choose a surrogate value [pursuant to 19 U.S.C. § 1677b(c)(1)] that represents country-wide price averages specific to the input, which are contemporaneous with the period under consideration, net of taxes and import duties, and based on publicly available, non-aberrational, data from a single surrogate [market economy] country.") (citations omitted).

[69] Id. at 62 & n.236 (citing Ex. 74 to Trina Solar's Verification Report). See also Ex. 2 (extracts from Thai HTS Chapter 76) to [Trina Solar's] Additional surrogate Info., [CSPC], Whether or Not Assembled into Modules, from the [PRC], A-570-979, AD Investigation (July 9, 2012), reproduced in Def.'s App., ECF No. 56-2 at P.D. 1267 ("Thai HTS Ch. 76").

[70] Id. at 62 & n.237 (citing Wuxi Suntech's Apr. 25, 2012, submission at resps. to questions 35-36).

determinations are not supported by substantial evidence, contending that the sole reasonable choice of "best available" information regarding this FOP was to value Trina Solar and Wuxi Suntech's aluminum frames using Thai HTS category 7616.99 (articles of aluminum not elsewhere specified).[71]

To SolarWorld, HTS category 7616.99 is the sole reasonable choice here because of a ruling issued prior to the POI by U.S. Customs and Border Protection ("Customs"), in response to a request by Wuxi Suntech's U.S. affiliate for guidance on classifying its "extruded aluminum frames for solar panels" for U.S. tariff assessment purposes.[72] In this ruling, Customs determined that, based on the description provided by Wuxi Suntech, its aluminum frames would be assessed tariff rates based on USHTS subheading 7616.99.5090 (articles of aluminum, other).[73]

In its preliminary determination, however, Commerce explained that it "is not bound by U.S. Customs classifications

---

[71] SolarWorld's Br., ECF No. 44, at 10-21.

[72] Id. at 10 (quoting Ex. 1 (Customs Ruling N139353 Jan. 13, 2011 ("Customs Ruling N139353")) to [SolarWorld's] Comments on Trina [Solar]'s 2d Supplemental Surrogate Questionnaire Resp., [CSPC], Whether or Not Assembled into Modules, from the [PRC], A-570-979, AD Investigation (Apr. 20, 2012), reproduced in App. to Pet'r-Pl.'s Br. Supp. Rule 56.2 Mot. for J. on the Agency R. ("SolarWorld's App."), ECF Nos. 46 (conf. version) & 47 (pub. version) at Tab 3).

[73] Customs Ruling N139353, ECF No. 47 at Tab 3 Ex. 1.

for U.S. imports when selecting import values from surrogate countries" but must instead "select a value using the best available information."[74] Commerce determined that HTS subheading 7616.99 was not the best information available regarding the market value of Trina Solar and Wuxi Suntech's aluminum frames because "HTS category 7616.99 is an 'other' category and could reflect imports of numerous types of products"[75] – such as pencil ferrules, textile yarn spools, or spouts and cups for latex collection – that are very different (in nature and value) from the aluminum frame inputs in question.[76] Instead, Commerce determined that because "aluminum window frames are structurally similar to the frames used in

---

[74] Factor Valuation Mem., [CSPC], Whether or Not Assembled into Modules, from the [PRC], A-570-979, AD Investigation (May 16, 2012) ("Prelim. SV Mem."), reproduced in SolarWorld's App., ECF No. 47 at Tab 16, at 3. See *supra* note 65 (discussing relevant statutory framework).

[75] Prelim. SV Mem., ECF No. 47 at Tab 16, at 3.

[76] See Def.'s Opp'n to Pls.' Rule 56.2 Mots. for J. Upon the Agency R., ECF Nos. 54 (conf. version) & 55 (pub. version) ("Def.'s Br."), at 38 (emphasizing that "the descriptions for the sub-categories under HTS 7616.99 indicate that this category includes a number of products that are wholly unrelated to the aluminum frame inputs used by Trina [Solar] and Wuxi Suntech, including 'ferrules used in the manufacture of pencils' (HTS 7616.99.20), 'slugs' (HTS 7616.99.30), 'bobbins, spools, reels and similar supports for textile yarn' (HTS 7616.99.40), and 'spouts and cups for latex collection' (HTS 7616.99.60)") (citing I&D Mem. cmt. 16 at 63; Thai HTS Ch. 76, ECF No. 56-2 at P.D. 1267 Ex. 2).

modules,"[77] the best information for valuing aluminum frames is provided by Thai HTS category 7610.10 ("aluminum doors, windows and their frames and thresholds for doors"[78]), "which reflects imports of a product most similar to the aluminum frames used [by the respondents]."[79]

In its final determination (reached after considering additional briefing from interested parties), however, Commerce changed course and concluded that HTS category 7610.10 did not in fact provide the best available information for valuing the aluminum frames used to manufacture the subject merchandise, because that category covers items specific to doors and windows rather than the type of aluminum used in solar panel frames.[80] Instead, Commerce determined to value Trina Solar's frames using Thai HTS subheading 7604.29.90 (other aluminum alloy non-hollow

[77] Prelim. SV Mem., ECF No. 46 at Tab 16, at 3.

[78] See I&D Mem. cmt. 16 at 63 (discussing HTS category 7610.10).

[79] Prelim. SV Mem., ECF No. 46 at Tab 16, at 3.

[80] See I&D Mem. cmt. 16 at 63 ("We agree that HTS category 7610.10 ('aluminum doors, windows and their frames and thresholds for doors') does not specify the types of aluminum frames used in solar cell modules."); id. at 61 (noting the Petitioner's argument that HTS category 7610.10 should not be used to value respondents' aluminum frames because that category "covers many items unrelated to aluminum frames; items that are not used by respondents"); id. (noting Trina Solar's argument that HTS category 7610.10 should not be used to value respondents' aluminum frames because that category "covers specific items related to doors and windows, rather than the type of aluminum used in solar panel frames").

profiles), and to value Wuxi Suntech's frames using Thai HTS subheading 7604.21 (aluminum alloy hollow profiles), noting that "both respondents have consistently described their aluminum frames as alloyed aluminum profiles."[81] In continuing to reject SolarWorld's proposal to value the aluminum frames using HTS category 7616.99, Commerce reiterated its prior position that this category did not provide the best available information regarding the market value of the aluminum frames in question because "HTS category 7616 covers a number of inputs, such as ferrules used in pencils, slugs, bobbins, spools, reels, spouts, cups, handles for traveling bags, cigarette cases or boxes, and blinds, which are dissimilar to the aluminum frames used by respondents."[82]

*B. Analysis*

SolarWorld argues that Commerce's decision to classify Wuxi Suntech and Trina Solar's aluminum alloy frames under Thai HTS category 7604 is not reasonable because 1) Commerce did not choose to calculate surrogate market economy values for the frames by using the same HTS category as that chosen by Customs

---

[81] Id. at 63; see Thai HTS Ch. 76, ECF No. 56-2 at P.D. 1267 Ex. 2.

[82] I&D Mem. cmt. 16 at 63.

for U.S. tariff assessment[83]; 2) other Customs rulings purportedly demonstrate that HTS category 7604 "covers base level products of uniform shape that require further working and processing before assembly into finished goods"[84] whereas the frames at issue are not of uniform cross-section and are "fully processed units, ready for simple and final assembly"[85]; and 3) Commerce's determination to value the mandatory respondents' aluminum frames using Thai HTS category 7604 does not follow from the reasons provided by the agency, because category 7616, like category 7604, also covers alloyed aluminum products, such that the alloyed constitution of respondents' aluminum frames cannot serve as a basis for determining to value such merchandise using category 7604 rather than 7616.[86] Each argument is addressed in turn below.

1. Customs Ruling N139353

SolarWorld first argues that Customs Ruling N139353 was the best available information regarding the surrogate market value of the aluminum frames used to produce the subject merchandise. SolarWorld's Br., ECF No. 44, at 10-14.

---

[83] SolarWorld's Br., ECF No. 44, at 10-14.

[84] Id. at 15.

[85] Id. at 16; see also id. at 17-20.

[86] Id. at 21.

SolarWorld claims that Commerce has an established practice of relying on Customs classification rulings in similar cases, from which it has here deviated without adequate justification.[87] But while SolarWorld emphasizes that Commerce has often used Customs' U.S. tariff classification rulings to support Commerce's determinations when calculating surrogate FOP values, both in past cases and with regard to other surrogate values in this case, Commerce explains that its "practice," in those cases as here, is to "carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis of valuing the FOPs on a case-by-case basis."[88] The fact that Commerce has at times found support for

---

[87] See id. at 12-14. SolarWorld identifies a range of other instances where Commerce has accepted Customs rulings as the "best available information" to establish surrogate FOP values, as well as several other surrogate value determinations in this investigation that have relied on Customs classification rulings for support. Id. at 12 n.4.

[88] Def.'s Br., ECF No. 55, at 40 (alteration omitted) (quoting Issues & Decision Mem., Certain New Pneumatic Off-the-Road Tires from the [PRC], A-570-912, ARP 10-11 (Apr. 9, 2013) (adopted by 78 Fed. Reg. 22,513 (Dep't Commerce Apr. 16, 2013) (final results of antidumping duty administrative review)) cmt. 5.A at 13-14). See also Issues & Decision Mem., Certain Preserved Mushrooms from the [PRC], A-570-851, ARP 04-05 (July 5, 2006) (adopted by 71 Fed. Reg. 40,477 (Dep't Commerce July 17, 2006) (final results and final partial rescission of the sixth administrative review)) cmt. 1 at 3 ("[Commerce] must weigh available information with respect to each input value and make a product-specific and case-specific decision as to what the 'best' surrogate value is for each input.") (citing Issues & Decision Mem., Freshwater Crawfish Tail Meat from the [PRC],

(footnote continued . . .)

its surrogate value choices in Customs classification rulings does not lead to the conclusion that Commerce must follow such rulings in every case. On the contrary, as this Court has previously held, "[t]he statute's silence regarding the definition of 'best available information' provides Commerce with 'broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis.'"[89]

2. Appropriateness of Thai HTS Category 7604

Next, SolarWorld argues that Thai HTS category 7604 was an unreasonable choice for calculating appropriate surrogate market economy values for respondents' aluminum frames because SolarWorld interprets that category to cover solely products with a "uniform cross-section along their whole length,"[90] which

---

A-570-848, ARP 99-00 (Apr. 22, 2002) (adopted by 67 Fed. Reg. 19,546 (Dep't Commerce Apr. 22, 2002) (notice of final results of antidumping duty administrative review, and final partial rescission of antidumping duty administrative review)) at "Surrogate Value Information – Introduction").

[89] Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006) (quoting Timken Co. v. United States, 25 CIT 939, 944, 166 F. Supp. 2d 608, 616 (2001)). See also Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994) ("The Act simply does not say – anywhere – that the [FOPs] must be ascertained in a single fashion. The Act requires that [Commerce's] determination be based on the 'best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.'") (quoting 19 U.S.C. § 1677b(c)(1)).

[90] SolarWorld's Br., ECF No. 44, at 16 (quotation marks and

(footnote continued . . .)

must also "require further working and processing before assembly into finished goods,"[91] whereas respondents' frames require only simple assembly and are not of uniform cross-section by virtue of having been mitered for assembly.[92]

But as Commerce explains, SolarWorld's claim – which relies on Customs rulings applying HTS category 7604 to unfinished aluminum articles[93] – is unpersuasive. The fact that HTS category 7604 has been applied in the past to unfinished articles does not support the conclusion that Thai HTS category 7604 covers solely unfinished merchandise that is different in nature and value from the aluminum frames at

---

citation omitted).

[91] Id. at 15.

[92] Id. at 16-17.

[93] See id. at 15 (relying on three Customs rulings classifying unfinished aluminum extrusions under HTS category 7604). SolarWorld also relies on Note 1(b) to HTS Chapter 76 ("Aluminum and Articles Thereof"), SolarWorld's Br. at 16, which defines "profiles" as "[r]olled, extruded, drawn, forged or formed products, coiled or not, *of a uniform cross section along their whole length*, which do not conform to any of the definitions of bars, rods, wire, plates, sheets, strip, foil, tubes or pipes," USHTS (2012) Ch. 76 Note 1(b) (emphasis added). But that same note also provides that "[t]he expression ['profiles'] also covers cast or sintered products, of the same forms, which have been subsequently worked after production (otherwise than by simple trimming or descaling), provided that they have not thereby assumed the character of articles or products of other headings." Id.

issue.[94] "While other HTS categories identify whether they contain finished or unfinished items, HTS category 7604 does not specify whether it contains finished or unfinished aluminum profiles."[95] Moreover, Note 1(b) to Chapter 76 ("Aluminum and Articles Thereof") of the HTS provides that aluminum profiles (such as those covered by category 7604 ("aluminum bars, rods and profiles")) includes products that "have been subsequently worked after production (otherwise than by simple trimming or descaling), provided that they have not thereby assumed the character of articles or products of other headings."[96] This

---

[94] See I&D Mem. cmt. 16 at 63 ("While [Customs] rulings on the record supporting the use of HTS category 7604 concern unfinished aluminum articles, this does not necessarily mean that HTS category 7604 would only contain unfinished aluminum profiles.").

[95] Id.

[96] See *supra* note 93. See also 4 World Customs Organization, Harmonized Commodity Description and Coding System Explanatory Notes 76.04 (5th ed. 2012) ("These products [i.e., aluminum bars, rods an profiles], which are defined in Notes 1(a) and 1(b) to [Chapter 76], correspond to similar goods made of copper. The provisions of the Explanatory Note to heading 74.07 ["Copper bars, rods, and profiles"] apply therefore, *mutatis mutandis*, to this heading."); id. at 74.07 ("[Products under this heading] may also be worked (e.g., drilled, punched, twisted, or crimped), provided that they do not thereby assume the character of articles or of products of other headings.") (emphasis omitted). During oral argument, counsel for SolarWorld suggested that the frames in question could not reasonably be valued by reference to merchandise covered by Thai HTS category 7604 because such frames have "assumed the character" of products covered by Thai HTS category 7616.99. See Oral Arg. Tr., ECF No. 83, at 17-18. But Commerce

(footnote continued . . .)

description reasonably supports Commerce's decision that Thai HTS category 7604 covers products most similar in nature and value to the aluminum solar panel frames in question, despite the fact that such frames have been mitered, drilled, and notched in the ways described in the record evidence cited by SolarWorld.[97]

3. Alloyed Aluminum Profiles

Finally, SolarWorld argues that Commerce's determination to value the mandatory respondents' aluminum frames using Thai HTS category 7604 does not follow from the reasons provided by the agency, because category 7616, like category 7604, also covers alloyed aluminum products, such that the alloyed constitution of respondents' aluminum frames cannot serve as a basis for Commerce's decision to value such merchandise using category 7604 rather than 7616.[98] But Commerce

---

reasonably concluded that the simple mitering of the respondents' alloyed aluminum profiles, in preparation for their assembly into solar panel frames, does not transform such profiles to assume the character of the myriad different products covered by the catch-all "other" HTS 7616.99 category. See I&D Mem. cmt. 16 at 63.

[97] See [SolarWorld's] Rebuttal Br. on Gen. Issues, [CSPC], Whether or Not Assembled into Modules, from the [PRC], A-570-979, AD Investigation (Aug. 6, 2012), reproduced in SolarWorld's App., ECF Nos. 46 & 46-1 at Tab 20, at 56-57 (photographs of subject aluminum frames showing worked sections consistent with this description).

[98] SolarWorld's Br., ECF No. 44, at 21.

did not choose HTS category 7604 over category 7616 based simply on the alloyed nature of respondents’ aluminum frames, but rather it did so based on its determination that category 7604 covers products most similar in nature and value to the aluminum frames at issue, whereas category 7616.99 covers many diverse products whose natures and values are not reasonably comparable to such frames.[99]

Commerce weighed the available information before it and reasonably determined that the best available information regarding the market value of respondents’ aluminum frames is provided by merchandise covered by Thai HTS category 7604 (“aluminum bars, rods, and profiles”), rather than Thai HTS category 7616.99 (“Other articles of aluminum: Other”[100]) because “both [mandatory] respondents have consistently described their aluminum frames as alloyed aluminum profiles”[101] and category 7604 specifically covers alloyed aluminum profiles, whereas category 7616.99 is a catch-all category that covers many diverse aluminum products – such as reels, cups, bag handles, and cigarette cases – whose value is not reasonably comparable

---

[99] See I&D Mem. cmt. 16 at 63.

[100] See Thai HTS Ch. 76, ECF No. 56-2 at P.D. 1267 Ex. 2.

[101] I&D Mem. cmt. 16 at 63.

to that of respondent's aluminum solar panel frames.[102] Because this determination comports with a reasonable reading of the record evidence in this case, it is sustained.

## III. Commerce's Determination to Grant Separate-Rate Status to Certain Respondents

As noted above, when investigating merchandise from NME countries, Commerce presumes that all companies operating within such countries are controlled by the government and should accordingly receive a single countrywide rate, unless respondents affirmatively demonstrate both *de jure* (in law) and *de facto* (in fact) autonomy during the POI.[103] Commerce's

---

[102] Id.

[103] See *supra* notes 11-13 and accompanying text. With regard to evidentiary support for relevant *de jure* autonomy, Commerce generally looks for evidence such as "(1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; or (3) any other formal measures by the government decentralizing control of companies." I&D Mem. cmt. 6 at 26 (citing Sparklers from the [PRC], 56 Fed. Reg. 20,588, 20,589 (Dep't Commerce May 6, 1991) (final determination of sales at less than fair value)). With regard to *de facto* autonomy, Commerce examines "(1) whether export prices are set by, or are subject to the approval of, a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses." I&D Mem. cmt. 6 at 31; see also Def.'s Br., ECF No. 55, at 44-45 (citing Silicon Carbide from the [PRC], 59 Fed. Reg. 22,585, 22,587 (Dep't Commerce May 2, 1994)

(footnote continued . . .)

essential inquiry with regard to whether a particular respondent's circumstances warrant the grant of separate-rate status focuses on whether, "considering the totality of circumstances," the respondents in question "had sufficient independence *in their export pricing decisions* from government control to qualify for separate rates."[104] To that end, the relevant *de jure* autonomy "can be demonstrated by reference to legislation and other governmental measures that decentralize control,"[105] and the relevant *de facto* autonomy "can be established by evidence that [the] exporter sets its prices independently of the government and of other exporters, and that [the] exporter keeps the proceeds of its sales."[106] In both its *de jure* and *de facto* determinations, Commerce may make reasonable inferences from the record evidence. See Daewoo Elecs. Co. v. United States, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (explaining that substantial evidence may include "reasonable inferences from the record") (quotation marks and citation

---

(final determination of sales at less than fair value) ("Silicon Carbide from China")).

[104] Certain Cut-to-Length Carbon Steel Plate from Ukraine, 62 Fed. Reg. 61,754, 61,759 (Dep't Commerce Nov. 19, 1997) (notice of final determination of sales at less than fair value) ("Steel from Ukraine") (emphasis added).

[105] Sigma, 117 F.3d at 1405 (citation omitted).

[106] Id. (citation omitted).

omitted).

Here, recognizing that "within the NME entity, companies exist which are independent from government control to such an extent that they can independently conduct export activities," I&D Mem. cmt. 6 at 26 (citation omitted), Commerce granted a number of separate-rate applications in this investigation, finding that "the evidence placed on the record of this investigation by [these respondents] . . . demonstrates both *de jure* and *de facto* absence of government control with respect to each company's respective exports of the merchandise under investigation." Final Results, 77 Fed. Reg. at 63,794.

SolarWorld claims that Commerce's determinations to grant some of these SRAs were not supported by substantial evidence. SolarWorld's Br., ECF No. 44, at 22-40.[107]

---

[107] As discussed above, see *supra* notes 12-13 and accompanying text, Commerce requires SRAs from NME respondents to rebut the presumption of government control. SolarWorld has no statutory claim to require Commerce to apply this presumption in a particular way, or indeed to require Commerce to apply it at all. The presumption of government control does not appear in the statute. It is a policy espoused by Commerce to effectuate 19 U.S.C. § 1677b(c), see Commerce Policy 5.1, *supra* note 14, which in turn simply grants Commerce permission to disregard NME respondents' actual home market prices where the agency determines that "available information does not permit the normal value of the subject merchandise to be determined under [19 U.S.C. § 1677b(a), i.e., by using "the price at which the foreign like product is first sold . . . for consumption in the exporting [or a third] country]." 19 U.S.C. § 1677b(c)(1). (Not only does the statute omit any mention of a "countrywide rate," it moreover requires Commerce to calculate individual dumping
(footnote continued . . .)

Specifically, SolarWorld challenges (1) Commerce's determination to grant separate-rate status to certain companies that either did not disclose the full extent of their ownership or "for whom [China's State-Owned Assets Supervision and Administration Commission ('SASAC')] appears at some point in the chain of ownership,"[108] arguing that these companies categorically failed

---

margins "for each known exporter and producer of the subject merchandise." 19 U.S.C. § 1677f-1(c)(1). The only exception to this rule is the "large number" exception, pursuant to which Commerce may limit its investigation to a set of representative respondents and assign to all remaining respondents the "all others" rate (usually an average of the individually-examined respondents' rates). See id. at §§ 1677f-1(c)(2); 1673d(c)(5).) While the presumption of NME government control is a policy within Commerce's sound discretion, see Sigma, 117 F.3d at 1405-06 (holding that "it was within Commerce's [discretionary] authority to employ a presumption of state control for exporters in a nonmarket economy" because "[t]he antidumping statute recognizes a close correlation between a nonmarket economy and government control of prices, output decisions, and the allocation of resources") (citing 19 U.S.C. §§ 1677(18)(B)(iv)-(v)), its application must necessarily be as fact-intensive and as flexible as the circumstances demand. See, e.g., Cope v. Scott, 45 F.3d 445, 450 (D.C. Cir. 1995) ("[F]lexibility is the essence of [agency] discretion."). See also Jiangsu Changbao Steel Tube Co. v. United States, __ CIT __, 884 F. Supp. 2d 1295, 1311-12 & n.21 (2012) (opining that, although Commerce's NME presumptions were upheld by the decision in Sigma in 1997, the issue may be worth revisiting); Qingdao Taifa Grp. Co. v. United States, __ CIT __, 760 F. Supp. 2d 1379, 1384-85 (2010) (holding that Commerce's reliance on a presumption of government control, without evidence, is incompatible with the agency's duty to support its decision with substantial evidence).

[108] I&D Mem. cmt. 6 at 26 (discussing the Petitioner's (i.e., SolarWorld's) argument); see id. at Table of Abbreviations and Acronyms (deacronymizing "SASAC").

to rebut the presumption of *de jure* government control;[109] and (2) Commerce's determination to grant separate-rate status to certain companies whose chain of ownership included the SASAC, the Communist Party of China ("CPC"), the National People's Congress ("NPC"), and/or the Chinese People's Political Consultative Conference ("CPPCC"), contending that the record does not support Commerce's findings that these companies operated free from *de facto* "direct government involvement in the activities of the board members or in the day to day operations of the company"[110] during the POI, and claiming that Commerce improperly failed to address "significant arguments and evidence which seriously undermine[] its reasoning and conclusions."[111]

Commerce has requested a voluntary remand to reevaluate the evidence and reconsider the separate rate eligibility of four specific separate-rate recipients whose separate-rate status SolarWorld challenged.[112] As this motion is

---

[109] See SolarWorld's Br., ECF No. 44, at 22-33.

[110] I&D Mem. cmt. 6 at 32 (discussing *de facto* findings challenged by SolarWorld).

[111] Pet'r-Pl. [SolarWorld]'s Reply to Resps. to SolarWorld's Rule 56.2 Mot. for J. on the Agency R., ECF Nos. 73 (conf. version) & 74 (pub. version), at 12 (quoting Altx, Inc. v. United States, 370 F.3d 1108, 1113 (Fed. Cir. 2004)). See SolarWorld's Br., ECF No. 44, at 33-40.

[112] Def.'s Mot., ECF No. 81, at 2.

both unopposed and based on a "substantial and legitimate" concern,[113] Commerce's motion for a voluntary remand to reconsider the separate rate eligibility of these four respondents is granted. SolarWorld's remaining challenges to Commerce's grant of separate rates in this case are addressed in turn below.

*A. Commerce's* De Jure *Determinations*

1. *De Jure* Autonomy of Companies Indirectly Owned by China's SASAC

SolarWorld argues that four of the separate-rate recipients failed to establish *de jure* autonomy from the PRC government because, although none of these companies is *directly* owned by China's SASAC, the SASAC appears at some point in these companies' chain of ownership, such as when the company is owned

---

[113] See SKF USA Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001) ("[E]ven if there are no intervening events, the agency may request a remand (without confessing error) in order to reconsider its previous position. . . . [I]f the agency's concern is substantial and legitimate, a remand is usually appropriate."). Here, Commerce's stated concern is consistency of agency action with "other pending cases where a similar issue is presented." Def.'s Mot., ECF No. 81, at 3 (citing Diamond Sawblades Mfrs.' Coalition v. United States, Ct. No. 13-00078 and Diamond Sawblades Mfrs.' Coalition v. United States, Ct. No. 13-00241, and noting that the court granted a similar remand request in Ct. No. 13-00078) (citing Diamond Sawblades Mfrs.' Coalition v. United States, Slip Op. 14-50, 2014 WL 1673757 (CIT Apr. 29, 2014)).

by other companies that are in turn SASAC-owned.[114] Because this portion of SolarWorld's challenge concerns the same four respondents with respect to whose separate rate eligibility the court has now granted Commerce's voluntary remand request,[115] the court will reserve judgment in this respect until Commerce has had an opportunity to effect its reconsideration and the parties have had an opportunity to submit their comments. In the interest of expedition, however, some clarification may be

---

[114] See SolarWorld's Br., ECF No. 44, at 27 (naming the four separate-rate recipients whose separate-rate status is challenged based on these companies' links to SASAC); I&D Mem. cmt. 6 at 26 (noting that "these companies are not directly owned by SASAC," but rather these companies "are owned by SASAC-owned companies or for whom SASAC appears at some point in the chain of ownership"). According to SolarWorld's uncontested description of this institution, the SASAC is "a central governmental body in China" that was "created to represent the state's shareholder interests in state-owned enterprises ('SOEs')." SolarWorld's Br., ECF No. 44, at 27 (quotation marks and citation to SolarWorld's submission to Commerce below omitted). SolarWorld argues that Commerce's findings of *je dure* autonomy with regard to companies owned by other companies that are in turn owned by the SASAC (or for whom SASAC may appear at some point in the chain of ownership) are not supported by substantial evidence because certain provisions of Chinese laws and regulations "confer upon SASAC the authority to appoint or remove the responsible persons of its invested enterprises," id. at 30 (quotation and alteration marks and citation omitted); to "nominate candidates for the director of the board or supervisor" and "instruct those directors/representatives to exercise voting rights in accordance with SASAC's instructions," id. (quotation marks and citation omitted); and generally provide investors, including the government, with the power to intervene in companies' operations in a variety of ways. See id. at 29-31.

[115] Compare SolarWorld's Br., ECF No. 44, at 27, with Def.'s Mot., ECF No. 81, at 2.

relevant here.

Specifically, SolarWorld argues that Commerce gave insufficient weight to evidence that Chinese laws permit the government to intervene in Chinese companies' operations in a variety of ways.[116] But by definition, the laws of an NME country will generally permit the government of such country to intervene in the operations of its companies.[117] Thus to require NME companies to prove complete legal autonomy would introduce an internal inconsistency into the analysis. Instead, as Commerce explained in this case,[118] the agency determines whether

---

[116] See SolarWorld's Br., ECF No. 44, at 29-32. See, e.g., id. at 30 (arguing that Chinese laws and regulations "make clear that there is a *de jure possibility* of a general manager appointed by a board under SASAC's effective control") (quotation marks and citation omitted; emphasis added).

[117] See 19 U.S.C. § 1677(18)(A) (defining "nonmarket economy country" as a foreign country that "does not operate on market principles of cost or pricing structures"); Qingdao Taifa Grp. Co. v. United States, 33 CIT 1090, 1101, 637 F. Supp. 2d 1231, 1243 (2009) ("The statute applies special rules to NME countries because prices and costs are not reliable in valuing goods from NME countries 'in view of the level of intervention by the government in setting relative prices.'") (quoting ICC Indus., Inc. v. United States, 812 F.2d 694, 697 (Fed. Cir. 1987)) (additional citations omitted).

[118] Admittedly, Commerce's articulation of its separate-rates analysis has not been a model of clarity. Cf., e.g., Advanced Tech. & Materials Co. v. United States, Slip Op. 11-122, 2011 WL 5191016, at *13 (CIT Oct. 12, 2011) ("Advanced Tech I") (remanding Commerce's separate-rates analysis because the court could not decide on the reasonableness of Commerce's practice in this regard "without [Commerce]'s full explanation of [this] practice, which [was] not evident from [the] determination

(footnote continued . . .)

the legal possibility exists to permit the company in question to operate as an autonomous market participant, notwithstanding any residual authority for *potential* governmental intervention,[119] and if so, whether that company should be exempted from the NME system-wide analysis because it in fact

---

[at issue in that case] (or any other, for that matter)”); Advanced Tech. & Materials Co. v. United States, __ CIT __, 885 F. Supp. 2d 1343, 1350-53 (2012) (“Advanced Tech II”) (adjudicating challenges to the results of the remand ordered in Advanced Tech I, and opining that Commerce’s separate-rates analysis appeared to conflate the *de jure* and *de facto* analyses where Commerce did not clearly articulate the focus of its determination and failed to delineate whether Chinese law created actual restrictions on individual firms’ export price-setting autonomy or merely allowed for the possibility thereof).

[119] See I&D Mem. cmt. 6 at 26 (“The existence of government ownership does not necessarily indicate *de jure* control over pricing decisions . . . . [A]n absence of *de jure* government control over [export] activities [may be demonstrated] through the absence of restrictive stipulations associated with the companies’ business licenses and export certificates of approval . . . .”); cf., e.g., Issues & Decision Mem., Certain Circular Welded Carbon Quality Steel Line Pipe from [the PRC], A-570-935, AD Investigation (Mar. 23, 2009) (adopted by 74 Fed. Reg. 14,514 (Dep’t Commerce Mar. 31, 2009) (final determination of sales at less than fair value)) cmt. 11 at 20 (granting a separate-rate application, over petitioners’ objections, because there was credible record evidence that the respondent in question was both legally permitted to operate autonomously in managing its production and pricing, and in fact did so operate, and explaining that “[t]he information submitted by petitioners addresse[d] only *speculative and potential control* by SASAC over [this respondent]”) (emphasis added). When the *de jure* analysis is properly construed in this way, it is not clear that Commerce regularly conflates its *de jure* and *de facto* government control analyses, as SolarWorld suggests. See SolarWorld Br., ECF No. 44, at 32-33 (relying on Advanced Tech II, __ CIT __, 885 F. Supp. 2d 1343); see also *supra* note 118 (providing context for Advanced Tech II).

managed its production, pricing, and profits as an autonomous market participant.[120] Here, Commerce first determined that, as a matter of *de jure* possibility, the respondents in question *could have* acted as sufficiently autonomous market participants to deserve separate rates; then, having made this threshold determination, Commerce determined that the evidence in the record reasonably supported the conclusion that these respondents in fact *did* act sufficiently autonomously in terms of managing production and profit and setting prices during the POI.[121]

---

[120] See I&D Mem. cmt. 6 at 26 ("[Commerce] has recognized, over time, that within the NME entity, companies exist which are independent from government control to such an extent that they can independently conduct export activities.") (citing Separate-Rates Practice in Antidumping Proceedings Involving Non-Market Economy Countries, 69 Fed. Reg. 77,722 (Dep't Commerce Dec. 28, 2004) ("Separate-Rates Practice")). See also Separate-Rates Practice, 69 Fed. Reg. at 77,723 ("[Commerce's separate-rates] test focuses on controls over the decision-making process on export-related investment, pricing, and output decisions at the individual firm level.") (citations omitted); Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States, 25 CIT 1150, 1174, 178 F. Supp. 2d 1305, 1331 (2001) ("The essence of a separate rates analysis is to determine whether the exporter is an autonomous market participant, or whether instead it is so closely tied to the communist government as to be shielded from the vagaries of the free market.") (footnote omitted).

[121] See Prelim. Results, 77 Fed. Reg. at 31,316-17 (unchanged in the Final Results, 77 Fed. Reg. at 63,794); I&D Mem. cmt. 6 at 26-27, 31-33. Thus in this case, the path of Commerce's analysis may be reasonably discerned. See, e.g., I&D Mem. cmt. 6 at 27 (finding a permissive *de jure* space for export pricing autonomy by emphasizing evidence that the PRC government's reach did not extend "as a matter of law to such day-to-day activities

(footnote continued . . .)

Commerce requests and is granted permission to reconsider the record evidence regarding whether certain respondents were sufficiently autonomous from the Chinese government in the conduct of their export activities as to qualify for rates separate from the PRC-wide entity. In doing so, Commerce need not require proof of complete freedom from any mere legal possibility of government control.

2. *De Jure* Autonomy of Companies that Did Not Disclose the Full Extent of their Ownership

SolarWorld also argues that Commerce's decision to grant separate-rate status to certain respondents that did not provide exhaustive details of their indirect ownership was unreasonable and arbitrary in light of Commerce's prior practice.[122] Specifically, SolarWorld argues that a number of respondents who received separate rates "revealed that they were ultimately held by a legal entity, such as a holding company or limited partnership," but then "failed to disclose the

---

as export pricing of the companies in question"); id. at 32 ("[Commerce] issued supplemental questionnaires to numerous separate rate respondents and reviewed the respondents' SRAs and supplemental questionnaire responses and found no evidence of direct government involvement in the decisions of the board members, the selection of management, or in the operations of any respondents granted a separate rate in the [Prelim. Results, 77 Fed. Reg. at 31,316-17].").

[122] SolarWorld's Br., ECF No. 44, at 24-27.

controlling shareholders of such entities."[123] SolarWorld contends that Commerce must deny separate-rate status to respondents "who failed to report the ultimate owner(s) of their parent company because the ultimate ownership of the company could point to relevant government control."[124]

In response, Commerce explains that the weight of the evidence on record supports the agency's determination that these separate-rate recipients operated their export activities independently of government control during the POI.[125] Commerce emphasizes that the agency is neither required, nor permitted by its resource constraints, to exhaustively detail every aspect of a company's indirect ownership when the evidence is otherwise sufficient to reasonably find the existence of relevant autonomy over export activities.[126]

---

[123] Id. at 24. See also id. ("The companies that failed to provide sufficient evidence to rebut the presumption of government control by not providing ownership information are Trina [Solar]; Chint Solar; Shanghai BYD; Solarone Qidong; Solarone Hong Kong; Motech; tenKsolar; Zhejiang Jiutai; CEEG Shanghai; Jatison Solar; CSG PV; CEEG Nanjing; Ningbo Komaes; and China Sunergy.").

[124] I&D Mem. cmt. 6 at 31 (discussing SolarWorld's argument in this regard).

[125] Id. at 31-33.

[126] Id.; Def.'s Br., ECF No. 55, at 47; Oral Arg. Tr., ECF No. 83, at 36-37 (emphasizing that Commerce requested and received "substantial information from these companies regarding their owners, their direct owners and the owners of those companies[,] and with respect to companies that are listed on

(footnote continued . . .)

For example, Trina Solar – a Defendant-Intervenor in this action and one of the respondents whose separate-rate status is challenged by SolarWorld on grounds of failure to provide exhaustive details of ultimate ownership[127] – submitted evidence, which was verified by Commerce, that its parent company is a foreign entity incorporated outside of China,[128] in the Cayman Islands, which "has been listed on the New York Stock Exchange since December 2006."[129] Ownership of this parent

---

public exchanges or owned by companies that are listed Commerce did ask for some information regarding shareholders [but it did not] obtain information regarding every single shareholder from every single entity that might be in that [ownership] chain," and arguing that doing the latter was "not a requirement here" because "at some point Commerce has to draw the line"); id. at 37 (noting that, for "most companies," Commerce requested information regarding "the top ten shareholders"); id. (arguing that requiring Commerce to exhaustively investigate every single entity in a respondent company's ownership chain, no matter how far removed, would "require Commerce to conduct an inquiry that is far more robust than Commerce could in fact conduct given the time constraints and administrative burdens that it has").

[127] See *supra* note 123 (quoting SolarWorld's list of separate-rate recipients challenged on this ground).

[128] In Commerce's practice, a full separate-rate analysis is generally considered unnecessary for wholly foreign-owned companies. See, e.g., Petroleum Wax Candles from the [PRC], 72 Fed. Reg. 52,355, 52,356 & n.3 (Dep't Commerce Sept. 13, 2007) (final results of antidumping duty administrative review).

[129] Verification of the Sales & Factors of Prod. Info. Submitted by [Trina Solar], [CSPC], Whether or Not Assembled into Modules, from the [PRC], A-570-979, AD Investigation (July 19, 2012) ("Trina Solar Verif. Rep."), reproduced in App. to Def.-Intervenor [Trina Solar]'s Resp. to Pet'r-Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF Nos. 68 & 68-1 (conf. version) & 70 (pub. version), at Tab 5, at 5.

company was in turn revealed to be "in two forms: ordinary shares and ADRs [American Depository Receipts] (one ADR is the equivalent of 50 ordinary shares),"[130] and Commerce examined the ordinary share ownership, which was tracked by the parent company's "secretary company," and the ownership of ADRs by institutional shareholders, which was "tracked by Ipreo, a market intelligence company, at the beginning of the POI, and by Bank of New York Mellon at the end of the POI."[131] Although Trina Solar was unable to identify the ultimate shareholders of its parent company's largest shareholder, and noted that "holders of ADRs are not obligated to identify their individual shareholders,"[132] Commerce found that the evidence was sufficient to conclude that there was no "Chinese government ownership among [Trina Solar's parent company's] top 75 institutional shareholders or among the largest ordinary shareholders, which together represent approximately 70 percent of all outstanding shares of [Trina Solar's publicly traded non-Chinese parent company]."[133]

---

[130] Id. at 6.

[131] Id.

[132] Id.

[133] Id.

In another example, Hanwha Solarone (Qidong) Company, Limited ("Hanwha") – another Defendant-Intervenor/respondent in this action whose separate-rate status SolarWorld challenges on grounds of failure to provide exhaustive details of ultimate ownership[134] – submitted evidence that, during the POI, it was wholly owned by a company domiciled in Hong Kong, which was in turn wholly owned by a company domiciled in the British Virgin Islands, which was in turn wholly owned by a company registered in the Cayman Islands and listed on the NASDAQ exchange.[135]

The Government maintains that, as with Trina Solar and Hanwha, Commerce obtained sufficient information regarding the ownership of each separate-rate recipient in this investigation to reasonably conclude that the Chinese government did not exercise control over these companies' export activities during the POI.[136] And while SolarWorld speculates that,

---

[134] Hanwha is referred to in SolarWorld's brief as "Solarone Qidong" and "Solarone Hong Kong." See *supra* note 123 (quoting SolarWorld's list of separate-rate recipients challenged on this ground); [Hanwha's] Resp. Br. in Opp'n to Pet'r-Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 63 ("Hanwha's Br."), at 1 n.1 (explaining name discrepancy).

[135] Hanwha's Br., ECF No. 63, at 2-3 (quoting [Hanwha's] Separate Rate Application, [CSPC], Whether or Not Assembled into Modules, from the [PRC], A-570-979, AD Investigation (Jan. 17, 2012), reproduced in Ex. 1 to App. to [Hanwha's Br.], ECF No. 65 at Doc. 1 Ex. 1, at 8-9).

[136] See *supra* note 126; see also Oral Arg. Tr., ECF No. 83, at 36 (emphasizing that, for each separate-rate recipient, Commerce

(footnote continued . . .)

notwithstanding all this evidence, the Chinese government is nevertheless exerting control over these companies through ownership of shares at least two steps removed from the companies themselves (e.g., in the case of Trina Solar, shares invested in a company which in turn holds shares in a company which ultimately owns the company in question), Commerce has determined that the weight of the evidence suggests the contrary conclusion, and SolarWorld has not pointed to any specific non-speculative evidence to cast doubt upon this determination.[137] Accordingly, because Commerce has considered and relied upon sufficient evidence to reasonably support the agency's conclusion that the respondents in question were sufficiently autonomous from government control over their export activities to qualify for a separate rate, and because SolarWorld presents no specific evidence to impugn these reasonable determinations,

---

received "documentation of price negotiations and other interactions with customers . . .; bank statements, financial documents, articles of incorporation, [and, in many instances,] documentation of ownership by foreign entities").

[137] See SolarWorld's Br., ECF No. 44, at 25 (speculating that "it is impossible to fully explore the issue of control unless all of a company's government ownership is revealed" but identifying no evidence to impugn the sufficiency of the evidence considered by Commerce when inferring that the likelihood of indirect Chinese government control of these companies was too small to warrant a fully exhaustive inquiry into indirect ownership, beyond the extensive inquiry already performed by the agency).

Commerce's findings with regard to these separate-rate recipients are supported by substantial evidence.

SolarWorld also argues that Commerce's decision to grant separate-rate status to these respondents was arbitrary because, in the past, Commerce has denied such status to respondents who submitted ownership evidence that was later contradicted at verification.[138] But the issue presented here is not analogous to the prior decisions on which SolarWorld relies because the respondents in those cases had submitted ownership information that was contradicted at verification, whereas here there was no similar impeachment of any of the evidence submitted by the challenged separate-rate recipients.[139]

---

[138] See id. at 26 (relying on Issues & Decision Mem., Certain Frozen Warmwater Shrimp from the [PRC], A-570-893, NSR 2/06-7/06 (Dec. 17, 2007) (adopted by 72 Fed. Reg. 72,668 (Dep't Commerce Dec. 21, 2007) (final rescission of antidumping duty new shipper review)) ("Shrimp from China New Shipper") cmt. 1; Issues & Decision Mem., Porcelain-on-Steel Cooking Ware from the [PRC], A-570-506, ARP 03-04 (Apr. 21, 2006) (adopted by 71 Fed. Reg. 24,641 (Dep't Commerce Apr. 26, 2006) (notice of final results of antidumping duty administrative review)) ("Cooking Ware from China") cmt. 1).

[139] Cf. Shrimp from China New Shipper cmt. 1 at 7-9 (detailing the information that was discredited at verification, including information relating to the respondent's "sales negotiation and sales execution process"); Cooking Ware from China cmt. 1 at 4-5 (explaining that the respondent in that case provided evidence at verification that contradicted the evidence it had previously submitted, and that verification produced evidence of a material undisclosed affiliation, which the respondent had concealed by refusing to answer Commerce's repeated requests for information).

In both of the prior cases upon which SolarWorld's argument relies, the record revealed material discrepancies between the information initially provided by the respondents and that ultimately obtained at verification.[140] These material discrepancies impugned the reliability of evidence that had been previously accepted to preliminarily rebut the presumption of government control. Finding such evidence to have been discredited, Commerce found that the record did not contain reliable evidence to rebut the presumption of government control, and accordingly denied those respondents separate-rate status.[141]

---

[140] See *supra* note 139.

[141] Compare Shrimp from China New Shipper cmt. 1 at 10 ("[Commerce] found at verification information contrary to [the respondent's] description of the sales negotiation and sales execution process . . . . As a result, [this respondent] has not affirmatively proven that it is free from *de facto* government control . . . ."), and Cooking Ware from China cmt. 1 at 5 ("[The respondent in question] did not disclose the existence of an affiliate despite [Commerce]'s numerous requests both in its questionnaires and at verification to identify any affiliates . . . . Because [this respondent] chose not to disclose the existence of this affiliate, and it was not discovered until the middle of [the respondent]'s one-week verification, [Commerce] was not able to fully question and consider this affiliate's relationship with the PRC government through written questions and at verification."); id. at 6 ("[Because this respondent] withheld information requested by [Commerce] and significantly impeded the proceeding by not providing accurate or complete responses to [Commerce]'s questions regarding the identity of the respondent's affiliates[,] . . . we find that [this respondent] did not affirmatively demonstrate that it operates free of government

(footnote continued . . .)

Here, on the other hand, the record contains credible evidence – which was not subsequently invalidated or discredited – of a *de jure* space for the respondents' *de facto* autonomy from government control. Based on this evidence, Commerce concluded that the presumption was rebutted.[142] Specifically, the respondents "placed on the record laws, regulations, business licenses, export licenses, and other documents demonstrating [sufficient] *de jure* independence from the government on the relevant issues"[143] to satisfy Commerce's threshold inquiry, and

---

control."), with *supra* notes 126 and 136 and accompanying text (detailing the extent of unimpeached evidence relied on by Commerce in granting separate-rate status to the challenged recipients).

[142] See Prelim. Results, 77 Fed. Reg. at 31,316-17 (discussing the evidence). Because a presumption is not evidence, see, e.g., Amanda Foods (Vietnam) Ltd. v. United States, __ CIT __, 714 F. Supp. 2d 1282, 1295 (2010) (discussing relevant case law analyzing the evidentiary status of presumptions) (quoting, *inter alia*, A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1037 (Fed. Cir. 1992) ("[A] presumption compels the production of [a] minimum quantum of evidence from the party against whom it operates, nothing more. In sum, a presumption is not evidence.") (citation omitted)), the presence of any credible rebutting evidence dispenses with the presumption, such that only *conflicting evidence* may now weigh against the evidence submitted in support of separate-rate eligibility. Put differently, the question presented here concerns the reasonableness of Commerce's weighing of the totality of reliable evidence before it, whereas that presented in Shrimp from China New Shipper and Cooking Ware from China concerned Commerce's resort to a presumption in the absence of any reliable evidence at all.

[143] I&D Mem. cmt. 6 at 31 (citing Prelim. Results, 77 Fed. Reg. at 31,317).

therefore to reasonably support Commerce's decision to move on to consider whether these companies in fact availed themselves of the autonomy that these legal documents appear to permit. Given these circumstances, Commerce reasonably determined that its threshold *de jure* criteria were satisfied by the challenged separate-rate recipients who submitted sufficient proof of legal autonomy without providing even more extensive information regarding their ultimate chain of ownership (e.g., not reporting some far-removed ultimate owner(s) of their respective parent companies), and the agency moved on to examining the evidence of these companies' *de facto* autonomy. As Commerce explained, "[a]bsent evidence of *de facto* control over a company's export activities, even if one of the respondents in question had identified the government among one of its ultimate owners, government ownership alone would not have warranted denying the company separate rate status."[144] Accordingly, Commerce's

[144] I&D Mem. cmt. 6 at 31-32. See also id. at 33 (quoting Structural Steel Beams from the [PRC], 66 Fed. Reg. 67,197, 67,199 (Dep't Commerce Dec. 28, 2001) (notice of preliminary determination of sales at less than fair value and postponement of final determination) ("As stated in [Silicon Carbide from China, 59 Fed. Reg. at 22,587], ownership of the company by a state-owned enterprise does not require the application of a single rate.") (unchanged in the final determination, 67 Fed. Reg. 35,479 (Dep't Commerce May 20, 2012) (notice of final determination of sales at less than fair value))); id. at 32 (explaining that Commerce "found no evidence of direct [*de facto*] government involvement in the decisions of the board members, the selection of management, or in the operations of
(footnote continued . . .)

challenged *de jure* determinations with regard to these respondents are also sustained.[145]

---

any respondents granted a separate rate in the [Prelim. Results, 77 Fed. Reg. at 31,316-17]”).

[145] SolarWorld also makes a policy argument that the effect of denying separate rates when ownership information proves unverifiable, as in Shrimp from China New Shipper and Cooking Ware from China, combined with permitting respondents to receive separate rates without complete ownership disclosure, will be to encourage respondents to withhold relevant information. SolarWorld’s Br., ECF No. 44, at 27. But this argument overlooks a crucial distinction between the facts of this case and those of Shrimp from China New Shipper and Cooking Ware from China. In those prior cases, the respondents in question either submitted contradictory information in response to Commerce’s specific requests, or else withheld information specifically requested of them. See, e.g., Shrimp from China New Shipper cmt. 1 at 7-8 (explaining that the respondent in question had withheld ownership information that had been specifically and repeatedly requested by Commerce, which then ultimately did not come to light until verification); id. at 8 (“[Commerce] found at verification information contrary to [the separate-rate applicant’s] description of the sales negotiation and sales execution process . . . .”); Cooking Ware from China cmt. 1 at 5 (explaining that the respondent in question “did not disclose the existence of an affiliate despite [Commerce]’s numerous requests both in its questionnaires and at verification to identify any affiliates . . . .”); see also I&D Mem. cmt. 6 at 32 n.117 (noting these distinctive facts). Here, by contrast, the challenged separate-rate recipients neither withheld any information in response to Commerce’s follow-up questionnaires nor submitted any information that was later discredited. Rather, Commerce concluded that the evidence submitted in support of these respondents’ claims to *de jure* autonomy during the POI was sufficient for that determination, and did not seek any additional information. This in no way limits Commerce’s authority to request relevant information and respond appropriately to a respondent’s failure to provide such information. Accordingly, this is not a case that will “incentivize respondents to withhold information from the agency completely,” SolarWorld Br., ECF No. 44, at 27, because this matter does not affect respondents’ incentives to provide the

(footnote continued . . .)

*B. Commerce's* De Facto *Autonomy Determinations*

SolarWorld additionally argues that Commerce improperly granted separate-rate status to certain respondents whose senior managers and/or board directors held membership or positions in certain state-owned enterprises or governmental entities during the POI. Essentially, SolarWorld believes that the potential for governmental control through such managers or board directors categorically precludes a finding that such companies in fact acted autonomously in conducting their own export activities.[146] The core of SolarWorld's argument is that

---

information requested of them.

[146] See SolarWorld's Br., ECF No. 44, at 34-40 (relying on [SolarWorld's] Case Br. on Gen. Issues, [CSPC], Whether or Not Assembled into Modules, from the [PRC], A-570-979, AD Investigation (July 30, 2012) ("SolarWorld's Case Br."), reproduced in SolarWorld's App., ECF Nos. 46 & 47 at Tab. 19, at 88-114). Cf., e.g., SolarWorld's Case Br., ECF Nos. 46 & 47 at Tab. 19, at 93 (arguing that a certain respondent failed to demonstrate relevant *de facto* autonomy because a manager who also held positions within the parent state-owned enterprise had "the legal authority" to influence the company's decisions); id. at 96 (arguing that another respondent failed to demonstrate relevant *de facto* autonomy because its Articles of Association "authorize" decision-making by persons who may also hold positions in state-owned enterprises); id. at 99 (arguing the same with regard to another respondent); id. at 102-03 (arguing that companies whose senior managers and board members include members of the NPC should be categorically denied separate-rate status because "NPC members are government officials and *can* control a company's export activities when in senior management positions of a company") (emphasis added); id. at 103-05 (arguing that certain respondents failed to demonstrate relevant *de facto* autonomy because these companies employ high-level officials who are members of the NPC); id. at 106-13 (arguing
(footnote continued . . .)

these respondents failed to establish *de facto* autonomy because 1) some of these companies' shareholders are SOEs (i.e., wholly state-owned companies), with the power to recommend or appoint the company's board members and senior managers; and 2) some of these companies' senior managers or board directors contemporaneously also held membership or positions within organizations such as the CPC, NPC, and/or CPPCC.[147] But these facts alone are not dispositive of the *de facto* autonomy inquiry, because they speak solely to the *possibility* for governmental control over export activities through these persons, not whether such control was in fact reasonably likely to have been exercised during the POI.

Fundamentally, SolarWorld's arguments regarding the *de facto* autonomy of the challenged separate-rate recipients suffer from the same analytical defect as its arguments regarding *de jure* autonomy – namely that, in an NME country, there will usually be state involvement and *authority* to intervene in

---

that certain respondents failed to demonstrate relevant *de facto* autonomy because some of their company officials are also government officials, implying the *possibility* of effective government control of these companies' export activities through these officials).

[147] See SolarWorld's Br., ECF No. 44, at 34-40 (relying on SolarWorld's Case Br., ECF Nos. 46 & 47 at Tab 19); SolarWorld's Case Br., ECF Nos. 46 & 47 at Tab 19, at 89-113.

commercial affairs.[148] But this fact alone does not necessarily lead to the conclusion that all NME producers and exporters should be categorically treated as in fact setting their prices according to some centralized strategy.[149]

Here, each of the challenged separate-rate recipients submitted evidence that "(1) [t]heir [export prices] are not set by, and are not subject to, the approval of a governmental agency; (2) they have authority to negotiate and sign contracts and other agreements; (3) they have autonomy from the government in making decisions regarding the selection of management; and (4) they retain the proceeds of their export sales and make independent decisions regarding the disposition of profits or

---

[148] Cf., e.g., Advanced Tech II, __ CIT at __, 885 F. Supp. 2d at 1355 ("'[G]overnmental control' in the context of the separate rate test appears to be a fuzzy concept . . . since a 'degree' of it can obviously be traced from the controlling shareholder [which is often a state-owned enterprise], to the board, to the general manager, and so on along the chain to 'day-to-day decisions of export operations,' including terms, financing, and inputs into finished product for export."); see also id. at 1353-54 n.9 ("Commerce concluded that 'SASAC *solely* provides oversight and is not intended to *direct* day-to-day business operation' (italics added), but how can that be the case if any SASAC-appointed/nominated 'responsible person' or director or even manager within SASAC's 'invested enterprises' (including 'a company with State-owned equity' . . .) has had a hand or vote that results in 'guiding' or 'supervising' or 'overseeing' any of such enterprise's operational activities including its export activities? That is, where does 'oversight' end and 'day-to-day business operation' begin, or does the exception swallow the rule?").

[149] See *supra* note 120 (quoting relevant authorities).

financing of losses."[150] Moreover, "[a]ll of the separate rate respondents at issue reported that neither SASAC nor the government was involved in the activities of the board of directors."[151]

Upon examination of this record, Commerce concluded that, despite SolarWorld's challenges to the agency's analysis in the Preliminary Results, "the evidence placed on the record of this investigation by the [s]eparate [r]ate [a]pplicants that were granted separate rate status in the Preliminary Determination [continues to demonstrate] both *de jure* and *de facto* absence of government control with respect to each company's respective exports of the merchandise under investigation." Final Results, 77 Fed. Reg. at 63,794. "The record does not show that the membership or position of senior managers or board directors of certain [separate-rate applicants] in [organizations such as the CPC, CPPCC, or NPC] resulted in a lack of autonomy on the part of the respondent[s] to set prices, negotiate and sign agreements, select management,

---

150 Prelim. Results, 77 Fed. Reg. at 31,316-17 (unchanged in the Final Results, 77 Fed. Reg. at 63,794); I&D Mem. cmt. 6 at 31 (noting that all of the challenged separate-rate recipients "provided information demonstrating an absence of *de facto* control of their export activities") (referencing the Prelim. Results).

151 I&D Mem. cmt. 6 at 27 (footnote omitted).

or decide how to dispose of profits or financing of losses," I&D Mem. cmt. 6 at 35, and "there is no record evidence of PRC government direction with respect to the day-to-day export related operations of any of the companies with senior board members or managers in the CPC, CPPCC, [or] NPC . . . ." Id. at 36.

Our standard of review does not require more. Commerce has reasonably exercised its responsibility for investigating, questioning, and verifying the respondents' submitted data and evidence,[152] as well as for determining the appropriate treatment for producers and exporters from NME countries.[153] Because Commerce possesses both expertise and relevant first-hand knowledge – sending follow-up questionnaires and conducting on-sight verification as needed – the court will

---

[152] See 19 U.S.C. §§ 1673b(b), 1673d(a); see also Max Fortune Indus. Ltd. v. United States, __ CIT __, 853 F. Supp. 2d 1258, 1263 (2012) ("In an antidumping administrative review, Commerce is the expert factfinder . . . .") (citing Nippon Steel, 458 F.3d at 1358); British Steel PLC v. United States, 20 CIT 663, 702, 929 F. Supp. 426, 457 (1996) ("As the fact-finder in these complex investigations, Commerce is charged with surveying the record and making a determination; the agency's decision need not be the most correct, nor the one the Court would have reached had the Court considered the evidence *de novo*.") (citations omitted).

[153] See 19 U.S.C. § 1677b(c). Notably, the antidumping statute exempts Commerce's NME designations from judicial review, id. at § 1677(18)(D), further supporting Commerce's general authority with regard to NME matters.

not reweigh the evidence before the agency.[154] Here, Commerce relied on certifications from the companies, each of which affirmed that they independently managed their own sales negotiations and set their own export prices.[155] As needed, Commerce sent follow-up inquiries, all of which were answered to Commerce's satisfaction.[156] The agency's conclusion was that, despite the systemic cross-contamination of personnel between the government and the commercial sector within the PRC, these companies exhibited sufficient localized control over their own export activities during the POI to warrant individualized

---

[154] Cf., e.g., Usinor Sacilor v. United States, 215 F.3d 1350 (Fed. Cir. 1999) (Table) ("Our review of the record indicates that the [Court of International Trade] evaluated and weighed the evidence in order to make its own [factual] determination . . . . That was error. It was not proper for the court to conclude that evidence that it considered 'persuasive' eclipsed contrary evidence that Commerce thought persuasive.") (citing Trent Tube Div., Crucible Materials Corp. v. United States, 975 F.2d 807, 815 (Fed. Cir. 1992) (noting that a court reviewing a factual determination for substantial evidence does not reweigh the evidence or reconsider questions of fact anew); Henry, 902 F.2d at 951 (noting that, when reviewing agency determinations for, *inter alia*, whether such determinations are supported by substantial evidence, "[i]t is not for this court to reweigh the evidence before the [agency]")).

[155] See *supra* note 150 and accompanying text (quoting relevant text from Commerce's determinations in this proceeding).

[156] See Prelim. Results, 77 Fed. Reg. at 31,317 ("[Commerce] has examined the record, including responses to supplemental questionnaires that were issued to a number of separate rate applicants, and . . . determined to grant these companies a separate rate.") (unchanged in the Final Results, 77 Fed. Reg. at 63,794).

rates.[157]

Beyond emphasizing the legal and practical *possibility* that the company officials who are also in some capacity government officials *could have* influenced these companies' export sales negotiations during the POI,[158] SolarWorld has not pointed to any specific evidence that, in influencing the companies' operations pursuant to their duties as *company* officials (including through the selection of management and preparation of profit distribution plans), these persons were directing the companies' export pricing decisions based on the will of the PRC government.[159] Commerce concluded that, on the

---

[157] See id. In this case, where Commerce limited its individualized examination pursuant to the "large number" exception, see 19 U.S.C. § 1677f-1(c)(2), the individualized rate for all non-individually examined separate-rate recipients was the "all others" rate, see 19 U.S.C. § 1673d(c)(5). See Prelim. Results, 77 Fed. Reg. at 31,318 (unchanged in the Final Results, 77 Fed. Reg. at 63,795).

[158] See *supra* notes 146 and 147 and accompanying text (discussing SolarWorld's specific arguments regarding *de facto* autonomy).

[159] SolarWorld argues that requiring it to produce such evidence in challenging Commerce's grant of separate-rate applications would impermissibly shift the burden of proof to the domestic industry, when the burden is properly on the respondents to rebut the presumption against their autonomy. See, e.g., SolarWorld Br., ECF No. 44, at 33; Sigma, 117 F.3d at 1406 ("[B]ecause exporters have the best access to information pertinent to the 'state control' issue, Commerce is justified in placing on them the burden of showing a lack of state control.") (quoting Zenith Elecs. Corp. v. United States, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the necessary information.")

(footnote continued . . .)

evidence presented, it was more likely that these companies had autonomy over their own export price negotiations, and that grouping them within the countrywide entity would be accordingly inappropriate.[160] Commerce credited evidence, which was never persuasively contradicted, that the companies themselves negotiate and set their U.S. export prices, notwithstanding the

---

(citation omitted)). But, as previously mentioned, see *supra* note 142 (discussing the evidentiary status of presumptions), the submission of relevant credible evidence (i.e., evidence that is both relevant to the presumed fact and not subsequently discredited) disposes of the presumption, which is not evidence and only operates in the absence of relevant credible evidence. Here Commerce relied on evidence submitted by the challenged separate-rate recipients, and the investigation did not reveal – and SolarWorld does not point to – any specific evidence to the contrary.

[160] After all, the purpose of an antidumping duty order is solely to encourage exporters to sell (and importers to buy) at fair prices. See, e.g., Ad Hoc Shrimp Trade Action Comm. v. United States, __ CIT __, 925 F. Supp. 2d 1367, 1373 (2013) (noting that "the antidumping deposit [imposed upon publication of an AD order, see 19 U.S.C. § 1673e(a)(3)] merely serves to provide an incentive to ensure fair export prices"). The pertinent inquiry, therefore, is who actually sets the export prices? SolarWorld quotes a statement made by Commerce, in a 1997 investigation of merchandise from Ukraine, to suggest that "[t]he purpose of applying one countrywide rate in an NME context is to prevent an NME government from later circumventing an antidumping order by controlling the flow of subject merchandise through exporters which have the lowest margin." SolarWorld's Br., ECF No. 44, at 23 (quoting Steel from Ukraine, 62 Fed. Reg. at 61,759). This is true as far as it goes. But in the same document, Commerce explains that the essence of its separate-rate analysis is whether, "considering the totality of circumstances," the respondents in question "had sufficient independence *in their export pricing decisions* from government control to qualify for separate rates." Steel from Ukraine, 62 Fed. Reg. at 61,759 (emphasis added).

dual roles played by some company officials as both company managers and members of government, and the agency concluded that these companies negotiated and set their U.S. export prices during the POI separately, both from each other and from any centralized countrywide mind. This conclusion is at least as reasonable as the one SolarWorld suggests Commerce should have reached instead – i.e., that the relatively low-level government officials holding high-level positions within these companies were in fact all conduits effectuating a countrywide governmental price-setting scheme.

Accordingly, because Commerce's conclusions regarding these companies' *de facto* autonomy to set export prices during the POI are consistent with a reasonable reading of the record presented here, these conclusions are supported by substantial evidence, and are therefore sustained.

**CONCLUSION**

For all of the foregoing reasons, this matter is remanded for reconsideration of the separate rate eligibility of the four respondents named in Commerce's request for voluntary remand, consistent with this opinion. Commerce's Final Results are sustained against all other challenges presented in this consolidated action. Commerce shall have until February 18, 2015, to file its remand results. The parties shall have until

March 4, 2015, to file their comments, and until March 18, 2015, to file any replies.

It is SO ORDERED.

/s/ Donald C. Pogue
Donald C. Pogue, Senior Judge

Dated: November 20, 2014
New York, NY