Slip Op. 15 - 113

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JIANGSU JIASHENG PHOTOVOLTAIC TECHNOLOGY CO., LTD.,<br><br>                    Plaintiff,<br><br>               v.<br><br>UNITED STATES,<br><br>                    Defendant. | **PUBLIC VERSION**<br><br>Before: Donald C. Pogue,<br>          Senior Judge<br><br>Consol. Court No. 13-00012[1] |

OPINION

[affirming the Department of Commerce's final results of redetermination on remand]

Dated: October 5, 2015

Timothy C. Brightbill and Laura El-Sabaawi, Wiley Rein LLP, of Washington, DC, for SolarWorld Americas, Inc.

L. Misha Preheim, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant. Also on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel was Rebecca Cantu, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

**Pogue, Senior Judge:** This consolidated action arises

from the United States Department of Commerce's ("Commerce")

antidumping investigation of crystalline silicon photovoltaic

---

[1] This action is consolidated with SolarWorld Indus. Am., Inc. v. United States, Ct. No. 13-00006. Order, June 12, 2013, ECF No. 18.

cells from the People's Republic of China ("China").[2]  Before the court is Commerce's redetermination, pursuant to remand, of the antidumping cash deposit rates for four specific producers/exporters of merchandise subject to the investigation.[3] On remand, Commerce found that three of these four respondents have not shown that their production and export operations are free from government control, and so determined to assign to those respondents the China-wide rate.[4]  This portion of the

---

[2] See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) (final determination of sales at less than fair value, and affirmative final determination of critical circumstances, in part) ("Final Results") and accompanying Issues & Decision Mem., A-570-979, Investigation (Oct. 9, 2012) ("I&D Mem.").

[3] See Final Results of Redetermination Pursuant to Ct. Order, ECF Nos. 97-1 (conf. version) & 98-1 (pub. version) ("Remand Results"); Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States, __ CIT __, 28 F. Supp. 3d 1317, 1343, 1351 (2014) ("SolarWorld I") (granting Commerce's request for voluntary remand with respect to these four specific respondents, and remanding the Final Results solely with regard to "the separate rate eligibility of the four respondents named in Commerce's request").  Although the most relevant background is summarized below, familiarity with the history of this litigation is presumed.  The court's prior opinion – referred to here as SolarWorld I – affirmed the Final Results of this antidumping investigation against all challenges presented in this consolidated action, other than the separate rate eligibility of these four respondents. SolarWorld I, __ CIT at __, 28 F. Supp. 3d at 1351.

[4] Remand Results, ECF Nos. 97-1 & 98-1, at 8-11. See Background, infra, for relevant context.

Remand Results is not subject to challenge.[5]  With respect to the

remaining respondent – Ningbo ETDZ Holdings Limited ("Ningbo

ETDZ") – however, Commerce found that this company sufficiently

demonstrated its eligibility for a rate separate from the China-

wide entity.[6]  Defendant-Intervenor SolarWorld Americas, Inc.

("SolarWorld") – a petitioner in the underlying antidumping

investigation – now challenges this latter determination.[7]

The court has jurisdiction pursuant to

Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended,

19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[8] and 28 U.S.C.

---

[5] None of these three respondents filed comments with this Court
regarding the Remand Results, see ECF Nos. 97 et seq., although
one of these companies – Sumec Hardware & Tools Co., Ltd.
("Sumec Hardware") – unsuccessfully sought to intervene in this
action, out of time, in order to challenge Commerce's Remand
Results. See Jiangsu Jiasheng Photovoltaic Tech. Co. v. United
States, __ CIT __, 72 F. Supp. 3d 1378 (2015) (denying Sumec
Hardware's motion to intervene in this action more than two
years past the 30 day time limit provided by
USCIT Rule 24(a)(3)).  Because Sumec Hardware failed to
demonstrate good cause for the significant tardiness of its
attempted intervention, the court denied Sumec Hardware's
motion, and consequently no opinion is expressed herein with
regard to Sumec Hardware's arguments against the Remand Results.
See id. at 1382-83 (explaining the court's reasoning).

[6] Remand Results, ECF Nos. 97-1 & 98-1, at 12-13.

[7] Def.-Intervenor SolarWorld Americas, Inc.'s Comments on Final
Results of Redetermination Pursuant to Ct. Order, ECF Nos. 104
(conf. version) & 105 (pub. version) ("SolarWorld's Br.").
Ningbo ETDZ itself did not file any commentary regarding the
Remand Results. See ECF Nos. 97 et seq.

[8] Further citations to the Tariff Act of 1930, as amended, are to
the relevant provisions of Title 19 of the U.S. Code,

(footnote continued)

§ 1581(c) (2012).

Because Commerce's redetermination is based on a reasonable reading of the record evidence, as explained below, the Remand Results are sustained.

## BACKGROUND

When investigating merchandise from a country that Commerce considers to be a non-market economy ("NME"), including China,[9] Commerce employs a rebuttable presumption that the export-related decision-making of all enterprises operating within the NME is controlled by the government (whether at the central, provincial, or local level).[10]   "Consistent with this presumption, it is [Commerce]'s policy to assign all exporters of the merchandise subject to review in an NME country a single [country-wide] rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de*

---

2012 edition.

[9] See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, 76 Fed. Reg. 70,960, 70,962 (Dep't Commerce Nov. 16, 2011) (initiation of antidumping duty investigation) ("The presumption of NME status for [China] has not been revoked by [Commerce] and, therefore, in accordance with [19 U.S.C. § 1677(18)(C)(i)], remains in effect for purposes of the initiation of this investigation.").

[10] See SolarWorld I, __ CIT at __, 28 F. Supp. 3d at 1323-24 & nn.12-13 (providing relevant background and authorities); Remand Results, ECF Nos. 97-1 & 98-1, at 2-3, 28.

*jure*) and in fact (*de facto*), with respect to exports,"[11] and

thereby demonstrate its eligibility for a "separate rate."[12]

> As this Court has previously explained,

> Commerce's essential inquiry with regard to whether a
> particular respondent's circumstances warrant the
> grant of separate-rate status focuses on whether,
> "considering the totality of circumstances," the
> respondents in question "had sufficient independence
> in their export pricing decisions from government
> control to qualify for separate rates."  To that end,
> the relevant *de jure* autonomy "can be demonstrated by
> reference to legislation and other governmental
> measures that decentralize control," and the relevant
> *de facto* autonomy "can be established by evidence that
> [the] exporter sets its prices independently of the
> government and of other exporters, and that [the]
> exporter keeps the proceeds of its sales."  In both
> its *de jure* and *de facto* determinations, Commerce may
> make reasonable inferences from the record evidence.[13]

> Here, recognizing that "within the NME entity,

companies exist which are independent from government control to

such an extent that they can independently conduct export

---

[11] Remand Results, ECF Nos. 97-1 & 98-1, at 3 (citations
omitted); see SolarWorld I, __ CIT at __, 28 F. Supp. 3d at 1338
& n.103 (providing relevant citations).

[12] See SolarWorld I, __ CIT at __, 28 F. Supp. 3d at 1324 & n.13.

[13] Id. at 1339 (emphasis omitted) (quoting Certain Cut-to-Length
Carbon Steel Plate from Ukraine, 62 Fed. Reg. 61,754, 61,759
(Dep't Commerce Nov. 19, 1997) (notice of final determination of
sales at less than fair value) and Sigma Corp. v. United States,
117 F.3d 1401, 1405 (Fed. Cir. 1997) (citation omitted),
respectively; and citing Daewoo Elecs. Co. v. United States,
6 F.3d 1511, 1520 (Fed. Cir. 1993) (explaining that substantial
evidence may include "reasonable inferences from the record")
(quotation marks and citation omitted)).

activities,"[14] Commerce granted a number of separate-rate
applications during its investigation, finding that "the
evidence placed on the record of this investigation by [these
respondents] demonstrates both *de jure* and *de facto* absence of
government control with respect to each company's respective
exports of the merchandise under investigation."[15]

    In the course of this litigation, however, Commerce
requested and was granted a voluntary remand to reevaluate the
evidence and reconsider the separate rate eligibility of four
separate-rate recipients whose rates had been challenged by
SolarWorld.[16]  Commerce's basis for the remand request was a
concern for consistency with the agency's approach to similar
issues in antidumping proceedings involving diamond sawblades
from China.[17]  Specifically, as a result of litigation
challenging Commerce's separate rate determinations in the
diamond sawblades proceedings, Commerce has clarified its
practice with regard to evaluating NME companies' *de facto*
independence from government control.[18]  This revised practice,

---

[14] I&D Mem. cmt. 6 at 26 (citation omitted).

[15] Final Results, 77 Fed. Reg. at 63,794.

[16] See SolarWorld I, ___ CIT at ___, 28 F. Supp. 3d at 1340-41.

[17] See id. at 1340 n.113; Remand Results, ECF Nos. 97-1 & 98-1,
at 6-7.

[18] See Remand Results, ECF Nos. 97-1 & 98-1, at 7, 17.

which was sustained by this Court and subsequently affirmed by

the Court of Appeals,[19] holds that "where a government entity

holds a majority ownership share, either directly or indirectly,

in the respondent exporter [or producer],"[20] such majority

ownership holding "in and of itself" precludes a finding of *de

facto* autonomy.[21]

Applying this clarified approach on remand, Commerce

reconsidered the separate rate eligibility of the four

respondents covered by the remand order.[22]  As a result, Commerce

found that three of these respondents were no longer eligible

for a separate rate, but that the remaining respondent – Ningbo

---

[19] See Advanced Tech. & Materials Co. v. United States,
__ CIT __, 938 F. Supp. 2d 1342 (2013), aff'd, 581 F. App'x 900
(Fed. Cir. 2014).

[20] Remand Results, ECF Nos. 97-1 & 98-1, at 7.

[21] See id. at 7-11; see also id. at 17 ("[W]here a government
entity holds a majority ownership share, either directly or
indirectly, in the respondent exporter, the majority ownership
holding, in and of itself, means that the government exercises,
or has the potential to exercise, control over the company's
operations generally, rendering the company ineligible for a
separate rate.") (citing Prelim. Decision Mem., Carbon and
Certain Alloy Steel Wire Rod from the People's Republic of
China, A-570-012, Investigation (Aug. 29, 2014) (adopted in
79 Fed. Reg. 53,169 (Dep't Commerce Sept. 8, 2014) (preliminary
determination of sales at less than fair value and preliminary
affirmative determination of critical circumstances, in part))
("Wire Rod from China") at 5-9 (unchanged in 79 Fed. Reg. 68,860
(Dep't Commerce Nov. 19, 2014) (final determination of sales at
less than fair value and final affirmative determination of
critical circumstances, in part))).

[22] See Remand Results, ECF Nos. 97-1 & 98-1, at 1-2;
SolarWorld I, __ CIT at __, 28 F. Supp. 3d at 1340-41.

ETDZ – continued to so qualify.[23]  While none of the affected
respondents filed comments with the court in response to
Commerce's Remand Results,[24] SolarWorld challenges Commerce's
determination that Ningbo ETDZ is eligible for a separate rate
in this investigation.[25]  Accordingly, the sole question before
the court is whether Commerce reasonably determined that Ningbo
ETDZ operated with sufficient autonomy during the period of
investigation to qualify for a rate separate from the
countrywide entity, notwithstanding the presumption of
government control.[26]  After a brief statement of the applicable
standard of review, this matter is discussed in detail below.

### STANDARD OF REVIEW

The court will sustain Commerce's antidumping
determinations on remand if they are supported by substantial
evidence and otherwise in accordance with law. See 19 U.S.C.
§ 1516a(b)(1)(B)(i).  Substantial evidence refers to "such
relevant evidence as a reasonable mind might accept as adequate

---

[23] Remand Results, ECF Nos. 97-1 & 98-1, at 1-2.

[24] See ECF Nos. 97 et seq.; see also supra note 5 (discussing
Sumec Hardware's unsuccessful attempt to file comments).

[25] SolarWorld's Br., ECF Nos. 104 & 105, at 5-9.

[26] See Remand Results, ECF Nos. 97-1 & 98-1, at 12-13 (explaining
Commerce's evidentiary findings and consequent conclusions with
regard to Ningbo ETDZ); id. at 26-27 (addressing SolarWorld's
challenges to these determinations); SolarWorld's Br.,
ECF Nos. 104 & 105, at 5-9.

to support a conclusion." SKF USA, Inc. v. United States,
537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting Consol. Edison Co.
v. NLRB, 305 U.S. 197, 229 (1938)).  Thus the substantial
evidence standard of review can be roughly translated to mean
"is the determination unreasonable?" Nippon Steel Corp. v.
United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quotation
marks, alteration marks, and citation omitted).  In this
context, substantial evidence is "something less than the weight
of the evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) (citations
omitted).[27]

## DISCUSSION

SolarWorld's challenge relies on the record evidence
concerning the extent to which a wholly state-owned company
exercised its ownership stake in Ningbo ETDZ to affect the
selection of certain high-level management personnel.[28]

---

[27] See also, e.g., Technoimportexport, UCF Am. Inc. v. United
States, 16 CIT 13, 18, 783 F. Supp. 1401, 1406 (1992) ("When
Commerce is faced with the decision to choose between two
reasonable alternatives and one alternative is favored over the
other in their eyes, then they have the discretion to choose
accordingly.").

[28] See SolarWorld's Br., ECF Nos. 104 & 105, at 5-9.

Specifically, SolarWorld argues that in light of this evidence,

"Commerce has not provided adequate explanation or support" for

its determination that Ningbo ETDZ is eligible for a separate

rate in this investigation.[29]

First, SolarWorld argues that, on the facts presented

here, a twenty percent ownership interest in the respondent

company held by a wholly state-owned enterprise should in itself

constitute conclusive evidence of *de facto* government control,

particularly where (as here) the next largest shareholder owned

only twelve percent, and no other shareholder owned more than

five percent.[30]  SolarWorld argues that "a reasonable

understanding of what constitutes 'control' in the corporate

context" should be "instruct[ed]" by regulations promulgated by

the Securities and Exchange Commission ("SEC") – "a U.S.

---

[29] Id. at 9.

[30] See id. at 6 (relying on Remand Results, ECF Nos. 97-1 & 98-1,
at 12 (Commerce's finding that [[
                                                       ]], "which
is indirectly a wholly state-owned company, owned the largest
percentage of shares of Ningbo ETDZ of any shareholder," because
it owned twenty percent of Ningbo ETDZ, with the next largest
shareholder being "an individual that controls 12 percent of the
total shares" and all remaining shareholders being
"individual[s] owning [no] more than five percent of Ningbo
ETDZ's total shares") (citing [Ningbo ETDZ's] Separate Rate
Appl., Crystalline Silicon Photovoltaic Cells, Whether or Not
Assembled into Modules, from the People's Republic of China, A-
570-979, Investigation (Jan. 14, 2012), reproduced in Def.'s
Suppl. App. of Rec. Docs., ECF Nos. 117 (conf. version) & 118
(pub. version) ("Def.'s Suppl. App.") at Tab 1 ("Ningbo ETDZ
SRA") at 13 & Exs. 5 & 10)).

government agency with significant experience in the regulation

of corporations" – using twenty percent "as the ownership

threshold for the point at which an investor is no longer

considered a 'passive investor,' triggering various reporting

requirements."[31]  But as Commerce points out,[32] and as SolarWorld

acknowledges,[33] these SEC regulations do not apply to Commerce's

antidumping determinations.  On the contrary, Commerce has

developed its own, different test for the threshold ownership

stake at which the ownership percentage in itself constitutes

conclusive evidence of *de facto* control.  For Commerce, such

conclusive evidence is "where a government entity holds *a

majority ownership share*, either directly or indirectly, in the

respondent exporter."[34]  Here, the state-owned entity did not

---

[31] SolarWorld's Br., ECF Nos. 104 & 105, at 6 (citing 17 C.F.R. § 240.13d-1 (triggering reporting requirements at twenty percent ownership and above); id. at § 210.3-09 (using twenty percent ownership as the threshold for the agency's "significant subsidiary" test)).

[32] Remand Results, ECF Nos. 97-1 & 98-1, at 27 ("[Commerce] does not find Petitioner's argument regarding the SEC regulations to be persuasive[] [because these] are SEC regulations and do not apply to [Commerce]'s administration of the antidumping law or its separate rate practice.").

[33] SolarWorld's Br., ECF Nos. 104 & 105, at 6 (quoting Remand Results, ECF Nos. 97-1 & 98-1, at 27).

[34] Remand Results, ECF Nos. 97-1 & 98-1, at 28 (emphasis added); see also id. at 7 (citing Wire Rod from China, *supra* note 21, at 5-9).

hold a majority ownership share,[35] and it was not unreasonable
for the agency to determine not to rely on regulations
promulgated by an unrelated agency in an entirely different
context.

Next, SolarWorld also argues that Commerce
unreasonably found that Ningbo ETDZ rebutted the presumption of
*de facto* government control because the wholly state-owned
company holding the twenty percent share was involved in the
selection of certain of Ningbo ETDZ's high-level management
personnel.[36]  Specifically, the state-owned shareholder
recommended [[                              ]] to serve as the
Chairman of the Board of Ningbo ETDZ,[37] who was then elected by

---

[35] See *supra note* 30 (quoting relevant factual findings).

[36] SolarWorld's Br., ECF Nos. 104 & 105, at 6-9.

[37] Id. at 6-7 (relying on Remand Results, ECF Nos. 97-1 & 98-1,
at 12 ("Ningbo ETDZ's articles of association state that [the
state-owned shareholder] selects the chairman of the board of
directors of Ningbo ETDZ.  [[               ]] serves as both the
Chairman of the Board of Ningbo ETDZ and [[               ]].")
(citing, respectively, [Ningbo ETDZ's] Separate Rate Appl. – 2d
Suppl. Questionnaire Resp., Crystalline Silicon Photovoltaic
Cells, Whether or Not Assembled into Modules, from the People's
Republic of China, A-570-979, Investigation (May 1, 2012),
reproduced in Def.'s Suppl. App., ECF Nos. 117-1 & 118-1 at Tab
2 ("Ningbo ETDZ 2d SRA Resp.") at Ex. 4 (Articles of
Association, Art. 94); and Ningbo ETDZ SRA, ECF Nos. 117-1
& 118-1 at Tab 1, at Exs. 4 & 12; Ningbo ETDZ 2d SRA Resp. at
Ex. 1)).  In the Remand Results, Commerce incorrectly
characterizes the evidence to suggest that "Ningbo ETDZ's
articles of association state that [the state-owned shareholder]
*selects* the chairman of the board of directors of Ningbo ETDZ,"
ECF Nos. 97-1 & 98-1, at 12 (emphasis added) (citing Ningbo ETDZ
                                            (footnote continued)

the board members.[38]  In addition, the state-owned shareholder

also nominated Ningbo ETDZ's [[                          ]].[39]

        In response, Commerce emphasizes other record

evidence, which indicates that other than the Chairman of the

Board and the [[                     ]], the remainder of

Ningbo ETDZ's management personnel selections – and in

particular the selection of personnel with primary control over

Ningbo ETDZ's production and business operations – were *not* in

any way influenced by the government.[40]  Specifically, the record

indicates that, with the exception of the chairman,[41] all of

Ningbo ETDZ's board members, including the board's first vice

director, were recommended by shareholders other than the state-

owned entity, and appointed by a vote of all of the

---

2d SRA Resp., ECF Nos. 117-1 & 118-1 at Tab 2, at Ex. 4
(Articles of Association, Art. 94)) – in fact the articles state
that "[[

                                      ]]." Ningbo ETDZ 2d
SRA Resp., ECF Nos. 117-1 & 118-1 at Tab 2, at Ex. 4 (Articles
of Association, Art. 94) (emphasis added); see also Ningbo ETDZ
2d SRA Resp., ECF Nos. 117-1 & 118-1 at Tab 2, at 5 ("The
chairman is [[                                  ]] and
*elected* by the board members.") (emphasis added).

[38] See Ningbo ETDZ 2d SRA Resp., ECF Nos. 117-1 & 118-1 at Tab 2,
at 5 ("The chairman is . . . elected by the board members.").

[39] Remand Results, ECF Nos. 97-1 & 98-1, at 12 (citing Ningbo
ETDZ SRA, ECF Nos. 117-1 & 118-1 at Tab 1, at Ex. 12).

[40] Id. at 12-13, 27.

[41] See *supra* note 37 (referencing relevant factual findings
regarding the chairman).

shareholders.[42]  Moreover, the board's first vice director is

also Ningbo ETDZ's general manager, as well as the company's

second largest shareholder,[43] and Commerce found that it is this

individual, rather than the state-owned shareholder, that "has

the primary responsibilities associated with taking charge of

Ningbo ETDZ's production and business operations."[44]  This first

---

[42] Remand Results, ECF Nos. 97-1 & 98-1, at 12 (emphasizing
record evidence indicating that [[                     ]], the first
vice director of Ningbo ETDZ's board, was recommended by
shareholders other than the state-owned shareholder and
appointed by vote of all the shareholders) (citing Ningbo ETDZ
2d SRA Resp., ECF Nos. 117-1 & 118-1 at Tab 2, at 5); id. at 13
("The record also indicates that the remaining three of Ningbo
ETDZ's five board directors [after accounting for the first vice
director and the chairman] are recommended by shareholders other
than the state-owned company and appointed by vote of all the
shareholders.") (citing Ningbo ETDZ 2d SRA Resp., ECF Nos. 117-1
& 118-1 at Tab 2, at 5).

[43] Id. at 12-13 ("[T]he record indicates that the second largest
shareholder, [[               ]], is the first vice-director of
Ningbo ETDZ's board . . . .  [[                    ]] is also the
general manager of Ningbo ETDZ.") (citing Ningbo ETDZ SRA,
ECF Nos. 117-1 & 118-1 at Tab 1, at Ex. 12; Ningbo ETDZ 2d SRA
Resp., ECF Nos. 117-1 & 118-1 at Tab 2, at 5).

[44] Id. at 13, 26 (citing Ningbo ETDZ 2d SRA Resp., ECF Nos. 117-1
& 118-1 at Tab 2, at Ex. 4 (Articles of Association, Art. 116));
see also id. at 13 ("As general manager of Ningbo ETDZ, [[
        ]] has significant responsibilities in managing and
directing the operations of the company.") (citing Ningbo ETDZ
2d SRA Resp., ECF Nos. 117-1 & 118-1 at Tab 2, at Ex. 4
(Articles of Association, Art. 116)); id. at 26 ("The record
indicates that the second largest shareholder, [[
        ]], rather than the [state-owned] shareholder, is in a
position to control, and does control, the operations of Ningbo
ETDZ."); see Ningbo ETDZ 2d SRA Resp., ECF Nos. 117-1 & 118-1
at Tab 2, at Ex. 4 (Articles of Association, Art. 116)
(providing that [[

                                              (footnote continued)

vice director and general manager – who has no apparent
relationship with the government[45] – also nominated [[
               ]], as well as Ningbo ETDZ's [[
               ]], who also comprise two of Ningbo ETDZ's
remaining three board members (appointed by a vote of all the
shareholders).[46]  Based on this evidence, Commerce concluded that
Ningbo ETDZ's non-governmental general manager, "rather than the
[state-owned] shareholder, is in a position to control, and does
control, the operations of Ningbo ETDZ."[47]  Accordingly, the
agency determined that, because the evidence indicates that "the
Government of China [has] little ability to indirectly exercise
control over Ningbo ETDZ's operations, including its export

_____

               ]]).

[45] See Remand Results, ECF Nos. 97-1 & 98-1, at 13 ("The record
does not include any information indicating that [the general
manager and first vice director of Ningbo ETDZ's board] has a
relationship with [the state-owned shareholder] other than that
they are both shareholders of Ningbo ETDZ and [this individual]
is employed by Ningbo ETDZ.").

[46] Id. ("[[                    ]] nominated [[
        ]], and nominated [[
        ]].  The record also indicates that the remaining
three of Ningbo ETDZ's five board directors are recommended by
shareholders other than [[                ]] and appointed by
vote of all the shareholders.  One of the [[
               ]] and [[
                    ]] are also directors of the board.")
(citing Ningbo ETDZ SRA, ECF Nos. 117-1 & 118-1 at Tab 1,
at Ex. 12; Ningbo ETDZ 2d SRA Resp., ECF Nos. 117-1 & 118-1
at Tab 2, at 5).

[47] Id. at 26.

decisions," Ningbo ETDZ has "satisfie[d] the criteria

demonstrating an absence of *de facto* government control over

export activities."[48]

On the evidence presented, Commerce's conclusion is

not unreasonable.  It is undisputed that the individual who was

Ningbo ETDZ's second largest shareholder, first vice director of

the board, and general manager during the period of

investigation held no apparent ties to the government, and

wielded at least some amount of control over the company's

production and export operations.[49]  The essence of the dispute

here regards the relative weight placed by the agency on this

evidence, as well as the additional evidence that (unlike the

other three respondents whose separate rate status was revoked

on remand[50]) Ningbo ETDZ's state-owned shareholder neither

---

[48] Id. at 13.

[49] See Remand Results, ECF Nos. 97-1 & 98-1, at 12-13, 26-27;
*supra* note 44 (quoting relevant record evidence);
SolarWorld's Br., ECF Nos. 104 & 105, at 8-9 (citing Remand
Results, ECF Nos. 97-1 & 98-1, at 12-13, 26-27, and not
disputing this evidence, while arguing that Commerce should not
have given it as much weight as the agency did).

[50] See Remand Results, ECF Nos. 97-1 & 98-1, at 8 ("[T]he record
indicates that [[                    ]] is a wholly state-
owned company, which, through its group companies, owns and
controls a majority of the shares of Tianwei New Energy."); id.
at 9 ("[[      ]] is a wholly state-owned company which owns
and controls a majority of the shares of Dongfang Electric.");
id. at 27 ("[T]he [state-owned] shareholder of Sumec Hardware
and the [[employees of the state-owned shareholder]] own
approximately [[  ]] percent of that company's shares, and
(footnote continued)

controlled a majority of Ningbo ETDZ's shares nor appointed a
majority of its board directors.[51]  While Commerce determined
that this evidence of decision-making autonomy outweighs the
suggestion of potential for government control evidenced by the
state-owned shareholder's recommendation of Ningbo ETDZ's
elected Chairman of the Board and [[                      ]],[52]
SolarWorld argues that the latter evidence should outweigh the
former.[53]  But "[i]t is not for the courts to reweigh the
evidence before the agency,"[54] and a "court may [not] displace
the [agency's] choice between two fairly conflicting views,"
even if a reasonable person could also have justifiably made a
different choice.[55]

     Here, Commerce's weighing of the evidence to conclude
that Ningbo ETDZ's non-governmental general manager, rather than
the state-owned shareholder, "is in a position to control, and

---

appoint [[          ]] board directors.").

[51] See id. at 27; SolarWorld's Br., ECF Nos. 104 & 105, at 5-9
(arguing that this evidence does not outweigh "the significant
evidence of control" provided by the facts that the state-owned
shareholder owns 20 percent of Ningbo ETDZ's total shares and
that this state-owned shareholder appointed Ningbo ETDZ's
Chairman of the Board and [[                      ]]).

[52] See Remand Results, ECF Nos. 97-1 & 98-1, at 12-13, 26-27.

[53] See SolarWorld's Br., ECF Nos. 104 & 105, at 9.

[54] SolarWorld I, __ CIT at __, 28 F. Supp. 3d at 1323 (quoting
Henry v. Dep't of the Navy, 902 F.2d 949, 951 (Fed. Cir. 1990)
(alteration marks omitted)).

[55] Univ. Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

does control, the operations of Ningbo ETDZ"[56] comports with a
reasonable reading of the record,[57] even if a reasonable person
could have also concluded otherwise.  SolarWorld neither
challenges any of Commerce's factual findings nor points to any
evidence that Commerce did not consider and weigh in reaching
its determination.[58]  On the record presented, Commerce's
inferences are not unreasonable.[59]

---

[56] Remand Results, ECF Nos. 97-1 & 98-1, at 26.

[57] See supra note 44 (referencing relevant record evidence).

[58] See SolarWorld's Br., ECF Nos. 104 & 105, at 5-9 (arguing that
Commerce's findings that the state-owned shareholder owned 20
percent of Ningbo ETDZ's shares and recommended Ningbo ETDZ's
Chairman of the Board and [[                            ]] should
have been given dispositive weight, necessarily leading the
agency to conclude that Ningbo ETDZ's operations were controlled
by the Chinese government).  Although SolarWorld argues that
Commerce did not address SolarWorld's argument that the Chairman
of the Board "[[
                ]]," id. at 7, Commerce conceded that the
circumstances surrounding the selection of Ningbo ETDZ's
Chairman of the Board weighed on the side of state-control, see
Remand Results, ECF Nos. 97-1 & 98-1, at 12, but ultimately
concluded that this evidence was outweighed by other evidence on
the record, id. at 12-13.  Thus SolarWorld does not point to any
evidence that "fairly detracts from [the] weight" of the
evidence supporting Commerce's conclusion, cf. Univ. Camera,
340 U.S. at 488, but rather invites the court to reweigh
conflicting evidence, which is not this Court's function.  See,
e.g., Am. Bearing Mfrs. Ass'n v. United States, 28 CIT 1698,
1700, 350 F. Supp. 2d 1100, 1104 (2004) ("[T]he court's function
is not to reweigh the evidence but rather to ascertain 'whether
there was evidence which could reasonably lead to the [agency]'s
conclusion . . . .'") (quoting Matsushita Elec. Indus. v. United
States, 750 F.2d 927, 933 (Fed. Cir. 1984)).

[59] See supra notes 37, 42, and 44 (referencing relevant factual
findings and record evidence).  SolarWorld attempts to make its
                                              (footnote continued)

Accordingly, Commerce's determination that "Ningbo ETDZ satisfies the criteria demonstrating an absence of *de facto* government control over export activities" (and is therefore eligible for a separate rate)[60] is supported by substantial evidence, and is therefore sustained.

### CONCLUSION

For all of the foregoing reasons, Commerce's <u>Remand Results</u> are affirmed.  Judgment will issue accordingly.


_____
/s/ Donald C. Pogue
Donald C. Pogue, Senior Judge

Dated: October 5, 2015
      New York, NY

---

own (contrary) inferences. <u>See, e.g.</u>, SolarWorld's Br., ECF Nos. 104 & 105, at 9 n.4 (arguing that the [[                ]], who was recommended by Ningbo ETDZ's non-governmental general manager, "would *presumably* be under the direct control of the company's [[                    ]]," who was nominated by the state-owned shareholder) (emphasis added).  But Commerce may make reasonable inferences from the record evidence, <u>SolarWorld I</u>, __ CIT at __, 28 F. Supp. 3d at 1339 (citing <u>Daewoo Elecs. Co. v. United States</u>, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (explaining that substantial evidence may include "reasonable inferences from the record")), and in the absence of actual evidence to the contrary, SolarWorld's speculation regarding possible contrary interpretations of the existing record evidence does not impugn the reasonableness of Commerce's conclusion.

[60] <u>Remand Results</u>, ECF Nos. 97-1 & 98-1, at 13.